IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

JENNIFER BERRY,                          )
                                         )
                                         )
                    Plaintiff,           )
v.                                       )        Civil Action No. _5:21-cv-00001___
                                         )
TOWN OF FRONT ROYAL, VIRGINIA,           )
                                         )
                    Defendant.           )

## COMPLAINT
### (Jury Trial Demanded)

Plaintiff Jennifer Berry ("Plaintiff" or "Berry"), by counsel, as her Complaint against Defendant Town of Front Royal, Virginia ("Defendant" or the "Town") states as follows:

### Introduction

1.  This is an action for legal and equitable relief to correct and remedy Plaintiff's employer's unlawful, discriminatory and retaliatory employment practices during the course of and in the termination of Plaintiff's employment, and to make Plaintiff whole and compensate her for her employer's violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended ("Title VII") and/or the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, *et seq*. (the "FMLA").

### Jurisdiction and Venue

2.  Jurisdiction is founded in this case upon 28 U.S.C. §§ 1331, 1343, 29 U.S.C. § 2617, and 42 U.S.C. § 2000e-5.  The demand for declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

1

3.    Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to this action occurred, and Plaintiff's personnel records are maintained by the Town, in this District and Division.

## Parties

4.    Plaintiff is a resident of Front Royal, Virginia.  Plaintiff is a female, 44 years of age. At all times relevant to the matters alleged in this Complaint, Plaintiff was an employee of Defendant Town.  Plaintiff had worked more than twelve months for the Town and had worked for the Town at least 1250 hours over the twelve months preceding her leave described herein. Plaintiff was an eligible employee under the FMLA.

5.    Defendant Town is a municipal corporation incorporated by charter pursuant to the laws of the Commonwealth of Virginia under the authority of Title 15.2 of the Virginia Code. Defendant Town may be sued in its own capacity.  Defendant Town is a public agency within the meaning of 29 U.S.C. § 2611(4)(A)(iii) and 29 U.S.C. § 203(x) and is an employer within the meaning and subject to the requirements of the FMLA.

6.    At all times relevant to the matters alleged herein, Defendant maintained offices and transacted business in Front Royal, Virginia with a principal place of business located at the Front Royal Town Hall, 102 East Main Street, Front Royal, Virginia, which is within the Harrisonburg Division of this District.  At all times relevant to the matters alleged herein, Defendant employed more than 100 employees within the Town of Front Royal.

7.    From or about the year 1998 until approximately 2003, and again from 2005 through February 4, 2020, Plaintiff was employed by Defendant Town.   At all relevant times, Defendant was an "employer" and Plaintiff was an "employee" within the meaning of, and subject to, Title VII of the Civil Rights Act of 1964, as amended.

8.   At all times relevant to the matters alleged herein, Defendant's agents and employees were acting during the course and within the scope of their employment or agency and with the knowledge and consent of the Defendant.

### Administrative Prerequisites as to Title VII Claims

9.   On April 1, 2020, the Equal Employment Opportunity Commission (EEOC) (and, pursuant to a work sharing agreement, the Office of the Attorney General's Division of Human Rights) received from Plaintiff, and Plaintiff filed, a timely charge of discrimination against Defendant Town. Because of the COVID-19 pandemic, the EEOC did not mark the filing in its system until April 8, 2020.  Plaintiff's charge of discrimination is attached hereto, marked as Exhibit 1 and incorporated herein by this reference.

10.   Thereafter, on October 7, 2020, the EEOC issued and subsequently mailed to Plaintiff a Notice of Right to Sue (Issued on Request) with respect to the Charge of Discrimination, advising Plaintiff that she had 90 days from the date of her receipt of the Notice within which to institute her suit under Title VII.  Plaintiff received the Notice on or after October 7, 2020, and has instituted this action timely, within 90 days of the date of the receipt of that Notice of Right to Sue.

11.   All administrative conditions precedent to the filing of the Title VII claims in this lawsuit have been performed or have occurred.

### Facts

12.   Plaintiff began working full time for Defendant in 1998 as the administrative assistant for Public Works.  She held that position for almost five years when she took time off for the birth of her child in 2003.  In or around September 2005, the Town hired Plaintiff to be the Clerk to the Town of Front Royal's Council.

13.     Plaintiff performed her job well and met all legitimate expectations of the Town.  For example, in the job performance evaluation of Plaintiff dated in July 2019, Defendant Town described Plaintiff in the Overall Performance Review comments as:

> Exceptional employee, valuable team member, goes above & beyond, Glue in organization, pleasant & kind, on time with duties, excellent job.  Pleasant employee to Work with her knowledge, experience and willingness to assist.

14.     In the fall of 2016, William Sealock was elected to the Front Royal Town Council. He began his term as a member of the Town Council in January 2017.

15.     Within a matter of days after assuming his position as a Council member, Mr. Sealock began subjecting Plaintiff to sexually harassing and discriminatory conduct.

16.     To perform portions of the duties of her job as Clerk to the Town Council, Plaintiff typically was in the conference room before Council meetings in order to set up the room for the meeting and work on the computer.  Mr. Sealock would arrive early for the meetings before the other Council members.  He began touching Plaintiff, including rubbing her shoulders and down her arms.  Plaintiff repeatedly protested this unwelcome conduct.  When Plaintiff would try to get up from her seat at the table, he physically stopped her from rising from her chair on a couple of occasions.

17.     Plaintiff made it clear that his conduct was unwelcome, that it crossed the line, and that it made her uncomfortable.  Mr. Sealock's conduct directed towards Plaintiff constituted sexual harassment under Defendant Town's supposed "zero tolerance" policy towards such conduct.

18.     Despite Plaintiff's complaints, Mr. Sealock continued his conduct or attempts to touch Plaintiff.  Mr. Sealock caused Plaintiff to change how she handled her work in order to avoid the unwelcome touching.  She began working in her office area until right before meetings to avoid

being subject to his harassing conduct.  Mr. Sealock in turn acted annoyed at Plaintiff for not being in the room prior to the Council meetings.

19.    On one occasion, Mr. Sealock tried to hug Plaintiff when he came into the Council chambers.  Plaintiff avoided his grasp and remarked that he did not greet the male Town manager or Town attorney in that manner.  He acted annoyed at her comment.

20.    On that same day, Plaintiff knelt down to get a drink from the refrigerator.  Mr. Sealock approached her from behind and took both of his hands and pushed her down quickly and with a great deal of force, toppling Plaintiff to the side and exerting his physical dominance over Plaintiff.  The force of the push hurt Plaintiff's knees, back and wrists. The Town's human resources director, Julie Bush, was present when this assault occurred.

21.    Plaintiff complained about Mr. Sealock's unwanted attention and touchings, and thought that something would be done to get him to stop his conduct.  When Plaintiff complained about the pushing incident the next day, Ms. Bush said that she had not seen it and that in any event she could not really do anything because she reported to the Town Manager, not Council.

22.    True to her word, Ms. Bush did nothing to stop Mr. Sealock's harassment of Plaintiff.

23.    Incidents of harassment directed at Plaintiff continued unabated into 2018 and 2019. At her 2018 evaluation, which overall was good with regard to her performance, Mr. Sealock was present and told Plaintiff that she needed to act as the second receptionist and thus be at her desk at all times.  That was not Plaintiff's job and Mr. Sealock alone was not Plaintiff's employer.

24.    Plaintiff asked whether Mr. Sealock spoke with or required the same of the males in the office.  Mr. Sealock responded by asking whether she was calling him sexist, and Mayor Tharpe, who was also present, spoke up indicating that Mr. Sealock did not want the answer to

that question. Mayor Tharpe's statement acknowledged that it was well-known that Mr. Sealock was a misogynist.

25.     Plaintiff made it clear to the Town that Mr. Sealock directed inappropriate comments to her, and that he had also touched her inappropriately.

26.     Even after this meeting, Mr. Sealock continued to make inappropriate, sexually based comments, including on one occasion stating when he saw Plaintiff: "Whoa! The shoes, the dress, the legs" and pointing to Plaintiff's body parts and then making an hourglass shaped motion with his hands.  He made continuing and repeated comments in the presence of Plaintiff about how women dress to draw attention to their bodies and how men react to how women dress.

27.     Plaintiff repeatedly told Mr. Sealock that he was way out of line and asked him to stop his offending behavior.

28.     In April 2019, Mayor Tharpe was indicted for solicitation of prostitution. That indictment caused much turmoil in the Town's offices. Plaintiff was contacted by the Town Attorney, Town Manager, and Mr. Sealock.  Mr. Sealock told Plaintiff that it would be best if Mayor Tharpe did not attend the April 15, 2019 Town Council meeting.  Mr. Sealock then said that the Mayor would take the information better from Plaintiff because she was a woman.

29.     Plaintiff made the call to Mayor Tharpe as instructed.  Mayor Tharpe resigned the following week.

30.     Throughout the time leading up to Mayor Tharpe's resignation, and the weeks following, there were numerous sexually inappropriate comments directed towards Plaintiff. During that time, Mr. Sealock became Acting Mayor.  He inquired of Plaintiff on at least three occasions in the spring of 2019 while in the capacity of Acting Mayor as to whether she knew the

going rate of a "blow job" and then whether Plaintiff had found out the going rate for a "blow job." Plaintiff objected on each occasion to these humiliating and demeaning sexual inquiries.

31.     In a closed session of the Town Council, Plaintiff had objected to sexually inappropriate memes of Mayor Tharpe which Plaintiff's teenage daughter had seen online.

32.     On May 13, 2019, Acting Mayor Sealock came to Plaintiff's office and communicated threats to her over her job for having registered those complaints.  His threat was in the context of discussing an upcoming evaluation of Plaintiff's performance.  Mr. Sealock told Plaintiff that an evaluation of her performance was pointless because she would no longer have a job if Mayor Tharpe were re-elected following his criminal case.  Plaintiff understood this was because of her complaints of harassment and her involvement in advising Mayor Tharpe, as directed by Mr. Sealock, not to appear at the April 15, 2019 Town Council meeting.

33.     Plaintiff objected to Mr. Sealock's statements that had nothing to do with Plaintiff's performance.

34.     Plaintiff made it clear that she considered Mr. Sealock's conduct to be sexist and harassing.

35.     Despite the harassment to which she had been subjected, Plaintiff performed her job well, and her July 2019 evaluation confirmed that fact.

36.     On August 15, 2019, Plaintiff was approached by Mr. Sealock at her office door. He pounded his fist on the counter and declared to Plaintiff that she needed to take basic computer classes on how to use the internet.  He said this was due to "recent events," but he did not tell Plaintiff what "recent events" meant.  Plaintiff reminded him that she had worked for the Town for more than 20 years, and that she was well acquainted with the use of the internet and handled

on-line responses with citizens already.  Mr. Sealock acted annoyed with the response to his demeaning comments.

37.     That same day, Plaintiff spoke with Chris Holloway, another Council member, and complained about Mr. Sealock's demeaning conduct.  Mr. Holloway was aware of other complaints Plaintiff had made to the Town about Mr. Sealock's harassing conduct.

38.     Mr. Holloway instructed Plaintiff to document what had happened and to email that to him as soon as possible.

39.     Mr. Holloway then advised Plaintiff that the Town Council had intended on approaching Plaintiff about taking over more public information and social media duties as an additional part of her job, and that the Town intended on sending her to classes to learn about opportunities for the Town in those areas.

40.     Mr. Holloway expressed that he was upset over Mr. Sealock's apparent take on what Mr. Holloway described as a promotion for the Plaintiff.  He then said "I've had enough of this bullshit" referring to Mr. Sealock's conduct.

41.     Plaintiff understood that Mr. Holloway was going to help address her complaints and finally stop Mr. Sealock's harassing and abusive conduct which had created a hostile work environment for Plaintiff.  Her understanding proved incorrect.  Plaintiff documented instances of harassment by Mr. Sealock and sent them to Mr. Holloway.

42.     The next day, however, Mr. Holloway asked Plaintiff to take a walk with him and "talk about everything."  Mr. Holloway was aware of Mr. Sealock's harassing and sexist conduct towards Plaintiff.  Plaintiff thus assumed he was going to ask how he could help Plaintiff remedy the situation with Mr. Sealock.

43.     Mr. Holloway ushered Plaintiff out of the back door of Town Hall.  This was in plain view of other Town employees.  A meeting with an employee outside was an uncommon occurrence, so Plaintiff leaving with Mr. Holloway was notable to any employee in the area.  When they were outside, Mr. Holloway said the following, or words very close to the following, communicating this information relating to Plaintiff's complaints of harassment by Mr. Sealock:

> How do we make this all go away? We have to make this go away. You gotta take back what you said.  This is going to affect everything. This will affect the ordinances.  This will affect the election coming up. This will mess up everything. Bill (Sealock) is gonna have to resign. Matt (Tederick) took this to Julie (human resources). All Council knows about it now. This will affect your job, your kids, everything, Jennifer.

44.     Mr. Holloway also said that the situation with Mr. Sealock would come out in the papers and her children would know about it.

45.     Plaintiff told Mr. Holloway that this was about Mr. Sealock's conduct, not hers. She wanted his offending conduct to cease.  Mr. Holloway told Plaintiff that the Council would not stand for this, referring to her complaints.  He said that it may cost Plaintiff her job in the process.  Plaintiff made it clear to Mr. Holloway that she would not lie by retracting her complaints.

46.     That same day, August 16, 2019, Plaintiff met with Julie Bush and outlined some of her complaints about Mr. Sealock, including his sexual harassment of her and his retaliatory conduct.  Ms. Bush assured Plaintiff that she would hear back from Ms. Bush within two weeks after an investigation of her complaints.

47.     Plaintiff was told by the Town Attorney, Doug Napier, that she could not file a grievance regarding her complaints under the Town's grievance policy.  He advised her that one course of action was to hire her own attorney and file a charge with the Equal Employment Opportunity Commission.  Plaintiff made clear to him that she wanted the harassment to stop.

48.     Plaintiff heard nothing from Ms. Bush or the Town about her complaints until November 15, 2019 after the Town had engaged in numerous acts of retaliation against her and Plaintiff had repeatedly sought the status of the investigation and help with remedying and addressing Mr. Sealock's and Mr. Holloway's continuing harassing and retaliatory conduct.

49.     Over the weeks following Plaintiff's August 15, 2019 complaints to Mr. Holloway, and the August 16, 2019 complaints to Ms. Bush about sexual harassment, discrimination and retaliation, Plaintiff was subjected to a barrage of retaliatory conduct.

50.     Mr. Holloway engaged in on-going retaliation, hyperscrutiny, and bursts of anger directed at Plaintiff after she let Council know in August 2019 about threats to her job when Mr. Holloway took his "walk" with her behind Town Hall.  It was well known by Council that Mr. Holloway was the Council member who had made the threats to Plaintiff.

51.     Mr. Holloway made false statements about Plaintiff, contending that she had refused to perform her assigned duties.

52.     To deflect blame for Mr. Holloway's conduct, in October 2019, then Acting Mayor Matt Tederick told Plaintiff that Mr. Holloway was stressed because of the upcoming tap fee ordinance vote and that Mr. Holloway had been nervous about the incident behind Town Hall with Plaintiff, which caused him to react "oddly" towards Plaintiff.

53.     Mr. Tederick then questioned whether Plaintiff's perception of what had happened to her behind Town Hall was skewed even though Mr. Tederick had not been present during the exchange between Plaintiff and Mr. Holloway.  Plaintiff told Mr. Tederick that her recollection was very clear about the threats Mr. Holloway made to her job and family, and that those threats were because she had stood up for herself and had complained about Mr. Sealock's harassing and

retaliatory conduct. She further let Mr. Tederick know that she had been retaliated against continually since reporting Mr. Sealock and Mr. Holloway.

54. Following her complaints about Mr. Sealock and Mr. Holloway, Plaintiff was told that she had to leave Council chambers for closed sessions. Not only was she required to leave the room, she was required to leave the entire building, while male staff members were allowed to remain.

55. On one occasion, Plaintiff was required to leave the building and was instructed in front of other staff to search for and locate a janitor to lock the building after the meeting, rather than trusting Plaintiff to lock the building herself, which previously had been one of her responsibilities.

56. The Town also removed Plaintiff's ability to work from home on Tuesdays, which had been part of her schedule for years. Additionally, her hours of work were changed back and forth without notice even though the Town was aware that these changes disrupted scheduling Plaintiff's child's transportation to and from school. Mr. Tederick also questioned Plaintiff's proper use of her available leave which included leave for surgery at the end of August 2019.

57. Defendant Town required Plaintiff to put a sign on her office door whenever she was not in the office. This was a new requirement instituted only after Plaintiff's formal complaints in August 2019. She had never been required to do this in the past. Plaintiff asked that this same rule be applied to the male staff as well, but the male staff members were not subjected to this requirement.

58. After Plaintiff's formal complaint of harassment and retaliation in August 2019, Plaintiff was treated differently by Council in day-to-day encounters. Plaintiff was essentially shunned and ostracized, which differed from treatment she had received over the years.

59.     On October 21, 2019, Plaintiff was required to move from her regular seat at the Council conference table as Clerk for 15 years to a chair located behind Mr. Sealock, the man Council knew had been harassing her.

60.     Being sent to the back of the room was degrading, insulting and demeaning to Plaintiff, especially when the male staff members remained seated at the conference table with Council.

61.     Defendant Town, through its Council, was aware that its meetings were covered by local print and on-line media, and that a picture of the Plaintiff likely would make it into print. This in fact did occur.  Defendant Town was making a public show of putting Plaintiff in her place and away from Council after she had complained.

62.     In or around November 2019, Defendant Town promoted a male employee to assume the new public information position that previously had been designated for Plaintiff and which Mr. Holloway had described to her on August 15, 2019 as a promotion adding an increased social media presence to Plaintiff's job duties.  The promotion included a raise in pay.

63.     Not placing Plaintiff in that position and placing the male into the position was both discriminatory and retaliatory.

64.     From August 15, 2019 through November 15, 2019, Defendant Town failed to advise Plaintiff of the status of its investigation of her complaints of harassment and retaliation despite her repeated inquiries to Ms. Bush which went unanswered.  During this time, Mr. Sealock met on numerous occasions with Ms. Bush, a fact readily observable by Plaintiff because he had to pass by Plaintiff's work-station on the way to Ms. Bush's office.

65.     Plaintiff also contacted Council Member Letasha Thompson on a number of occasions for assistance. Ms. Thompson acted as if she would try to address Plaintiff's concerns,

including her complaints about the on-going retaliatory hostile work environment Plaintiff described.  Ultimately, whatever Ms. Thompson was doing regarding Plaintiff's complaints, if anything, came to naught.

66.     On November 15, 2019, Ms. Bush sent a document to Plaintiff entitled "Investigation Summary Report-Jennifer Berry, Clerk of Council."  That "report" failed to address the many issues raised by Plaintiff in her complaint, was wholly incomplete, was dismissive of Plaintiff's complaints (to the extent they were investigated at all) and was indicative of a sham investigation.  Moreover, the so-called "report" reflects that the most recent interview conducted by the Town had been conducted on September 6, 2019, but the "report" document was not provided to Plaintiff until two months after that latest interview and two and one-half months after Plaintiff had been told the investigation would be concluded.  This delay allowed Defendant Town to implement its retaliatory hostile work environment against Plaintiff.

67.     On December 10, 2019, Plaintiff went on medical leave for planned surgery on her foot of which Council was aware and for which she had been granted leave.  Plaintiff's leave was FMLA qualifying.  During the approved leave period, Plaintiff worked from home on a part-time basis with the knowledge of the Defendant Town, using 80 hours of FMLA leave time through January 7, 2020.

68.     Upon Plaintiff's return from leave, the Town Council continued to shun and isolate her.

69.     On January 30, 2020, Plaintiff was contacted by email and text and told that her job was subject to "right sizing," that her Clerk position was to be abolished and that the Clerk position was to be a part-time position.  She further was told that her employment with the Defendant Town would be terminated effective February 4, 2020.  The result was that a 20-year employee of the

Town had gone from being the employee slated to receive a promotion and raise in the summer of 2019 to an employee being terminated despite the fact that her Clerk position was required by the Town's charter to be filled by the Town.

70.     Moreover, Plaintiff previously had been employed as Clerk to the Council on a part-time basis.  She became a Certified as a Clerk and her position had been moved to full time. Plaintiff could have continued her employment in a part-time capacity without additional cost to Defendant Town and without losing her benefits.  Defendant Town did not allow Plaintiff to remain employed with the Town in the position in which she had performed well.

71.     Defendant Town's termination of Plaintiff's employment, however, was not about saving money.  It was pretext for Defendant's discrimination against Plaintiff based on her sex and/or for its retaliation for Plaintiff's opposition to Defendant Town's conduct that violated Title VII.

72.     Defendant Town did not arrive at its decision to make the Clerk position part-time and terminate Plaintiff's employment until Defendant Town's retaliatory conduct in the late summer and fall of 2019 failed to produce the desired result of Plaintiff voluntarily leaving her employment.

73.     Plaintiff has suffered severe emotional distress, humiliation, embarrassment, injury to her reputation, and anxiety due to Defendant Town's actions.

## CLAIMS FOR RELIEF

### COUNT ONE
### Discrimination on the Basis of Sex in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*

74.     Plaintiff incorporates and relies upon the averments stated in paragraphs 1 - 73 of the Complaint as if the same were fully restated here.

14

75.     Plaintiff was an "employee" within the meaning of Title VII, 42 U.S.C. § 2000e(f) at all times relevant to the matters alleged herein.

76.     Defendant was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b) at all times relevant to the matters alleged herein.

77.     Defendant discriminated against Plaintiff because of her sex with respect to the terms, conditions, and privileges of her employment in violation of Title VII, including by creating and perpetuating a sexually hostile work environment, subjecting her to unlawful and discriminatory conditions of employment, including sexual harassment, and terminating her employment.

78.     During Plaintiff's employment, Defendant discriminated against Plaintiff because of sex by allowing Mr. Sealock to make discriminatory remarks about, and toward, Plaintiff, and allowing him to engage in unwelcome touching based on sex.

79.     During Plaintiff's employment, Defendant discriminated against Plaintiff because of sex by allowing Mr. Sealock, a male employee, to verbally and physically abuse her with no consequence.

80.     The conduct to which Plaintiff was subjected was severe or pervasive.

81.     During Plaintiff's employment, Defendant discriminated against Plaintiff because of sex by dismissing Plaintiff's complaints about Mr. Sealock's abusive and harassing conduct and failing to take prompt and effective, or any, remedial action.   Defendant Town further discriminated against Plaintiff when it rescinded its decision to provide Plaintiff with a promotion and expanded job duties with significantly increased pay and gave the job to a male employee.

82.     Defendant terminated Plaintiff's employment for pretextual reasons.   Defendant Town also provided the EEOC with false information about Plaintiff's Charge, including as an

15

example and without limitation, that Mr. Tederick had witnessed, and minimized, the incident in which Mr. Sealock had pushed Plaintiff down in front of the refrigerator.  The Town's attribution of this state of affairs was false.  Mr. Tederick was not present, and in fact was not even employed by the Town, when that incident of harassment occurred.

83.     Defendant's conduct was disparate, intentional, deliberate, and willful.

84.     As a result of Defendant's discrimination, Plaintiff has suffered emotional and economic harm.

85.     By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 2000e, *et seq.,* including, but not limited to, declaratory and injunctive relief, back pay, front pay, compensatory damages, placement into a position she would be holding but for Defendant's discriminatory conduct, and any other legal or equitable relief as the Court deems appropriate.

## COUNT TWO
### Unlawful Retaliation in Violation of Title VII - 42 U.S.C. § 2000e, et seq.

86.     Plaintiff incorporates and relies upon the averments stated in paragraphs 1-85 of the Complaint as if same were fully restated here.

87.     Defendant engaged in a course of conduct designed to retaliate and which did retaliate against Plaintiff for her opposition to sex discrimination and retaliation and to challenge and oppose conduct in violation of Title VII of the Civil Rights Act of 1964, as amended.

88.     Defendant's actions in relation to Plaintiff's employment as alleged herein following her reporting of, and opposition to, Defendant Town's conduct, including the conduct by Mr. Sealock and Mr. Holloway, have been materially adverse to Plaintiff and would be materially adverse to a reasonable person in Plaintiff's situation.

89.     Defendant retaliated against Plaintiff after she reported and opposed discrimination based on sex and sexual harassment in at least the following respects:

a.      Defendant failed to correct and remedy the sexually harassing conduct by Mr. Sealock, and delayed in taking any action against him or in the action of Mr. Holloway;

b.      Defendant Town threatened Plaintiff with the loss of her job on several occasions, including the threat from Mr. Holloway if Plaintiff did not rescind her complaint against Mr. Sealock, and then the Town made good on those threats;

c.      Defendant Town delayed in addressing the August 15, and August 16, 2019 complaints by Plaintiff, while engaging in ostracization of Plaintiff, including requiring Plaintiff to be segregated from her regular seat at Council's conference table;

d.      Defendant Town excluded Plaintiff from closed sessions she had attended throughout her more than 15 years as Clerk of the Council, and demeaned her in front of male staff;

e.      Defendant Town rescinded the promotion it had planned to give Plaintiff in the third quarter of 2019, instead giving that promotion, raise, and additional duties to a male employee;

f.      Defendant Town engaged in a delayed, dysfunctional and sham investigation which failed to cover the areas about which Plaintiff had complained, and resulted in recommendations for sexual harassment training, and "professionalism" training not just for the Council or Mr. Sealock, but for Plaintiff as well, none of which was ever implemented;

g.      Defendant Town orchestrated a pretextual plan to cover up its discrimination and retaliation against Plaintiff, made false statements about Plaintiff's

performance, failed to place her in the "part-time" Clerk position, and terminated her employment; and

        h.     Failed to restore Plaintiff to the full-time Clerk position upon her return from FMLA-qualifying leave in January 2020.

90.     Defendant's conduct was disparate, intentional, deliberate, willful, and conducted in callous and/or reckless disregard of Plaintiff's civil rights.

91.     As a consequence of Defendant Town's retaliatory conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer loss of employment and wages and benefits, great emotional distress, anxiety, stress, embarrassment, humiliation, pain, suffering, damage to reputation, and loss of enjoyment of life.

92.     By reason of Defendant's retaliatory conduct, Plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 2000e, *et seq.,* including, but not limited to, declaratory and injunctive relief, compensatory damages, recovery for lost wages and benefits and other financial incidents of her employment, reinstatement into a position she would be holding but for Defendant's retaliatory conduct or in the event Plaintiff is not able to return to work or her position has been filled, which is the case at this point, for front pay and benefits, and any other legal or equitable relief as the Court deems appropriate.

**COUNT THREE**
**Retaliatory Hostile Work Environment in Violation of Title VII - 42 U.S.C. § 2000e, et seq.**

93.     Plaintiff incorporates and relies upon the averments stated in paragraphs 1-92 of the Complaint as if same were fully restated here.

94.     Defendant retaliated against Plaintiff with respect to the terms and conditions of her employment in violation of Title VII by creating and perpetuating a retaliatory hostile work environment, subjecting her to unlawful, discriminatory and retaliatory conduct and threats of job loss if she did not withdraw her complaints of discrimination and harassment, creating false assertions of performance deficiencies which subjected Plaintiff to a greater likelihood of termination, implementing a dysfunctional, delayed, and sham investigation of Plaintiff's complaints, failing to stop the retaliatory hostile work environment, and ultimately terminating her from her employment.

95.     Defendant's actions in relation to Plaintiff's employment as alleged herein including the maintenance of a retaliatory hostile work environment following her reporting of, and opposition to, sex discrimination and retaliation, have been materially adverse to Plaintiff and would be materially adverse to a reasonable person in Plaintiff's situation.

96.     Defendant's conduct was objectively severe or pervasive, and it was unwelcome to Plaintiff who made her objection to such conduct known to Defendant to no avail.

97.     Defendant's conduct was disparate, intentional, deliberate, and willful.

98.     As a consequence of Defendant's retaliatory conduct, Plaintiff has suffered, continues to suffer, and will in the future suffer loss of employment and wages and benefits, great emotional distress, anxiety, stress, embarrassment, humiliation, pain, suffering, damage to reputation, and loss of enjoyment of life.

99.     By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available under 42 U.S.C. § 2000e, *et seq.,* including, but not limited to, declaratory and injunctive relief, back pay, compensatory damages, placement into a position she

would be holding but for Defendant's retaliatory conduct if available, and front pay if not, and any other legal or equitable relief as the Court deems appropriate.

## COUNT FOUR
### (Violations of the FMLA)

100.     Plaintiff incorporates by reference and realleges Paragraphs 1-99 as if fully set forth here.

101.     Plaintiff's health condition for which she required surgery constitutes a serious health condition within the meaning of the FMLA, and/or its implementing regulations, of which Defendant was well aware and for which FMLA leave was approved for Plaintiff in December 2019 and early 2020.

102.     Plaintiff's chronic serious health condition and all of her related need for absences or periods of absence during the times relevant to this action were protected under the FMLA.

103.     Plaintiff had not exhausted her FMLA leave entitlement as of any time pertinent to the matters alleged herein.

104.     Plaintiff was entitled to and took leave to which she was entitled under the FMLA as a result of her serious health condition.

105.     Defendant Town was aware that Plaintiff continued working on a part-time basis during her FMLA leave.  It communicated with her and required her to respond to emails related to her work.

106.     Defendant Town had not decided to change Plaintiff's position to part-time and remove Plaintiff from the Town Clerk position until after Plaintiff already had gone on and taken approved FMLA leave for surgery.

107.     Defendant Town failed to restore Plaintiff to an equivalent position to which she was entitled upon her return to work in January 2020 following her FMLA qualifying leave and

terminated her employment several weeks after her return.  Alternatively,  Defendant Town used Plaintiff's required leave, which was FMLA-qualifying, and Plaintiff's possible future need for leave in relation to her serious health conditions, as negative factors in employment decisions relating to her, including in the decisions to change her position to part-time and to remove her from the position altogether.

108.   Defendant Town commented negatively on Plaintiff's use of medical leave, including in October 2019 when the Acting Mayor referred to her taking leave.  One of those instances was another surgery at the end of August 2019 of which the Town was fully aware.

109.   Defendant Town interfered with Plaintiff's rights under the FMLA, retaliated, and discriminated against Plaintiff for using FMLA qualifying leave or needing to use such leave in the future, and wrongfully discharged Plaintiff from her employment with Defendant in violation of 29 U.S.C. §§ 2615(a)(1) and (a)(2), and/or 29 U.S.C. §§ 2615(b).

110.   Defendant Town's conduct interfered with, restrained, and/or denied the exercise of or attempt to exercise Plaintiff's rights under the FMLA.

111.   Defendant's conduct also was in retaliation for Plaintiff's use of, and need to use in future, FMLA qualifying leave.

112.   Defendant's conduct complained of herein was willful and without legal justification.

113.   As a direct and proximate result of the acts and practices of Defendant, and its agents and employees set forth herein, Plaintiff has suffered and continues to suffer injury and damage, including loss of employment and past and future loss and denial of income, including wages, healthcare benefits, and other employment benefits denied or lost, together with her costs of this action, including attorneys' fees and costs of expert witnesses.

**WHEREFORE**, Plaintiff Jennifer Berry demands judgment against Defendant Town of Front Royal, Virginia, as follows:

A.  For appropriate declaratory relief declaring the acts and practices of Defendant Town of Front Royal, Virginia are in violation of Plaintiff's rights secured by 42 U.S.C. § 2000e, *et seq*. and/or 29 U.S.C. §2601, *et seq.;*

B.  Awarding Plaintiff back pay, appropriate recovery for lost employment benefits and other affirmative relief as may be appropriate, and for all other wages and benefits denied or lost under 42 U.S.C. § 2000e, *et seq*. and/or 29 U.S.C. §2601, *et seq.*;

C.  For compensatory damages against Defendant Town for violations of 42 U.S.C. § 2000e, *et seq.,* in an amount to be determined by a jury at trial;

D.  For appropriate relief against Defendant Town for the above referenced violations as allowed by 42 U.S.C. § 2000e, *et seq*. and/or 29 U.S.C. §2601, *et seq.,* including equitable relief consisting of reinstatement (or in the alternative for front pay), expungement of any adverse matters from Plaintiff's personnel record, the enjoining and permanent restraining of these violations, and direction to the Defendant Town and its management to take such affirmative steps as are necessary to ensure that the effects of the unlawful practices are eliminated and do not continue to affect the Plaintiff's future employment or employment opportunities;

E.  For liquidated damages under the FMLA;

F.  For an award to Plaintiff of a sufficient amount to offset the adverse tax consequences resulting from receipt of wage and benefit damages and any portion of damages received in a lump sum as opposed to over the time she would have

earned such wages and benefit equivalents but for the unlawful discrimination and/or retaliation;

G.     For an award of Plaintiff's reasonable attorney fees, expert witness fees, and costs expended;

H.     For an award of prejudgment and post-judgment interest on all sums awarded; and

I.     For such other and further relief this Court deems to be just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY pursuant to Rule 38 of the Federal Rules of Civil Procedure.**

Respectfully submitted,

JENNIFER BERRY

By: _s/Timothy E. Cupp_
Counsel

Timothy E. Cupp (VSB #23017)
Shelley Cupp Schulte, P.C.
1951 Evelyn Byrd Avenue, Suite D
Post Office Box 589
Harrisonburg, Virginia 22801
Telephone:  (540) 432-9988
Facsimile:   (804) 278-9634
cupp@scs-work.com

Tim Schulte (VSB #41881)
Shelley Cupp Schulte, P.C.
3 W. Cary Street
Richmond, Virginia  23220
Telephone: (804) 644-9700
Facsimile:  (804) 278-9634
schulte@scs-work.com

Counsel for Plaintiff