**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

| | | |
|---|---|---|
| JENNIFER BERRY, | ) | |
|     Plaintiff, | ) | |
| | ) | Case No.: 5:21cv00001 |
| v. | ) | |
| | ) | |
| TOWN OF FRONT ROYAL, VIRGINIA, | ) | |
|     Defendant. | ) | |

**<u>DEFENDANT'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT</u>**

COMES NOW defendant, Town of Front Royal, Virginia (sometimes hereinafter "the Town"), by counsel, and for its Memorandum of Law in Support of Motion for Summary Judgment filed pursuant to Fed. R. Civ. P. 56(a) states, as follows:

## I.    STATEMENT OF PROCEEDINGS

Jennifer Berry ("Berry"), former Clerk to Town Council, Town of Front Royal, Virginia, was terminated from employment on February 4, 2020. She was advised that the termination was the result of rightsizing of government. Berry takes issue with her termination and the stated reason therefor. Accordingly, on January 4, 2021, Berry filed a four-count Complaint against the Town, asserting discrimination on the basis of sex in violation of Title VII (Count I); unlawful retaliation in violation of Title VII (Count II); Retaliatory Hostile Work Environment in Violation of Title VII (Count III); and Violation of the FMLA (Count IV). The Town filed responsive pleadings, and the parties engaged in extensive discovery. Discovery has now closed, and the case is set for trial beginning May 31, 2022. The Town submits that, based on the evidence which has been developed, there are no genuine issues of material fact in dispute, and it is clear that a reasonable jury could not return a verdict for Berry on any of the counts asserted. Accordingly, the Town submits that summary judgment in its favor is warranted.

1

## II.    LISTED STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  Virginia Code § 24.2-222 provides how persons may become members of a Town Council and/or mayor of a city or town. It states, in relevant part, "[t]he qualified voters of each city and town shall elect a mayor, if so provided by charter, and a council for the terms provided by charter.

2.  In accordance with Virginia law, the Town has a Charter which provides that the qualified voters of Front Royal elect the mayor and Town Council members. Ex. 1, Chapter I, §§ 4, 6.

3.  The Town Charter provides that "[t]he town manager, town treasurer and town clerk shall be appointed by the council as is hereinafter provided." *Id.*, Chapter I, § 4. These employees are exclusively under Council's control. Tewalt Dep. pp. 26, 100, 113-115. Town Council has the authority to set schedules for these employees and to change their positions from full to part-time. Tewalt Dep. pp. 26-27.

4.  Chapter III, § 12 of the Town Charter provides, "[t]he council shall appoint a clerk to serve ***at the will of the council***, …." (emphasis added). *Id.*

5.  Chapter IV § 14 of the Town Charter, *id.*, provides, in relevant part:

> The council shall appoint a town manager who shall be the chief administrative officer of the town ….The town manager shall be appointed for a term acceptable to the town council and the town manager. He shall be removable by the town council for cause….The action of the council in suspending or removing the town manager shall be final, it being the intention of this charter to vest all authority and fix all responsibility for such suspension or removal in the council….

6.  Virginia Code § 24.2-233 provides the sole means by which an elected or appointed mayor or Town Council member may be removed from office.

7.  William A. Sealock ("Sealock") was elected as a Town Council member by the registered voters of the Town of Front Royal, effective January 1, 2017. Ex. 2.

8.  Chris W. Holloway ("Holloway") was elected as a Town Council member by the registered voters of the Town of Front Royal, effective January 1, 2019. Ex. 3.

9.  Hollis Tharpe ("Tharpe") was elected mayor in 2016. Tharpe Dep. pp. 11-12. On April 15, 2019, Tharpe placed himself on administrative leave. *Id.*, pp. 33-34; Ex. 4. He never served on Town Council thereafter. Tharpe Dep., pp. 33-34.

10. Upon Tharpe's resignation, Matthew A. Tederick ("Tederick") was appointed by Town Council as interim mayor on a part-time basis, effective June 3, 2019 through December 31, 2019. Town Dep., pp. 13-14, 22; Ex. 5. On November 1, 2019, Town Council appointed Tederick as Town Manager for the Town, effective November 9, 2019 and continuing through July 1, 2020. Exs. 6 and 7. As Town Manager, Tederick reported to Town Council. Ex. 7.

11. The Town of Front Royal maintains an Employee Handbook ("the Handbook"), last updated and adopted on March 11, 2013. Ex. 8. The Handbook expressly states:

> All employees of the Town of Front Royal, those persons who work for the Town in return for financial compensation, ***except elected officials*** and independent contractors, are governed by this common set of employment policies.

*Id.* at p. 1, paragraph I(C) (emphasis added). The handbook dated March 11, 2013 is still in effect. Gillispie Dep., p. 78.

12. Berry was hired as part-time clerk to Town Council on August 24, 2005. Berry Dep., pp. 64-65; Ex. 9. In that capacity, she attended Council meetings and prepared minutes. Berry Dep., p. 66. Berry became full-time Clerk of Council on July 1, 2017 when Tharpe was mayor. *Id.*, pp. 88-90; Ex. 10. Berry became full-time clerk through an affirmative vote on the Town's budget which included funding the clerk position as full-time. Tewalt Dep., pp. 29-30. A number of council members who voted to accept the proposed budget, including Tewalt, did not notice the line item in the budget which resulted in Berry becoming full-time clerk. *Id.*, pp. 29-31. Berry's job duties did not change when she went full-time. Berry Dep., pp. 92-93; Ex. 11. Berry reported to Council both when she was part-time and full-time clerk. Berry Dep., pp. 66-67, 93-94. Her

3

supervisor was the mayor. *Id.*, pp. 97-98. Her position as full-time clerk was an exempt position. *Id.*, pp. 117-118; Ex. 11. Berry understood that meant that if the Town needed her, she had to show up, even if it caused her to work more than 40 hours. Berry Dep., pp. 118-119.

13. Berry made no complaint regarding Sealock's alleged behavior to HR or any supervisor between January 1, 2017 (when Sealock took office) and February 6, 2017[1]. Berry Dep. pp. 150, 165-166. During that time, Berry contends that Sealock rubbed her shoulders and back two or three times. *Id.*, pp. 151-152. On February 6, 2017, Berry claims that she rebuffed Sealock's attempt to hug her and he then pushed her down in front of a refrigerator as she was bent down to get an item. *Id.*, pp. 152-159 Berry sent an email to Bush asking if she witnessed this, which Bush did not. *Id.*; Ex. 13. Berry filed no formal complaint related to Sealock's alleged behavior on February 6, 2017, nor did she seek criminal charges against Sealock. Berry Dep., p. 162.

14. Berry contends that on June 25, 2018, Sealock looked her up and down and made remarks about her dress, legs and shoes. Berry Dep., pp. 167-174. She did not report this to anyone. *Id.* Berry would later claim that the email attached as Ex. 14 substantiates her claim. *Id.*, pp. 167-176. The complete email exchange between Berry and Sealock on this date is attached as Ex. 15. *Id.*

15. On May 13, 2019, Sealock conveyed to Berry that former Mayor Tharpe had reportedly advised Sealock that Berry's job would be in jeopardy if he was reelected. Berry documented this in a note to herself the same day. Berry Dep., pp. 178-181; Ex. 16. She sent the note to Town Attorney Napier, by email that same day. Berry Dep. pp. 182-184; Ex. 17. Napier offered to pass the email on to HR, but Berry requested that he not do so. Berry Dep., pp. 187-190; Ex. 17. The note does not document any alleged threat by Sealock toward Berry.

---

1 Both the Town and Sealock dispute that Sealock sexually harassed Berry or that Berry was subjected to the many wrongs which she describes. Those factual disputes, however, are not material for purposes of this motion for summary judgment and do not preclude the court granting this motion.

16. According to Berry Sealock referred to her as a receptionist. Berry Dep., pp. 258-259.

17. In the Spring of 2019, around the time Tharpe stepped down as mayor, Sealock conveyed to Berry that while golfing, some men were joking about going to town hall to get a free blow job. Berry Dep., 251-252.[2] Sealock reportedly repeated the comment the following week and then two weeks later. *Id.*, pp. 252-256. Berry did not report any of these alleged comments to the Town when they were made. Berry Dep., pp. 253-255.

18. Berry has been unable to identify dates on which Sealock allegedly touched her in a manner she found unacceptable. Berry Dep., pp. 150-151, 177, 277-278; Ex. 18. She also cannot say how frequently Sealock purportedly made comments she found inappropriate or leered at her. Berry Dep., pp. 328-329; Ex. 18. Other than the comments regarding a blow job and the alleged comments made before the June 25, 2018 Council meeting, Berry has provided no specific recitation of any verbal comments which Sealock made to her. ECF No. 1; Ex. 18.

19. Berry's 2019 Employee Performance Evaluation was prepared and finalized in July of 2019. Town Dep., pp. 60-61, 82; Ex. 28. Berry signed the evaluation on October 9, 2019. Ex. 28.

20. On August 15, 2019, Sealock mentioned to Berry that she should take an internet class. Berry Dep., pp. 247-250. Berry claims the request was demeaning. *Id.* After this, at the request of Holloway, Berry sent an email to Holloway outlining her concerns with Sealock's alleged behavior. Holloway Dep., pp. 78-79, 88-89, 91; Ex. 19. Holloway forwarded the email to Tederick (then acting mayor). Holloway Dep., pp. 79, 89; Ex.19. The reason the email was forwarded to the mayor was because he oversees Council. Holloway Dep., pp. 95-96, 114. Within hours, Tederick forwarded the email to Julie Bush ("Bush"), HR Director for the Town, and directed her to

---

2 The blow job comment followed a meme which Berry shared with Council in closed session which depicted some sexual activity or scene involving the former mayor who had stepped down when indicted on allegations of solicitation of prosecution. Berry failed to preserve the meme and the Town has never seen it.

5

commence an investigation. *Id.*; Town Dep., pp. 96-99, 110-111. Almost immediately, the Town retained outside counsel to assist it with Berry's complaint. Town Dep., pp. 12-13, 110, 147-149, 246. Tederick also promptly advised Berry that if she wanted to file a formal complaint against Sealock, there were time limits and she should consult legal counsel. Ex. 27.

21. Berry contends that on August 16, 2019, the day after Holloway solicited a written complaint as it relates to Sealock, Holloway told Berry that she needed to recant her complaint (Berry would later refer to this as a threat). Berry Dep., pp. 261-263, 266-267. Berry did not relay this to Bush when she met with her on August 19, 2019. Berry Dep., p. 294.

22. The investigation into Berry's complaint of sexual harassment was delayed when Berry made an accusation that a Council member "took her out back" and threatened her, triggering the need for additional investigation. Town Dep., pp. 170, 206; Ex. 20. Berry refused to disclose who the Council member was. Town Dep., pp. 170, 182, 206. There was additional delay in finalizing the investigation due to outside counsel's trial schedule. *Id.,* Town Dep., pp. 170, 182, 219.

23. During Bush's investigation, there were times when Berry refused to speak with her and refused to provide information which Bush requested. Bush Dep. (12-13-21), pp. 32-33, 38-39. Berry Dep., pp. 342-345; Ex. 21. Ultimately, Bush determined that she was left with a he said/she said situation which left her unable to conclude that Sealock had engaged in the conduct about which Berry complained. Town Dep., pp. 222-224; Tewalt Dep., p. 70; Ex. 26.

24. Prior to August 15, 2019, Berry never made Tederick aware of any concerns with Holloway or Sealock's behavior toward her. Berry Dep., p. 199. The only written "complaint" Berry had sent to the Town regarding Sealock's behavior prior to August 15, 2019 was the email to Bush asking if she observed Sealock push her down in 2017. Berry Dep., p. 202; Ex. 13. Her initial complaint related to Sealock was filed on August 15, 2019. Berry Dep., pp. 343-344; Ex. 19.

25. After Berry lodged her complaint about Sealock on August 15, 2019, neither Sealock nor Holloway engaged in any behavior toward Berry which she would identify as sexual harassment. Berry Dep., pp. 77-79.

26. On September 8, 2019, Berry sent Town Council an email refusing to continue to perform social media functions she had performed up to that time. Town Dep., pp. 72-73, 84-86; Ex. 24. In part, the email states, "I know in order to address the needs of our citizens *the Town will want to make other arrangements for coverage.*" *Id.* (emphasis added). Due to the position Berry took, The Town never got to the point of determining whether Berry could fill the public information role, and the position was never offered to her. Town Dep., pp. 86-90, 94-95. After Berry sent the September 7-8 emails to Council, Tederick, through conversation with Joe Waltz ("Waltz"), determined that Todd Jones ("Jones") had extensive marketing and video production experience, which made him a good fit for the public information role. Town Dep. 86-87. Later, this developed into the position of Public Information Officer ("PIO"), and Jones was offered the position. Town Dep., pp. 94-95; Ex. 25. Before the offer was made, Jones had a lot of discussions with Tederick and made a presentation to Town Council. Jones Dep., pp. 111-112. The PIO position was time consuming, and Jones brought in two other persons, both female, to assist with it. Jones Dep., pp. 115-118. The PIO position required regular work outside standard work hours. Jones Dep., pp. 115-124. Jones did receive an increase in pay when he took the PIO position, but the increase was to bring his salary as an Information Technology Director to market level. Jones Dep., pp. 36-37, 125-126. He also received a one-time bonus of $6,000 to handle PIO matters. Jones Dep., pp. 36-37, 125; Ex. 25. Thereafter, Jones was not compensated to handle PIO matters. *Id.*

27. In October 2019, Holloway and Berry had a disagreement when Holloway asked Berry to read a citizen letter at a Council meeting, and Berry refused to do so. Berry Dep., pp. 355-363; Ex.

22. Tederick intervened on behalf of the Town to diffuse the situation. *Id.*

28. Berry was removed from Council table on October 21, 2019 by Tederick. Berry Dep., pp. 363-366; Ex. 23. She moved behind Sealock and found this to be embarrassing. *Id*. She never conveyed to Tederick how his request made her feel. *Id*. Napier and Berry were both moved from positions which they had once occupied at Town Council's table. Napier Dep., pp. 60-61, 73-75. This had happened to Napier on multiple occasions. Napier Dep., pp. 73-75. The mayor was the person who had discretion as to who sat at Town Council table. *Id.* Different mayors handled the composition of persons at Council table different ways, with no apparent pattern. *Id.*

29. It was Tewalt, as Mayor, ***having started his term in November 2019***, that suggested to Council that Berry should not attend closed session because he did not think the clerk should attend closed session. Tewalt Dep., pp. 119-120, 132-133. He had raised this issue when he had previously been on Council when Tharpe was mayor, but he was shot down. Tewalt Dep., pp. 132-133. Council, under Tewalt's leadership as mayor, agreed with his recommendation and decided that the clerk should not attend closed session. *Id.*

30. Berry was out on FMLA leave through the pay period ending January 7, 2020. Ex. 29. When she returned to work, she returned to her previous position as full-time Clerk of Council, with no change in salary, benefits or responsibility. *Id.* She continued in that position until laid off on February 4, 2020 by Town Council as part of the rightsizing recommended by Tederick and approved by Council. *Id.*; Gillispie Dep., pp. 32-33, 66-70, 79-80; Ex. 7. Berry's position was one of many which was eliminated or restructured due to budgetary concerns. Gillispie Dep., pp. 67-68, 79-80; Ex. 7. In discussions regarding elimination of positions, Council did not discuss the fact that Berry had filed a claim of discrimination. Gillispie Dep., pp. 68-69; Ex. 7.

31. Berry filed a Charge with the Equal Employment Commission ("EEOC") on March 31,

2020. Ex. 12. In the Charge, she did not assert that anyone other than Sealock ever sexually harassed her. *Id.;* Berry Dep., p. 130.3 Similarly, in her Complaint [ECF No. 1], the only person accused of ever sexually harassing Berry is Sealock. The first alleged acts of retaliation and creation of a retaliatory hostile work environment all post-date the filing of the August 15, 2019 complaint against Sealock. Ex. 12; ECF No. 1.

### III.    LAW AND ARGUMENT

### A.    Standard of Review

A party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). Any disputed facts must be material, ". . . to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." *Thompson Everett Inc., v. National Cable ADV*, 57 F.3d 1317, 1323 (4th Cir. 1995), citing Anderson, 477 U.S. at 252. Although, at the summary judgment stage, the facts must be viewed in the light most favorable to the nonmoving party, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted).

---

3 Throughout the course of discovery, Berry has asserted that not only did Sealock sexually harass her while she worked for the Town, but she was also sexually harassed by Holloway, former Town Manager Mike Graham, Tharpe, among many others. Many of these allegations pertain to alleged incidents long before the events giving rise to this litigation and were never reported. Further, none of these alleged incidents are contained within the EEOC Charge which preceded this litigation. Ex. 12, or in the Complaint. ECF No. 1. The Fourth Circuit has been clear "that a plaintiff may not raise new claims after discovery has begun without amending his complaint." Cloaninger ex rel. Est. of Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009). Berry has never moved to amend her Complaint, and would likely be time-barred or barred by failure to exhaust with the EEOC. The court, here, should not consider any alleged sexual harassment of Berry other than as it is alleged to have been committed by Sealock.

**B.      The Town is Not Responsible for the Alleged Actions by Elected Officials**

Virginia Code section 24.2-222 provides, in relevant part:

The qualified voters of each city and town shall elect a mayor, if so provided by charter, and a council for the terms provided by charter.

The Town of Front Royal Charter provides, in relevant part:

§ 6. A. The mayor and town council shall be elected … in the manner provided by Virginia general election laws, except insofar as they are otherwise herein provided by this charter….

C. Candidates for town council and mayor shall be nominated only by petition in the manner prescribed by general law….

Persons elected or appointed to serve as Town Council members may only be removed from office in accordance with Virginia Code § 24.2-233 which requires filing of a petition in the Circuit Court of the jurisdiction in which the incumbent holds office. "The petition must be signed by a number of registered voters who reside within the jurisdiction of the officer equal to ten percent of the total number of votes cast at the last election for the office that the officer holds." *Id.*

As is clear from the above cited sections of the Virginia Code and the Town of Front Royal Charter, council members, such as Sealock and Holloway, are elected officials, who serve at the pleasure of the citizens who elect them. Neither council members nor the mayor are employees of the Town. The Town has no ability to control, supervise, discipline, train or effect the positions held by the council members or mayor. The elected officials are answerable solely to the citizenry, and it is only that citizenry which can take action when an elected official is alleged to have violated the oath of his office or committed an offence enumerated in Virginia Code section 24.2-233. Thus, having no ability to control, supervise, discipline or train elected officials, the Town cannot bear the burden of compensating Berry should she be able to establish that any elected official within the Town discriminated or retaliated against her for any reason. Likewise, it was

10

Council who voted to terminate Berry. The Town had no ability or legal right to continue to employ Berry as the Clerk of Council in violation of the decision by Council. Berry's claims herein, lodged solely against the Town, are misplaced. She should have pursued a claim for violation of the 4th Amendment, under § 1983, against Sealock (and/or other elected officials) rather than seek relief from the Town for alleged actions by elected officials over whom the Town has no legal control.

While this circuit has not squarely addressed this issue, it has been addressed elsewhere. See *Poloschan v. Simon,* C.A. No. 9:13-1937-SB-BM, 2014 U.S. Dist. LEXIS 60104, at *3-4 (D.S.C. 2014)(holding that a county government was not liable for allegations of sexual harassment by an elected official because in South Carolina a county has 'no authority over the personnel actions of Probate employees' because such employees are 'employees of an elected official, the Probate Judge, and [are] not County employees."); *Allen v. Fidelity and Deposit Co*., 515 F. Supp. 1185, 1189-1191 (D.S.C. 1981) ("To allow the County to be held accountable for the actions of [an elected official] over whom it has no control as to the manner in which they perform their official duties and whom it cannot hire, fire, discipline or train relative to the performance of the duties of their offices, would be to subject the County to unbridled and unlimited liability over which it has no control and over which it is prevented from exercising such control.). Because the Town lacks control over the elected officials about whom Berry complains or their decision to terminate her, the Town cannot be held legally responsible to Berry for the claims made herein.

   **D.    The Evidence in this Case Does Not Establish a Claim for Discrimination on the Basis of Sex in Violation of Title VII**

Sexual harassment creating a hostile or abusive atmosphere in the workplace gives rise to a claim of sex discrimination under Title VII. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). To violate Title VII, conduct must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment." 477 U.S. at 67 (citations, internal brackets, and internal quotation marks omitted). Whether a party has established a hostile working environment under Title VII "can be determined only by looking at all the circumstances, [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.* 126 L. Ed. 2d 295, 114 S. Ct. 367, 371 (1993).

To prove a hostile work environment claim under Title VII, the plaintiff must show (1) that the conduct in question was unwelcome, (2) that the harassment was based on gender, (3) that the harassment was sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment, and (4) that some basis exists for imputing liability to the employer. *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009) (citing *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 313-14 (4th Cir. 2008)).

The severe or pervasive element has "'both subjective and objective components.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014) (quoting *Central Wholesalers*, 573 F.3d at 175). In order to prevail, a plaintiff must show that she "perceived — and that a reasonable person would perceive — the environment to be abusive or hostile." *Id.* Whether the environment is objectively hostile or abusive is "judged from the perspective of a reasonable person in the plaintiff's position." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). That determination is made "by looking at all the circumstances." *Harris*, 510 U.S. at 23. The Fourth Circuit has made it clear that "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test . . . . [E]ven incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). "Thus, complaints

12

premised on nothing more than 'rude treatment by [coworkers],' 'callous behavior by one's superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor,' are not actionable under Title VII." *Id*. at 315-16 (internal citations omitted). When evaluating a hostile work environment claim, the court must be cognizant of the fact that Title VII is not a "general civility code." *Oncale*, 523 U.S. at 81. While it protects against sexual harassment, it does not reach mere boorishness or crude behavior. *EEOC v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010).

In this case, the only person whom Berry identified in her EEOC charge or Complaint as sexually harassing her was Sealock. She has, for the most part, provided vague and conclusory statements to support her claims. She contends that the harassment began as soon as Sealock took office on January 1, 2017 and continued for 31 ½ months, until she made a formal complaint on August 15, 2019. The only instances of ***alleged*** sexual harassment which Berry has identified with any sort of specificity are:

- Sealock made a comment about LeTasha Thompson's ("Thompson") hair – date unspecified. Berry Dep., pp. 143-146.

- Between January 2017 and February 6, 2017, Sealock rubbed Berry's shoulders two or three times – dates unknown. Berry Dep., p. 150.

- On February 6, 2017, Sealock tried to hug Berry. She rebuffed him, and he pushed her down.

- On June 25, 2018, Sealock made a comment before Council meeting about Berry's dress, legs and shoes, and he made an hourglass motion with his hands. This was followed by an email exchange which Berry contends was Sealock apologizing for his actions.

- At her evaluation in 2018, Sealock referred to Berry as a receptionist.

- Three times in the spring of 2019, Sealock asked Berry the "going rate" for a blow job

The above allegations – almost entirely unsupported by any witness or documentation – do

not support a claim for sexual harassment. While the Town denies whole-heartedly that most of what Berry alleges occurred or that any action by Sealock was based on Berry's gender, the Town focuses below on Berry's complete lack of evidence and facts to establish prongs three or four.

As for the third prong - that the harassment was sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment – the allegations set forth above do not support that prong. All Berry has adduced in support of her claim of sexual harassment, is (a) a comment about Thompson's hair, the content of which has not been furnished; (b) a couple shoulder rubs between January 1, 2017 and February 6, 2017, and even then she has presented no facts to suggest the manner in which those rubs occurred. She has certainly not suggested they were sexual in nature. Beyond those couple shoulder rubs, she has identified no other specific date, time or detail regarding any purported shoulder rubs; (c) an incident in February 2017 where Sealock, allegedly due to having his hug rebuffed, knocked Berry down; (d) an alleged comment on June 25, 2018, in which Sealock made a comment about Berry's body and clothing and made an hour glass motion with his hands; (e) a reference to Berry as a receptionist; and (f) an inquiry, three (3) times in the spring of 2019 to Berry regarding the going rate for a blow job. That is all - in a period of 31 ½ months. These incidents are a far cry from what one must show to establish sexual harassment. They are neither pervasive nor severe. See *Harris v. Mayor & City Council of Baltimore*, Civil No. SKG-06-2415, 2008 U.S. Dist. LEXIS 136156, 2008 WL 11345897, at *10 (D. Md. Sept. 30, 2008) (noting that the majority of cases to survive summary judgment in the Fourth Circuit "include harassing conduct that occurs almost daily"), rev'd on other grounds by 429 F. App'x 195 (4th Cir. 2011) (per curiam) (unpublished).

Berry has also asserted, without providing dates, content of communication, or a description of any touching, that Sealock tried to hug her, rubbed her arms and back and

commented on her appearance. Ex. 18. She also says on a couple of occasions, Sealock prevented

her from rising from a chair or blocked her in her office. *Id.* Finally, she claims that on three or

four occasions, he was present outside the ladies' room when she exited, and he put his arm around

her waist and escorted her back to her office. *Id.* These allegations regarding alleged sexual

harassment are vague, conclusory, and devoid of any reference to dates or actual events, making

them insufficient to state a claim. *Taylor v. Univ. of Md.*, Civil Action No. 11-cv-03008-AW, 2012

U.S. Dist. LEXIS 91375, at *6 (D. Md. June 29, 2012); see also *Benaissa v. Tampa Armature

Works, Inc.*, 2009 U.S. Dist. LEXIS 137193 (M.D. Fla. Aug. 20, 2009) (rejecting plaintiff's

conclusory claim that he suffered discrimination "all the time," when only two specific incidents

were identified); *Bender v. Tropic Star Seafood, Inc.*, No. 4:07cv438SPM, 2009 U.S. Dist. LEXIS

26567, at *25-27 (N.D. Fla. Apr. 1, 2009) (rejecting a hostile work environment claim alleging a

"steady and constant stream" of religious harassment when the plaintiff could only identify ten

instances in an eight month period); *Simpson v. Welch*, 900 F.2d 33, 35 (4th Cir. 1990) (holding

mere allegations without descriptions of specific incidents … insufficient to state a claim under

Title VII).[4]

   Undoubtedly, Berry will insist that the alleged inquiries by Sealock regarding the "going

rate for a blow job" should tip this case past summary judgment. It is the only thing "sexual" in

nature which she can point to. But, she would be wrong. In *Czemrda v. Barcoding, Inc.*, 2013 U.S.

Dist. LEXIS 103282; 119 Fair Empl. Prac. Cas. (BNA) 588; 2013 WL 3873270 (D.C. Md. 2013),

---

4 To the extent that this claim also relies on the assertion that Sealock bullied Berry by pointing his finger,
speaking loudly, pounding the table or the like, "case law has long held that rudeness, bullying, and harsh
management styles generally do not meet the requisite standard to establish a hostile work environment."
*Bouknight v. S.C. Dep't of Corr.*, 487 F. Supp. 3d 470, 475-476 (2020) (citation omitted).Further, as in
*Bouknight*, the record here reveals that Sealock was perceived as loud and gregarious by many, and did not
direct this behavior solely toward Berry. Gillispie Dep., pp. 13-15; Tewalt Dep., pp. 73-74; Napier Dep.,
pp. 41-43. Also, as in *Bouknight*, the evidence shows that despite how Berry perceived Sealock, he did not
interfere with her work performance, having received good evaluations in 2018 and 2019. Ex. 28.

a plaintiff alleged that her supervisor engaged in the following conduct: (a) pulled his chair close to her at a dinner, put his arm around her, touched her arm and leg, and whispered in her ear. When she complained, plaintiff was told that her supervisor had a lot of influence over her and she should try to stay on his good side. The supervisor, during a business trip, also asked the plaintiff to come to his hotel room for breakfast. He later asked her to come party with him during a trip. He also told plaintiff that she should accompany him on trips and he had been thinking about her. The supervisor told plaintiff that "although I have given up my gynecological practice, I would still be willing to fit you in for a pap smear…." *Id*. at *4. He later placed his hands on plaintiff's knees and told her to call if she needed anything. He suggested that the two blow off a meeting and hang out at plaintiff's house. During a call which plaintiff was on, the supervisor offered to fly out and give a co-worker a blow job. Despite all of these offensive remarks, the court found that the supervisor's conduct was not so extreme to amount to a change in the terms and conditions of employment and could not support a hostile work environment (based on sex) under Title VII. See also *Walker v. Mod-U-Kraf, Inc.*, 988 F. Supp. 2d 589 (W.D. Va. 2013) (holding that comments to plaintiff regarding blow jobs, wieners in the mouth, and the facts that she could probably holler real loud were insufficient to establish the severe and pervasive prong for purposes of stating a claim for sexual harassment); *Sraver v. Surgical Monitoring Servs.*, 2006 U.S. Dist. LEXIS 55222 (Md. Jul 27, 2006) (granting summary judgment to an employer on the grounds plaintiff failed to establish the severe or pervasive prong even where she established her supervisor regularly asked her about her sex life, made sexual jokes, glanced and commented on her breasts two to three times a month, said he was on a liquid diet to make his dick look bigger, and told plaintiff she would get a raise when he got a blow job). Even assuming Sealock asked about the "going rate for a blow job" on three occasions during the 31 ½ months between when he took office and Berry's August

16

15, 2019 complaint, the law is clear that this is insufficient to establish the severe and pervasive prong necessary to state a claim for sexual harassment. Further, as noted above, there is no evidence that whatever Sealock (or anyone else) is alleged to have done altered the conditions of Berry's employment, as she continued to perform reasonably well.

D.     **The Evidence in This Case Does Not Establish a Claim for Retaliation in Violation of Title VII**

The requisite elements for a *prima facie* case of Title VII retaliation include: (1) the employee engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action. *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). Further, "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013).

To establish an adverse action, a plaintiff must show that it was objectively material. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). The United States Supreme Court has held that Title VII's prohibition of adverse actions taken in retaliation for protected activity "is not limited to discriminatory actions that affect the terms and conditions of employment." *Id*. at 64. Rather, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id*. at 67. However, the anti-retaliation provision does not shield an employee from all retaliation, but rather only from retaliation that produces injury or harm. *Id.* Accordingly, to fall within the provision's protection, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable

17

worker from making or supporting a charge of discrimination.'" *Id*. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219, 370 U.S. App. D.C. 74 (D.C. Cir. 2006)). A plaintiff must show material adversity to separate the significant harms from the trivial, as "Title VII . . . does not set forth 'a general civility code for the American workplace.'" *White*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). The question is whether the challenged action was material from the perspective of a reasonable person in the plaintiff's position. *Id*. at 69-70.

In this case, Berry claims that she engaged in protected activity when she filed a complaint against Sealock for sexual harassment on August 15, 2019. The Town agrees that meets the first element of a retaliation claim. Berry claims that after she filed the complaint, she was subjected to retaliation. Again, the Town notes that all of the retaliation which Berry has identified was purportedly done by elected officials. ***The Town has no legal liability for the elected officials' actions***. Further, however, the actions about which Berry claims (other than termination which will be addressed separately) are legally insufficient to qualify as retaliation.

The first alleged retaliatory act alleged by Berry is that "Defendant failed to correct and remedy the sexually harassing conduct by Mr. Sealock, and delayed in taking action against him or in the action of Mr. Holloway." ECF No. 1, ¶89. The first time Berry raised an issue as it pertains to Sealock was in the 2017 email to Bush related to being pushed down in front of the refrigerator. There is nothing about that incident which one could in any way conclude was sexual harassment (and that incident would be time barred). Berry claims, thereafter, to have advised Bush at times that Sealock said or did inappropriate things. Those allegations are too vague to give rise to a claim that Sealock was sexually harassing Berry. To be clear, Berry never filed a formal complaint related to anything Sealock purportedly did until August 15, 2019. That complaint was lodged

with Holloway, who then passed it on to Tederick, then interim mayor, who immediately forwarded it to Bush in HR and directed her to commence an investigation. The very next day, Bush opened the investigation and, by Berry's own admission, Sealock never did anything sexually harassing or inappropriate thereafter. With regard to the assertion that the Town delayed in taking action as it pertained to Holloway, Berry has acknowledged that she refused to identify him as the person who spoke with her behind Town Hall. Nonetheless, inasmuch as Berry raised the issue with Thompson, as soon as Tederick knew of the claim, he also directed that it be investigated. This was done despite Berry's refusal to identify who allegedly took her behind Town Hall. There is simply no facts which support Berry's allegation that the Town (or the elected officials) retaliated against her by failing to correct and remedy the sexually harassing conduct by Mr. Sealock, or delayed taking action against him or in the action of Mr. Holloway.

Berry goes on to claim the Town retaliated against her when Holloway had Berry walk out back of Town Hall the day after she made a report related to Sealock. Holloway purportedly said:

> How do we make this all go away? We have to make this go away. You gotta take back what you said. This is going to affect everything. This will affect the ordinances. This will affect the election coming up. This will mess up everything. Bill (Sealock) is gonna have to resign. Matt (Tederick) took this to Julie (human resources). All Council knows about it now. This will affect your job, your kids, everything, Jennifer.

ECF No. 1, ¶ 43. Berry contends that the above was a threat against her job. It is not. Instead (although Holloway denies making the statement), it conveys one councilmembers' concerns, belief or opinion about the effect the complaint might have on Berry. Furthermore, it is not a statement or act by the Town. It reflects no retaliatory animus from the Town towards Berry. It should also be noted that the Town had no independent authority to fire or terminate Berry. She served at the will of Council, and it was only Town Council which could opt to terminate her.

Berry also complains about being moved from a seat at Council table. This occurred when

Tederick, newly acting mayor, with the discretion to decide who sat at Council table, asked Berry to move to allow a presentation to be given. The act of moving non-councilmembers from Council table was not new and at times resulted in the Town Manager and Town Attorney also being moved from Council table. Although Berry believes this act (by an elected official) was retaliatory, it is simply not at the level which would qualify it as objectively retaliatory, especially given the mayor's discretion and history of movement of people from Council table. See *Martin v. Merck & Co.*, 446 F. Supp. 2d 615, 636 (2006) (removal from a position of employment is not a materially adverse employment action where one's duties remain unchanged).

With regard to being removed from closed session, again, the mayor has discretion regarding who attends closed session. Such sessions are, by their very nature, intended to include only persons with a need to attend. Berry had no need to attend. She was excluded at the discretion of a new mayor who had previously, when serving on Council, stated that he did not believe that the clerk should attend closed session. Further, after Berry made her complaint in August of 2019, closed sessions were held to discuss her complaint. None of the parties subject to the complaint were permitted in closed session. The fact is that removal of Berry from closed session (by the elected officials) is not an adverse employment action by the Town. See, *Martin*, *supra.*

Another alleged act of retaliation occurred when Holloway blew up at Berry for refusing to read a citizen's statement during a Council meeting. That event does not constitute an adverse employment action, and also is not the type of action which Title VII seeks to protect against.

Berry also claims that, after she complained about Sealock, the Town "rescinded the promotion" of PIO it had planned to give her. There is not a shred of evidence that a decision had been made to give Berry the PIO position. Rather, the morning of August 15, 2019, before Berry raised concerns regarding Sealock, Tederick discussed enhancing the Town's public information

image and who might be a good fit for the role. Town Dep., pp. 63-71, 94-95. The consensus by those at the meeting was that Berry might be. *Id.,* pp. 86-88. Before the Town had an opportunity to look into that, Berry sent an email to Council making it clear that she was not going to conduct Town business, including anything related to social media, outside her workweek hours. She advised the Town that they would need to look for someone else to fill that role. Once Berry reacted in that manner, it was clear that she would not be able to perform what eventually became the PIO position, and Jones was tapped for that position in November of 2019. He had the background for the position and was assisted by a team of females. There was simply no rescission of any position or promotion, and no adverse employment action.

Berry also complains that she was retaliated against by a delayed, dysfunctional and sham investigation. These are conclusory statements without a basis in fact. The investigation was immediately opened the day Berry first presented a complaint. Berry and Sealock were interviewed multiple times. When Berry made a complaint about a council member taking her outside the back of Town Hall, Bush attempted to also investigate that claim. Berry refused to identify the council member. Berry purportedly had other complaints, but as is evident from her October 2, 2019 email (Ex. 21), she refused to disclose them. Eventually, failing to uncover any evidence to corroborate Berry's complaints and being left with a he said/she said situation, Bush concluded that Berry's complaints could not be substantiated, and the investigation was closed. As the Fourth Circuit has observed, courts "do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by [employers]." *Anderson v. Westinghouse Savannah River Co*., 406 F.3d 248, 272 (4th Cir. 2005). Here, the Town, at the request of Council, promptly investigated Berry's complaints and conducted as thorough an investigation as it could, especially considering Berry's failure to provide information requested of her and her affirmative decision to hold back

21

information, as evidenced by her October 2, 2019 email. As to any delay in concluding the investigation, the evidence shows this was due to Berry's addition of the new allegation about the threat behind Town Hall, the need to coordinate with outside counsel, and outside counsel's trial schedule. As soon as the investigation was complete, Berry was advised of the conclusion.

Lastly, with regard to the investigation, it is not even clear that a purportedly sham investigation would amount to an adverse employment action. See *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("An employee whose complaint is not investigated cannot be said to have thereby suffered a punishment for bringing that same complaint: Her situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint or had the complaint been investigated but denied for good reason or for none at all."); *Oliver v. Penny*, No. 1:19-cv-00233 (BKS/DJS), 2020 U.S. Dist. LEXIS 233048, at *40 (N.D.N.Y. Dec. 11, 2020).

Berry also claims that the Town failed to restore her to the full-time Clerk position upon her return form FMLA-qualifying leave in January 2020. This is untrue. Berry returned to her full-time clerk position when she came back from FMLA leave. Tederick, who was working on the budget in preparation for a February 3, 2020 work session, had not yet made a recommendation to Council regarding rightsizing and changing the clerk position to part-time when Berry returned from FMLA leave. That discussion occurred at the end of January, 2020, while Berry was gainfully employed as the full-time clerk. This alleged adverse employment action simply did not occur.

Finally, Berry contends that her termination was an adverse employment action which resulted from lodging a complaint against Sealock. While termination of employment is an adverse employment action, Berry cannot establish that it "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570

U.S. 338, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013). Again, here, it is the elected officials who are alleged to have committed wrongful acts, not the Town. Further, since Berry served at the will of the Council, it was they, not the Town, who had authority to terminate her. Additionally, the record clearly establishes that Tederick, then acting as Town Manager, had an obligation of developing a fiscally sound budget to present to Council on February 3, 2020. As part of development of that budget, Tederick saw a need to rightsize the government by eliminating and restructuring staffing. The Town Clerk position had, until 2017, been a part-time position. Tederick saw value in returning the position to part-time, resulting in a savings of approximately $75,000. The tasks which the Clerk had done could be and were absorbed by two existing employees, one of whom had already been acting as deputy clerk. Along with restructuring the Clerk position, Tederick's budget eliminated four other positions. The overall effect of this was a savings of approximately $573,000 to the Town. This was not a targeted effort to eliminate Berry's employment, and there is nothing other than wild conjecture on Berry's part from which that conclusion can be drawn.[5] Her complaint with regard to Sealock was made 5 ½ months before the budget was presented by Tederick and voted upon by Council, and there is simply no basis upon which one could objectively tie the two together.[6],[7]

**E.     Plaintiff Cannot Establish a Claim for Retaliatory Hostile Work Environment in Violation of Title VII[8]**

---

[5] It is well established that a party opposing summary judgment may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992).

[6] The Fourth Circuit has stated, "[t]emporal proximity . . . is simply too slender a reed upon which to rest a . . . claim." *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993).

[7] To the extent Berry has also asserted through discovery – not in her Complaint – that she received the "cold shoulder" from Councilmembers and/or Town employees after she made her complaint, this constitutes petty slights and minor annoyances, not a materially adverse employment action. *Martin*, 446 F. Supp. 2d 615, 639.

[8] As with her other claims, the Town reiterates that it is not responsible for any actions taken by elected officials.

The Fourth Circuit has recognized that a claim of retaliatory hostile work environment is a distinct cause of action. See *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) ("Retaliatory harassment can constitute adverse employment action ...."), overruled on other grounds by *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-68 (2006); *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 600 (D. Md. 2011), aff'd, 465 Fed. App'x 274 (4th Cir. 2012); see also *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (collecting circuit decisions). To state a claim for a retaliatory hostile work environment, a plaintiff must show: (1) engagement in a protected activity; (2) that she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (3) a causal link between the protected activity and the harassment. *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 840 (E.D. Va. 2016) (citing several cases, including *White*, 548 U.S. at 67; *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 283 (2015) additional citations omitted). Put another way, a retaliatory hostile work environment claim "requires establishing the same facts as a retaliation claim, save that the 'materially adverse' element is replaced by 'subjected to severe or pervasive retaliatory harassment by a supervisor.'" *Hinton*, 185 F. Supp. 3d at 840.

As with the retaliation claim, Berry satisfies the first element of this cause of action. However, for the same reasons stated in regard to the retaliation claim, she cannot satisfy the other elements. That is, the behavior by her supervisors (not employees of the Town), all of which she also relies upon for her retaliation claim and which the Town has addressed above, does not amount to that which the case law deems to be severe or pervasive. There are isolated events which occurred after the August 15, 2019 complaint, none of which are severe and which together are not pervasive. Further, Berry lacks evidence to show that any perceived harassment was causally linked to the complaint which she made, other than the purported walk behind Town Hall, which

24

alone is neither severe nor pervasive.

**F.      Plaintiff Cannot Establish a Claim for Violation of the FMLA**

To survive summary judgment on an FMLA retaliation claim, "the plaintiff must produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason, i.e., retaliation.'" *Sharif v. United Airlines, Inc.*, 841 F. 3d 199, 203 (4th Cir. 2016). For purposes of establishing a prima facie case, close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation. See *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), abrogation on other grounds recognized by *Foster v. Univ. of Md—E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). But, even assuming that Berry could establish a prima facie case of retaliation under the FMLA by temporal proximity alone, she still "bears the burden of establishing that [the Town's] proffered explanation is pretext for FMLA retaliation." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006).

The evidence in this case establishes that Berry was terminated for legitimate non-discriminatory reasons. That is, the Town Manager, in analyzing the budget, believed that certain staff positions needed to be restructured or eliminated to reduce expense. Berry's position was a casualty of the rightsizing. Further, Berry has come forward with no evidence to show that her taking of FMLA leave was of concern to or irritated any Town employee or had any role in the termination decision. This claim is created from whole cloth. It is worth noting, as well, that it is premised on provably false allegations. That is, in her Complaint, Berry asserts that when she returned from FMLA leave, she was not placed back in the full-time Clerk of Council position. This is simply untrue. She returned to that position on January 8, 2020, and she was subsequently laid off on February 4, 2020.

IV.    CONCLUSION

WHEREFORE, for the foregoing reasons and any additional reasons to be argued at any

hearing, defendant, Town of Front Royal, Virginia, by counsel, requests that the court grant its

Motion for Summary Judgment and dismiss this case with prejudice.

Respectfully submitted,

**TOWN OF FRONT ROYAL, VIRGINIA**
By Counsel

McGAVIN, BOYCE, BARDOT,
 THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
(703) 385-1000 Phone
(703) 385-1555 Facsimile
hbardot@mbbtklaw.com


_____/s/_____
Heather K. Bardot, Esquire
Virginia State Bar No. 37269
Counsel for Defendant


**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of March, 2022, I electronically filed the foregoing
pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of
such filing (NEF) to the following:

Timothy E. Cupp, Esquire
Shelley Cupp Schulte, PC
1951 Evelyn Byrd Avenue, Suite D
PO Box 589
Harrisonburg, Virginia 22803
Telephone:     (540) 432-9988
Facsimile:      (804) 278-9634
cupp@scs-work.com
Counsel for Plaintiff

Tim Schulte, Esquire
Shelley Cupp Schulte, PC
2020 Monument Avenue
Richmond, Virginia 23220
Telephone:      (804) 644-9700
Facsimile:      (804) 278-9634
Shelley@scs-work.com
Co-Counsel for Plaintiff

                                           McGAVIN, BOYCE, BARDOT,
                                            THORSEN & KATZ, P.C.
                                           9990 Fairfax Boulevard, Suite 400
                                           Fairfax, Virginia 22030
                                           (703) 385-1000 Phone
                                           (703) 385-1555 Facsimile
                                           hbardot@mbbtklaw.com


                                           _____/s/_____
                                           Heather K. Bardot, Esquire
                                           Virginia State Bar No. 37269
                                           Counsel for Defendant