**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

| | | |
|---|---|---|
| **JENNIFER BERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5:21-CV-00001** |
| | ) | |
| **TOWN OF FRONT ROYAL, VIRGINIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff, Jennifer Berry ( "Berry" or "Plaintiff"), by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure, submits her memorandum in support of her motion for partial summary judgment on the issue of liability against Defendant Town of Front Royal, Virginia (the "Town" on the portion of Count II of her Complaint arising from the Town's failure to offer her the position of Public Information Officer ("PIO") in retaliation for her having engaged in protected activity under Title VII, namely, in complaining of sexual harassment and sexist, demeaning, and humiliating behavior by William Sealock ("Sealock"), a Town Councilmember, for reasons that follow, including this illuminating explanation:

> because of everything that was going on. . . . it kind of fell off to the wayside after everything else came up. . . . We were dealing with everything else that was going on. So we still had – **I think the Bill Sealock, this whole thing by itself, right? And then we have, you know, Jennifer [Berry] and what's going on there.** . . . Like I said, it completely fell off . . . . [E]verything kind of went everywhere and it was never brought up again. . . . **You've got the case ongoing. . . . Jennifer's case**.

(Councilmember Letasha Thompson, explaining why the Town did not offer Berry the PIO position it had intended to give her.) (Emphasis added). Exhibit ("Exh.") 1, Letasha Thompson Deposition ("Thompson Dep.") 129:16-134:9.

## I.  <u>Standard for a Motion Under Rule 56 for Partial Summary Judgment</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The standards for partial summary judgment are no different. *Id*. The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Where a plaintiff seeking partial summary judgment on the liability issue satisfies her initial burden to present evidence demonstrating the absence of a genuine issue of fact, the burden shifts to the opponent to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects*, *L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). The opponent must offer "more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Here, the undisputed facts include that Berry is a female, she was qualified for and the Town intended to offer her expanded duties of a PIO, which entailed a promotion, she engaged in activity protected by Title VII when she formally complained of sexual harassment and sexist, demeaning, and humiliating conduct by Sealock, and immediately after the complaints, the Town no longer considered her for the PIO position, did not offer it to her, and offered her no training related to it. Instead, three months after Berry's complaints of sexual harassment, and only eleven days after the Town purported to find Berry's complaints of sexual harassment had not been corroborated, the Town offered the PIO position to a male with a substantial raise of $10,795.20 per year plus a $6,000 bonus.

The Town asserts that Berry rejected both training for the PIO position and the PIO position itself. The Town's burden, however, is more than simply coming up with a conceivable reason for an adverse action. There must be admissible evidence to support it. Here, the Town's and Berry's evidence on these points align: Berry was **not offered the PIO position** and **she did not turn down any training** in connection with such a position. Berry's prima facie case is unrebutted.

Absence of "the existence of an element essential to [an opposing] party's case," here, the Town's burden to rebut Berry's prima facie case, may entitle the moving party to summary judgment. *Evans v. Int'l Paper Co.*, 936 F.3d 183 (4th Cir. 2019). If no rational juror could find for the Town on an issue, partial summary judgment is appropriate as it is here in favor of Berry.

## II.      Statement of Material Facts About Which There is No Genuine Dispute[1]

1.       Berry, a female, was employed with the Town for 15 years as its Clerk of Town Council.  Exh. 2, Charge of Discrimination, ECF Document No.1-2.

2.       Berry was good at her job and was performing in accordance with the Town's legitimate requirements of her for her job. Exh. 3, Rule 30(b)(6) Deposition of Town of Front Royal, Matthew Tederick Designee ("Tederick Dep.") 92:12-23; Exh. 4, Plaintiff's Answer to Interrogatory No. 1 of Defendant's First Interrogatories ("Plaintiff's Answer to IR No. 1"), p. 20. The Town Council's evaluation of Berry's job performance was given to her on August 22, 2019. Exh. 3, Tederick  Dep. 63:5-11. The Overall Performance Review stated:

> Exceptional employee, valuable team member, gives above & beyond, Glue in organization, pleasant & kind, on time with duties, excellent job. Pleasant employee to Work with her knowledge, experience and willingness to assist.

---

[1] Much of the adverse actions and adverse employment actions to which Berry was subjected is disputed by the Town, including the threats to her job communicated to her on August 16, 2019 by Chris Holloway.  Berry addresses here only those facts and inferences that are not in dispute.

The numerical entries by the Town on the "Competencies" listed in her Performance Evaluation averaged 3.53, which on the Performance Rating Scale is closer to Exceeds Expectations than Meets Expectations. Exh. 5, Berry's Employee Performance Evaluation (TOWN187-193). The Town concedes that this is a good evaluation. Exh. 3, Tederick Dep. 91:13-92:23. Sealock, referencing Berry's evaluation, said her performance was "excellent." Exh. 6, William Sealock July 13, 2021 Deposition ("Sealock 7-13-21 Dep.") 92:2-4.

3.       The Town gave Berry a merit increase in her pay of two percent in connection with and based on her good performance review. Exh. 5, Berry's Employee Performance Evaluation (TOWN187-193); Exh. 1, Thompson Dep. 56:7-9, Exh. 7, Defendant's Answer to Interrogatory No. 2 of Plaintiff's First Interrogatories ("Defendant's Answer to IR No. 2"), p. 3. Employees performing at less than an acceptable level received no advancement in pay under the Town's policy. *See* Exh. 8, TOWN1188.

4.       Councilmember Gary Gillispie rated Berry's performance as "Fabulous."  Exh. 9, Gary Gillispie Deposition 24:2-5. Thompson rated Berry's performance as "excellent." Exh. 1, Thompson Dep. 30:2-13. Hollis Tharpe ("Tharpe"), former Mayor of the Town who resigned in April 2019, testified that Berry's performance during his tenure was "[a] hundred percent.  I mean, she did her, she did her job . . . ."  Exh. 10, Hollis Tharpe Deposition 38:6-24.

**Berry Is Subjected to Sexual Harassment by William Sealock**

5.       Sealock was elected to Town Council in the fall of 2016 and became a councilmember in January 2017. Exh. 6, William Sealock 7-13-21 Deposition ("Sealock 7-13-21 Dep.") 17:20-24. He is a former Marine. *Id.,* 27:12-14.

6.       In April, 2019 Mayor Tharpe was indicted for solicitation of prostitution. Sealock instructed Berry to contact Tharpe and tell him not to come to the council meeting that night because he would take it better "coming from a woman." Berry did as she was told. Berry had

always attended closed sessions as required by her job description and to carry out her responsibilities to certify the vote at the conclusion of closed sessions as required by state law and to be available to take any minutes if requested. She was also tasked with locking up the building at the end of the evening. Berry attended Town Council's closed session in April 2019 when Tharpe's indictment was discussed. After her request to speak was granted, she reported and showed a meme her daughters had seen on the internet that depicted her and then Mayor Tharpe with a suggestion or innuendo of a "blow job" and Tharpe's public, inappropriate, joking reaction to it. Berry indicated how offensive she found the meme and Tharpe's public reactions to it and stated that she thought Tharpe should be censured. Exh 4, Plaintiff's Answer to IR No. 1, p.10.

7.     After that meeting, Sealock and Councilmember Eugene Tewalt ("Tewalt") met with Tharpe to advise him of his censure and request his resignation. Sealock testified that it was obvious to him and Tewalt that Tharpe knew everything that had happened at the April 15, 2019 closed session, which would have included Berry's request that he be censured for his joking public reaction to the obscene meme. Sealock alone took a resignation letter to Tharpe for his signature. Tharpe resigned effective April 15, 2019 and Sealock became acting mayor. *Id.*

### Sealock's "Blow Job" Comments to Berry

8.     Sealock admits that he was told that the meme depicted Berry, Tharpe and a "blow job". Exh. 6, Sealock 7-13-21 Dep. 153:5-17, 21-25, 154:1-9; Exh. 11, TOWN648; Exh. 12, Julie Bush July 6, 2021 Deposition ("Bush 7-6-21 Dep.") 204:11-20.

9.      Sealock called the meme a "cartoon" and a "joke." Exh. 6, Sealock 7-13-21 Dep. 153:13, 178:9, 179:19-20.

10.     Part of Berry's evidence includes her complaint of sexual harassment involving Sealock asking Berry on three separate occasions while serving as acting mayor and councilmember whether she knew the going rate for a "blow job". On another occasion, Sealock

asked Berry if she had found out the going rate for a "blow job".  Exh. 13, Holloway Dep. 70:1-71:7, 75:24-77:12, 91:5-24, 118:20-24, 119:4-8,  14-23, 120:2-6, 120:21-23, 126:5-7, 9-10; Exh. 12, Bush 7-6-21 Dep. 143:17-21, 152:8-9, 189:16; Exh. 14, Jennifer Berry Deposition ("Berry Dep.") 251:1-21, 252:3-22, 253:1-12, 254:2-3, 254:11-22, 255:12-22, 279:21-280:1, 288:15-289:5, Berry Dep. Exh. 20.

11.    Bush testified that asking a female employee the going rate for a "blow job" would violate the Town's policies.  Exh. 12, Bush 7-6-21 Dep. 127:19-24.  Similarly, rubbing someone's shoulders or arms violate those policies if the person being rubbed or stroked did not like it.  *Id*., 127:25-128:4. Thompson said that the "blow job" statement Sealock admitted to in his deposition was "awful and it should violate something."  Exh. 1, Thompson Dep. 227:6-23.

12.    While Sealock denies having used the exact words Berry complained of, Sealock did testify as follows about what he said to Berry about "blow jobs":

> My statement to her was—when I left the golf course that day and I came to the town hall, the statement I made was, "A golfer at the golf course shouted from the top of the hill, 'Hey, Mayor, I think I'm going down to town hall and get a free blow job.'"  That's what I said.

Exh. 6, Sealock 7-13-21 Dep. 159:12-17.

13.    The "blow job" statement Sealock admits he communicated to Berry was offensive to him ( *id.,* 178:4-10, 16) and would be very offensive to a female subordinate (*id*., 178:17-22).

### May 13, 2019 Job Threat

14.    On May 13, 2019, Sealock came to Berry's office purportedly to discuss her goals in relation to her upcoming evaluation, which would typically be prepared in May and delivered by July.  He told her that Tharpe had told him that Berry and Councilmember Meza had a bull's eye target on their backs and she would be fired when Tharpe was re-elected.  Berry objected to Tharpe's supposed threat, made as former mayor and potential future mayor, and objected to

Sealock conveying a threat of her being fired in a conversation that was supposed to be about her performance goals. Sealock told her there was no reason to discuss her goals because she was on her way out.  Exh. 4, Plaintiff's Answer to IR No. 1, p. 12.

15.     Berry emailed the Town Attorney, Douglas Napier ("Napier"), and recounted what had happened in the meeting with Sealock and her objections to Sealock communicating a threat to her job. Napier stated that he would hold onto this information.  He also stated, "HR cannot do anything directly, however, it might prove to be a (sic) evidentiary backup should there be proceedings of some sort later on. . . .   My gut tells me this is pretty serious."  Exh. 15, Douglas Napier Deposition ("Napier Dep.") Exh. 1.   The Town considered Napier to be one of Berry's HR representatives. *Id.*, Napier Dep. Exh. 3.  Nonetheless, it excluded Napier from further involvement with Berry's complaints.  *Id.*,  20: 21-23, 21:9-19, 76:19-77:6;  Napier Dep. Exh. 9.

### The PIO Position

16.     In connection with a discussion about Berry's evaluation sometime prior to August 15, 2019, Council discussed giving Berry enhanced duties associated with a PIO position.  Exh. 16, Answer to Complaint, ECF No. 7, Pageid#: 43, ¶ 36.  The PIO position carried with it increased pay for the additional duties.  Exh. 17, TOWN705; Exh. 18, TOWN706.

17.     The idea for the PIO position came from Tederick, who was serving as the interim mayor.  Exh. 1, Thompson Dep. 70:9-15.  Tederick was "on a big push to enhance the Town's public information image and role."  Exh. 3, Tederick Dep. 66:10-12.

18.     Council as a whole suggested that Berry would be a good fit to do the public relations officer position, and there was consensus that Berry could assume this role.  Exh. 13, Holloway Dep. 43:18-22; Exh. 3, Tederick Dep. 66:10-23.

19.     Indeed, Tederick and Town Council wanted Berry to become the PIO.  Exh. 3, Tederick Dep. 243:14-244:9; Tederick Dep. Exh. 22, p. 11.

20.     Moreover, Berry was qualified for the PIO position. Exh. 19, Deposition of Eugene Tewalt ("Tewalt Dep.") 95:13-20.  She was responsible for managing the Town's Facebook page (Exh. 7, Defendant's Answer to IR No. 4); she was doing the duties of the PIO as part of her job (Exh. 19, Tewalt Dep. 84:7-15); she was "well spoken" (Exh. 13, Holloway Dep. 44:3-7); and, because she was a "front-facing person," she could be "doing more things that would be helpful with the way [the Town] interact[ed] with the public"  (Exh. 1, Thompson Dep. 70:15-20).

21.     Town Council intended for Berry to be approached about taking on the PIO position.  Exh. 1, Thompson Dep. 68:13-17; 69:25-70:3, 11-15.

22.     On the morning of August 15, 2019, after Council had approved offering the PIO position to Berry, Tederick, then interim Mayor, was meeting with Sealock, then Vice-Mayor, regarding the scheduling of Berry's evaluation.  Exh. 3, Tederick Dep. 65:3-22.  At that time, Tederick and Sealock discussed with Joe Waltz ("Waltz"), the Town Manager, the role of the PIO. and they agreed that Berry could assume that role.  *Id*., 66:12-23.

23.     Tederick had "general knowledge of social media marketing and enhanced marketing" and "thought it would be a good idea to get [Berry] to take some enhanced specific in-depth, perhaps marketing training." Exh. 3, Tederick Dep. 67:1-6.  Yet, Tederick did nothing to offer the position or any training to Berry. *Id.*, 88:10-16.

24.     While the Town's position is that Sealock "took it upon himself to approach [Berry] about the [PIO] position" after his meeting with Tederick and Waltz (Exh. 7, Defendant's Answer to IR No. 4), no facts support this position.

25.     Sealock did not even mention the PIO position when he went to Berry's office on the morning of August 15, 2019 after his meeting with Tederick and Waltz where they agreed Berry could assume the PIO role.  Exh. 6, Sealock 7-13-21 Dep. 94:24-95:1, 97:9-22, 100:1-4, 20-

21; Exh. 20, William Sealock August 31, 2021 Deposition  ("Sealock 8-31-21 Dep.") 336:19-22, 338:24-25, 339:3-5; Exh. 3, Tederick Dep. 72:12-14; Exh. 1, Thompson Dep. 69:25-70:6.

26.    Rather than offering Berry a promotion or otherwise discussing the PIO position or duties, Sealock instructed Berry to take a free class at the library on "how to use the internet" or words to that effect.  Exh. 14, Berry Dep. 247:17-20.

27.    A class on "how to use the internet" would have been well beneath Berry's skill levels. Exh. 1, Thompson Dep. 69:6-21; Exh. 4, Plaintiff's Answer to IR No. 1, p. 14.

28.    Sealock did not offer any specifics about the course.  Exh. 6, Sealock 7-13-21 Dep. 96:23-97:3, 97:15-24. He also did not tell Berry that the purported training related in any way to Council's intention to offer her the PIO position or that such a position was even being considered. *Id.*, 95:2-19, 96:18-25; Exh. 14, Berry Dep. 247:17-22; 248:1-21; Exh. 3, Tederick Dep. 72:12-14.

29.    When Berry asked Sealock the reason for her taking the internet class, he said it was because of "recent issues."  When she asked what those were, he seemed very frustrated and agitated, but did not respond. Berry had no idea what he was talking about. His conduct demeaned Berry. Exh. 14,  Berry Dep. 247:5-22, 248:1-21.

30.    Though he couldn't recall telling Berry this, Sealock testified that Berry needed to take the class because of an incident that had occurred months prior relating to Berry having to remove a citizen's profane comment from the Town's Facebook page.  Exh. 6, Sealock 7-13-21 Dep. 96:18-22, 98:16-21.  This incident occurred in March 2019, and Council, including Sealock, resoundingly had supported Berry's handling of the citizen's profane post.  *Id.*, 109:16-110:24, Dep. Exh. 8; Exh. 13, Holloway Dep. 153:4-155:1.

31.    In response to Sealock's demeaning and bullying conduct, Berry responded to him that she was well acquainted with the use of the internet and already handled on-line social media

responses with citizens through the Town's Facebook site. Sealock acted agitated and frustrated with Berry's response to his demeaning comments. Exh. 14, Berry Dep. 248:4-21.

32.    Despite being overqualified for a basic internet class, Berry attempted to find the class on the library's website, found nothing, and notified Sealock she could not find the class.[2] Exh. 14, Berry Dep. 247:17-248:14.

33.    Sealock admitted that Berry did not refuse to take the course he suggested and that she told him she could not find it. Exh. 6, Sealock 7-13-21 Dep. 103:7-12. Sealock did not follow up to find any training for Berry. *Id.*, 103:15-18.

34.    Berry first learned that Council had been planning to offer her the PIO position when Holloway told her later in the day on August 15, 2019 after she complained to him about Sealock's demeaning and ongoing harassment. Holloway advised Berry that Council had intended to speak to her about the PIO position, that Sealock had ruined that prospect and had muddied the waters by offering a basic internet class, which was not what Council intended to offer her. Exh. 14, Berry Dep. 249:18-250:12. Holloway also said, referring to Sealock's conduct, that he was tired of all this "bullshit." *Id.*, 249:1-4. Holloway claims he did not recall whether he had spoken with Berry about the PIO position, but he did not deny that he had done so. Exh. 13, Holloway Dep. 43:23 – 44:2.

35.    Holloway's mention of the PIO position to Berry on August 15, 2019 was the first and last Berry heard of it. After she complained on August 15, 2019 of sexual harassment and other discriminatory conduct by Sealock, the Town never approached Berry about assuming the PIO position or an enhanced public relations role.  Exh. 3, Tederick Dep. 89:5-14, 25; 90:1-5.

---

[2] Bush also called the library to try to find out if the class Sealock mentioned actually existed and was told that there was no such course. Exh. 12,  Bush 7-6-21 Deposition 171:23-172:17.

36.    No one on Council indicated that Berry did not want the PIO position (Exh. 1, Thompson Dep. 134:14-17), but she nevertheless was not given the position (*id.,* 131:1-3).

**Berry Engages In Protected Activity**

37.    When Berry spoke with Holloway on August 15, 2019, she complained about Sealock's demeaning conduct in relation to the internet class, as well as his sexist and harassing behavior. Holloway instructed Berry to document her complaints and email that to him. Exh. 4, Plaintiff's Answer to IR No. 1;  Exh. 13, Holloway Dep. 88:12-89:3, 95:25-96:4; Exh. 14, Berry Dep. 249:1-4.

38.    Berry sent Holloway an email on August 15, 2019, which included complaints that Sealock instructed her to take a class to learn to use the internet despite her proficiency with the internet; that "he has been sexual with comments to me, and has placed his hands on me in ways that are not professional;" that, as she previously advised Holloway, Sealock had approached her while he was Acting Mayor to threaten her job should former Mayor Tharpe return to Town, all while discussing her upcoming evaluation; and that Sealock had referred to her as a receptionist, made inappropriate and uncomfortable comments, and "repeatedly treated me in a manner which is sexist and demeaning . . . ."  Exh. 21, TOWN620-622.

39.    Earlier on August 15, 2019, before Berry spoke with Holloway, Napier told Berry that Sealock intended to have Human Resources ("HR") Manager, Julie Bush ("Bush"), sit in on Berry's evaluation. Exh. 22, TOWN630.  Berry objected to this because she had been advised that Bush was not her HR representative, since Berry reported directly to Town Council, not the Town Manager.  *See* Exh. 23, BERRY000922-000923; Exh. 12, Bush 7-6-21 Dep. 109:16-21, 110:15-19, 25, 111:3-10.  Berry also said he "better keep his hands to hisself (sic)" (Exh. 12, Bush 7-6-21 Dep. 41:18-42:1-5), that "he needs to keep his hands off me," or words to that effect.  Berry made this statement in the presence of Bush and Town Manager, Joe Waltz, both of whom the Town

considered to be Berry's HR representatives.  Exh. 15, Napier Dep. Exh. 3. Bush testified that she took Berry's statement as a complaint of conduct requiring an investigation.  Exh. 12,  Bush 7-6-21-21 Dep. 41:16-42:5, 137:9-11, 18-25, 138: 1-8.

40.    The Town knew that Berry's complaints included Sealock's offensive statements to her about "blow jobs."  She communicated this directly to Holloway (Exh. 13, Holloway Dep. 75:24-76:1, 76:10-12, 77:3-12, 91:5-20), who then relayed the complaints to Tederick (*id.,* 118:20-24, 119:4-8).  Berry also discussed Sealock's "blow job" comments with Bush (Exh. 12, Bush 7-6-21 Dep. 14317-21), who then relayed Berry's complaints about the "blow job" comments, as well as other complaints, to Council (*id.*, 151:7-9, 152:6-14).

41.    Within days of Berry's complaints of sexual harassment and differing treatment based on sex, Sealock demanded that there be a penalty for Berry's complaints.  Exh. 12, Bush 7-6-21 Dep. 194:22-195:17; Exh. 24, TOWN649.

42.    After Berry made the complaints of sexual harassment and other discrimination based on sex, Sealock came to the conclusion and was told by human resources to avoid Berry at all costs, to walk around her, not to speak with her or to do anything with her.  He came to the conclusion that he "should avoid myself of any activity with her."  Exh. 6, Sealock 7-13-21 Dep. 113:1-13, 169:23-170:5.

43.    According to Sealock, avoiding any dealings with Berry made it extremely hard for Sealock to conduct business on a daily basis as the vice mayor.  Exh. 6, Sealock 7-13-21 Dep. 170:6-7.  Sealock also wrote to Bush that "[i]t will be further hard for me to conduct my council business with this staff member being in future closed session discussions on sensitive matters." *Id.*, 169:23-170:5.

44.     The Town's training on sexual harassment and retaliation identifies "giving a cold shoulder, spreading rumors, avoiding someone who refuses to go along with the offensive behavior" as retaliation and "AGAINST THE LAW."  Exh. 12, Bush 7-6-21 Dep. Exh. 1, p. 5.

45.     On August 16, 2019 at 10:00 a.m., Bush and Laura McIntosh, then risk manager for the Town, met with Berry.  Bush interviewed Berry and questioned her about her complaints of harassment.  This was done at the direction of Tederick.  Exh. 15, Napier Dep. Exh. 3.

46.     The Town Council discussed Berry's complaints of sexual harassment and discrimination at its August 19, 2019 closed session. Exh. 15, Napier Dep. Exh. 3.

47.     On August 19, 2019 at 6:54 p.m., Napier sent Berry an email, with a copy to Tederick, citing to information from the EEOC website for timeframes for filing harassment claims.  Exh. 15, Napier Dep. Exh. 5.

48.     On August 19, 2019, Tederick sent Berry a letter instructing her not to have direct contact with Sealock and also providing information on filing EEOC proceedings.  Exh. 15,  Napier Dep. Exh. 4.

49.     On August 19, 2019, Tederick sent Sealock a letter advising him to have no direct contact with Berry and to contact the Virginia Municipal League ("VML") to request VML-appointed legal counsel to advise him.  Exh. 6, Sealock 7-13-21 Dep. Exh. 1.

50.     On August 19, 2019 at 9:07 p.m., Berry sent an email to Napier with a copy to Tederick and said, in part, "I certainly understand that you cannot provide legal advice to me, not (sic) have I sought legal advice from anyone else. I just want to come to work and not feel demeaned and bullied.  At the moment, I feel as though others have spoken on my behalf to Council for me (HR), and I'm unsure that the actual truth of what happened came across."  Exh. 25, TOWN675.

51.     On August 19, 2019 at 9:09 p.m., Berry followed up with an email telling Napier "it's truly disastrous how things have been handled. I'm beyond shaken by these entire events." Exh. 26, TOWN2185.

52.     On August 20, 2019 at 1:03 p.m., Tina Stevens, Director of Human Resources Services at Virginia Risk Sharing Association ("VRSA"), emailed Bush and confirmed that Bush had indicated to her that the Clerk of Council had brought a claim of harassment by a council member to Bush's attention.  Ms. Stevens went on to say that "(i)f this employee has been harassed, she has a claim in the eyes of the EEOC."  Exh. 27, TOWN637-638.

53.     On August 21, 2019, Tederick sent Berry a letter advising her that "VRSA/VML unequivocally confirmed that Ms. Bush is your Human Resources representative as well as Doug Napier and Joe Waltz." Exh. 15, Napier Dep. Exh. 3. Tederick instructed Berry that the Council would not then hear from her regarding her complaint and that she should not contact any Council members regarding her "statement nor any Town Employees."  *Id*.

54.     On August 22, 2019, Berry was given a copy of her annual evaluation (Exh.5). Exh. 3, Tederick Dep. 63:8-11. There was no mention made of Berry being offered the PIO position, PIO duties, or any training related to that position. *Id*., 89:5-14, 25, 90:1-5.

**The Town's Intent to Offer Berry the PIO Position Ended Due to Her Complaint**

55.     The Town's intent to offer Berry the PIO position evaporated due to the Sealock situation and Berry's case. Exh. 1, Thompson Dep. 129:11-130:14.

56.     Berry continued to perform social media duties for the Town after August 15, 2019. Exh. 3, Tederick Dep. 87:2-4; Exh. 6, Sealock 7-13-21 Dep. 102:3-5, 102:13-18.

57.     Bush finally sent Berry a report on the Town's purported investigation on November 15, 2019. Exh. 28, p.3, TOWN2109; Bush 7-6-21 Dep. 190:5-191:1. Bush concluded that she could not find any witness to corroborate either side. Berry complained about the report

and Sealock's harassment by emails of the same date. Exh. 28, pp.1-2, TOWN 2107-2018; Exh. 29, TOWN625-627.

58.    Instead of offering the PIO position to Berry as Council had previously approved, Tederick told Council that he had decided to give the PIO position to a male employee, Todd Jones.  Exh. 1, Thompson Dep. 134:13.  Jones had been employed in the Town's IT department when Berry was considered as the appropriate choice for the PIO position.  Jones was not identified as a possible candidate until months after Berry's August 15, 2019 complaints of sexual harassment.  *Id.*, 130:14-16, 133:11-25, 134:12-13; Exh. 19, Tewalt Dep. 84:15-22.

59.    Only eleven days after the Bush report was given to Berry, Tederick announced that Jones would take on the PIO duties. Exh. 18, TOWN706.

60.    The Town's position is that it was "[o]nly after [Berry] rejected assuming the PIO duties" that the Town identified "another individual to assume those responsibilities."  Exh. 16, Answer to Complaint, ECF No. 7, Pageid#: 48, ¶ 62.  *See also*, Exh. 7, Defendant's Answer to IR No. 4.[3]

61.    This position is contrary to the undisputed facts.  The Town cannot produce and has not produced facts showing that it ever offered Berry the PIO position or that it offered her any training for such a position.  Berry was not offered the PIO position. SOF ¶¶ 23, 25.  Exh. 3, Tederick Dep. 89:5-14, 25, 90:1-5; Exh. 19, Tewalt Dep. 84:20-22. Berry was not offered any training in connection with the assumption of PIO duties.  SOF ¶¶ 23, 28. Berry never refused to

---

[3] Defendant's Answer to IR No. 4 states in part: ". . . Following their discussion, Mr. Sealock took it upon himself to approach plaintiff about the position. During the discussion, Mr. Sealock suggested that plaintiff would need to take an internet class to gain additional skills necessary to perform the duties of PIO – specifically, digital and social media marketing. Plaintiff clearly expressed she had no interest in taking the class or assuming the duties of PIO. It was only after plaintiff rejected the possibility of becoming PIO, that another candidate was considered. . . ."

take training related to the PIO position or otherwise.  Exh. 6, Sealock 7-13-21 Dep. 103:10-18; SOF ¶ 33

62.     Tederick attempted to assert that Berry rejected the position in a September 7, 2019 email. Exh. 3, Tederick Dep. 72:16-19, 84:9-24. However, when confronted with the email itself (Exh. 3, Tederick Dep. Exh. 8), Tederick admitted that Berry stated she was happy to continue to manage social media during the regular workweek hours being required of her by the Town. *Id.*, 85:1-8. This email specifically referred to Berry's continuing her duties related to social media and in no way reflected her assumption of additional duties related to the PIO position because they were never offered.

63.     Tederick also admitted that Berry was not required to work overtime in her job. Exh. 3, Tederick Dep. 75:19-24.

64.     The Town knew that Berry was perfectly willing to (and did) continue to perform her social media duties during her regular work hours and that Berry's reluctance to do so outside of her regular hours beginning in September 2019 after Council changed her schedule did not affect the decision not to give her the PIO position.  Exh. 1, Thompson Dep. 136:16-137:2.  Berry was not required to work overtime (Exh. 3, Tederick Dep. 75:19-24) and was not paid for overtime (*id.,* 75:5-8) despite VRSA's opinion that she was a non-exempt employee (Exh. 30, Julie Bush 12-13-21 Deposition Exh. 5, p.4).  Berry never rejected assuming the PIO duties or the possibility of becoming the PIO.  Further, no one on Council had indicated that Berry did not want to do the PIO position when Tederick decided to give the position to Jones.  Exh. 1, Thompson Dep. 134:14-19.

65.     The PIO position carried with it a promotion (Exh. 17, TOWN705 "Re: Offer of Promotion with the Town of Front Royal").  This promotion resulted in Jones receiving a substantial increase in pay (Exh. 1, Thompson Dep. 131:4-13; Exh. 19, Tewalt Dep. 85:18-25,

86:1-2; Exh. 17, TOWN705), together with a bonus of $6,000 despite the fact that "a committee of persons, all of whom are female, support[ed] [him as] the PIO and perform[ed] its functions." Exh. 16, Answer to Complaint, ECF No. 7, Pageid#: 43, ¶ 36. Together, the pay increase and bonus amounted to a $16,795.20 increase to Jones's salary. For Berry, that would have represented over a 30% increase in pay. *See* Exh. 7, Defendant's Answer to IR No. 2, p.3. Performing the duties of the PIO position required 15 to 30 hours per week between Jones and his "committee." Exh. 31, Todd Jones Deposition ("Jones Dep.") 117:14-17.

66.     The "committee" who performed the functions of the PIO position (Exh. 16, Answer to Complaint, ECF No. 7, Pageid#: 43, ¶ 36) included a woman who was an independent contractor and was paid $35.00 per hour. Exh. 31, Jones Dep. 117:18-118:8, 121: 1-5, 124:19-125:1.

67.     Berry was terminated from her job effective February 4, 2020. Exh. 32, BERRY001078.

68.     After Berry's termination, Jones continued as PIO until he left his employment with the Town on August 3, 2021. Exh. 31, Jones Dep. 128:8-11; Exh. 33, TOWN2469.


### III.    Application of the Law

### Undisputed Facts Establish Prima Facie Case

The undisputed facts establish all elements of the prima facie case for Berry's Title VII retaliation claim involving the PIO position. "But-for" her complaints on August 15 and 16, 2019 of sexual harassment and sexist and demeaning behavior by Sealock, Berry would have been given the PIO position, which would have been a promotion for her with a substantial increase in income and an enhanced position with the Town. The Town can offer no admissible evidence to rebut the

prima facie case. Berry is entitled to partial summary judgment for liability against the Town on this one portion of her retaliation claims.

It is a violation of Title VII for an employer to "discriminate against" an employee because she has "opposed any practice" made unlawful under Title VII. 42 U.S.C. 2000e-3(a). Berry can prove her retaliation claims through direct evidence, circumstantial evidence, or through the inferential model of proof under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *see Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). First, Thompson's testimony as to the reason for the Town not offering the PIO position to Berry included that "**I think the Bill Sealock, this whole thing by itself, right? And then we have, you know, Jennifer [Berry] and what's going on there.** . . . Like I said, it completely fell off . . . . [E]verything kind of went everywhere and it was never brought up again. . . . **You've got the case ongoing. . . . Jennifer's case**." (Emphasis added.) Statement of Fact ("SOF") ¶ 54. This testimony requires no inference of the reason for the adverse action. Berry's case and the Sealock "whole thing by itself" resulted in the denial of the promotion to the additional PIO duties, even if there were other reasons. *See Bostock v. Clayton County, Georgia*, __ U.S. __, 140 S. Ct. 1731, 1739 (2020) ("[o]ften, events have multiple but-for causes").

Even without Thompson's statements, Berry has established all elements of the prima facie case of Title VII retaliation insofar as the PIO position is concerned. Thus, Berry satisfies the prima facie case where she shows, as she does here, that she engaged in protected activity, the Town took adverse action against her, and there was a causal connection between Berry's protected activity and the adverse action. *Sempowich v. Tactile Sys. Tech., Inc.*, 2021 U.S. App. LEXIS 35820 *17 (4th Cir. Dec. 3, 2021); *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018); *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016). Establishment of a

prima facie case presents an evidentiary presumption that there has been intentional discrimination or retaliation in this case.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

The burden then shifts to the Town to produce evidence to show that the action claimed to be retaliatory "was in fact the result of a legitimate non-retaliatory reason."  *Sempowich*, 2021 U.S. App. LEXIS, at *17.  *See also Strothers,* 895 F.3d at 328, citing to *Foster*, 787 F.3d at 250.  The burden requires the Town to clearly set forth through the introduction of admissible evidence the reasons the Town did not offer Berry the PIO position or any training for the position.  *Burdine*, 450 U.S. at 255 (1981).  If the Town does so, the burden shifts back to Berry to rebut the Town's purported non-retaliatory reasons by demonstrating pretext. *Strothers, 895 F.3d at 328*.  Because the Town fails to meet its burden, as it does on this record, the prima facie case (which raises the inference of discrimination) is unrebutted, and Berry is entitled to partial summary judgment on her Title VII retaliation claim involving the PIO position. *See Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576 (1978) (prima facie case generates inference of discrimination if employer's actions remain unexplained).

**Berry's Complaints of Sexual Harassment by Sealock Constitute Protected Activity**

The Fourth Circuit views oppositional conduct expansively.  *See  DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) and *EEOC v. FLC & Bros. Rebel, Inc.*, 663 F. Supp. 864, 867-68 (W.D. Va. 1987). Berry's complaints orally and by email on August 15, 2019 constitute protected activity under Title VII. Bush considered even Berry's initial statement that morning that "he needs—" or, "He better keep his hands to hisself (sic)" to be a complaint of conduct that needed to be investigated.  SOF ¶ 39.  Berry's August 15, 2019 statements to Holloway and her email to him on that same day outlined some of her harassment complaint.  SOF ¶¶ 10, 37, 38, 40. She followed this up with two sessions with Bush in which Bush questioned her about specifics.  SOF ¶ 45. Among those specifics were complaints of statements by Sealock using the phrase "blow

job." SOF ¶¶ 10, 40. Sealock admitted in his deposition that he referred to a "blow job" comment while in Berry's office.  SOF ¶ 12. He further testified that a subordinate female would be "very offended" by the statements he in turn admitted making about a golfer stating that he was going to come to Town Hall and get a free "blow job".  SOF ¶ 13. Sealock made the "blow job" statement knowing that Berry had been implicated in memes with former Mayor Tharpe containing sexual innuendo that Sealock understood to include "jokes" about "blow jobs", Tharpe, and Berry.  SOF ¶ 8. Additionally, Berry complained of the threat Sealock communicated as coming from Tharpe after she had spoken at closed session in which she offered her opinion that Tharpe should be censured in relation to his public response to the meme.  SOF ¶ 6. Sealock's communication of that threat itself was discriminatory and was made in the context of Berry's evaluation and job goals.  Berry also complained of Sealock's conduct in connection with the "how to use the internet class."  SOF ¶¶ 31, 38. Especially in light of the Town's position that the Town intended to communicate its and Tederick's desire to promote Berry with the enhanced duties of the PIO position, Sealock's instruction to Berry was discriminatory, demeaning and humiliating to her, and she so stated.

Berry's complaints of harassment and sexist behavior constitute protected activity.  The Fourth Circuit found complaints of harassment much less specific than those by Berry to be protected activity in *Okoli v. City of Baltimore*, 648 F.3d 216, 224 (4th Cir. 2011).  The Court said:

> Here, it was enough for Okoli to twice complain of "harassment," even if it might have been more ideal for her to detail the sexual incidents she later relayed. . . . Okoli's April 1 memo to the Mayor further described "unethical and unprofessional business characteristics, e.g., *harassment*, degrading and dehumanizing yelling and demanding, disrespect, mocking and gossiping about other colleagues (anyone in the City government) and lack or disregard for integrity." . . . .
>
> The City surely should have known that Okoli's complaints of "harassment" likely encompassed sexual harassment. Indeed, Okoli's description of

"unethical," "degrading and dehumanizing" conduct suggest severe misbehavior related to her identity—not a mere workplace squabble. Moreover, based on his alleged conduct, Stewart himself surely would have known that Okoli was complaining of sexual harassment.

Oppositional activity also is protected when an employee opposes a "hostile work environment that, although not fully formed, is in progress." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 284 (4th Cir. 2015). A reasonable belief can arise that a hostile work environment is occurring if an isolated incident is physically threatening or humiliating. *Id.*

Indeed, Berry referred, in her August 15, 2019 email, to Holloway to the threats to her job and Sealock's sexually discriminatory, sexist, and demeaning behavior. SOF ¶ 38. Berry then gave more specifics in her meetings the next two days with Bush. Exh. 14, Berry Dep. Exh. 20. Bush testified that at least some of Berry's allegations described conduct that would violate the Town's policies. SOF ¶ 11. Additionally, evidence supporting causation referenced below further supports the conclusion that Berry's complaints were protected by the antiretaliation provisions of Title VII.

**Denial of the PIO Position Was a Materially Adverse Action**

Berry's protected activity at issue in this Motion,[4] namely her complaints about conduct by Sealock, her follow up oral and email complaints to Holloway, and her statements given to Bush on August 15 and 16, 2019, were followed immediately by the Town failing to offer her the PIO position or any training for it to the extent needed. SOF ¶¶ 16-26, 28, 61. The obvious time to have made the offer, if the Town had not been retaliating, would have been when the Town gave Berry her performance evaluation on August 22, 2019. Not being provided the PIO position resulted in a loss of at least $16,795.20 subsequently given to Todd Jones in the first year alone, together with the amounts paid to the women who comprised the committee that performed the functions of the

---

[4] Berry engaged in other protected activity before and after August 15, 2019. Those instances of protected activity will be presented at trial or in opposition to any defensive dispositive motions.

PIO. SOF ¶ 65. Almost $11,000.00 of the amount paid to Jones was a salary increase, with the $6,000.00 balance in the form of a bonus. SOF ¶ 65. The denial of this promotion was a materially adverse action.

In *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 64 (2006), the Supreme Court addressed the type of conduct considered retaliatory under Title VII. In the course of its consideration, the Court stated "the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination. . . . [P]urpose reinforces what language already indicates, namely, that the antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment." Thus, depending on the circumstances, actions may be materially adverse even where they do not result in ultimate adverse employment actions like termination, demotion, denial of a promotion, hiring or the like. However, "'a refusal to promote is a materially adverse action' because it denies a plaintiff a 'tangible opportunity to advance her career.'" *Roman v. Castro*, 149 F. Supp. 3d 157, 173 (D.D.C. 2016) (citing *Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003). In *McCormack v. Blue Ridge Behavioral Healthcare*, 523 F. Supp. 3d 841 (W.D. Va. 2021), Judge Conrad stated that "[i]t is undisputed that failure to promote constitutes an adverse employment action." *(*citing to *Whitaker v. Nash Cnty*, 504 Fed. App'x 237, 239 (4th Cir. 2013) and *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Thus, because a failure to promote meets the higher standard of an adverse employment action, the failure to promote Berry to the PIO position clearly constitutes a materially adverse action for purposes of her retaliation claim. The denial of the PIO position to Berry, then, meets the requirement of material adversity.

**There is a Direct Causal Relationship Between Berry's
Protected Activity and the Denial of the PIO Position.**

"[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden."

*Strothers,* 895 F.3d at 335. There was a direct causal relationship between Berry's protected

conduct and the denial of the PIO position. First, Thompson made that causal connection clear by

reference to the situation involving Sealock and Berry's case. SOF ¶ 55. In addition to that direct

evidence from a sitting councilmember, the immediate temporal proximity of the adverse action

to Berry's oppositional behavior alone provides a causal connection. *See Strothers*, 895 F.3d 317

at 337; *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (noting that causal connection in the prima

facie case has been found where four months lapsed between plaintiff's protected activity and

firing).

Berry also "may establish prima facie causation simply by showing that (1) the employer

either understood or should have understood the employee to be engaged in protected activity and

(2) the employer took adverse action against the employee soon after becoming aware of such

activity." *Sempowich*, 2021 U.S. App. LEXIS, at *18; *Strothers v. City of Laurel*, 895 F.3d 317,

336 (4th Cir. 2018). Berry's complaint on the morning of August 15, 2019 in the Town Manager's

office, through her email to Holloway that day, and then through two meetings with Bush

specifically included references to sexual statements and touching, discrimination, and demeaning

and sexist conduct. Her complaint also referenced the prior threats to her job communicated to her

by Sealock when he should have been addressing Berry's goals for her evaluation. Instead, Sealock

told her that Tharpe had threatened her job and that she would not be employed long so her

employment goals did not matter. Berry's complaints and the Town's reaction to them show the

Town's understanding, or that it should have understood, that Berry's complaints constituted

protected activity.  *Id*.  Moreover, general corporate (municipal) knowledge that Berry had

engaged in protected activity is sufficient to satisfy the knowledge requirement. *Gordon v. New York City Board of Ed.*, 232 F.3d 111, 116 (2d Cir. 2000).

But there is more. The Town unambiguously understood Berry to be engaged in protected activity. Napier, the Town Attorney, sent Berry an email citing to information from the EEOC website regarding timeframes for filing harassment claims. SOF ¶ 47. He copied Interim Mayor Tederick with the email. *Id.* Tederick followed with a letter to Berry providing the same information. SOF ¶ 48. The Town also claims that it began an investigation of Berry's complaints, and councilmembers, Tederick, and Bush discussed Berry's complaints of Sealock's sexual harassment and sexually demeaning conduct. SOF ¶¶ 45, 46.

As to the second element of the causation inquiry, the Town took virtually immediate adverse action against Berry in not offering her the PIO position as it had intended to do as recently as August 15, 2019. The Town's position is that it offered Berry the PIO position and training for it, and that she rejected both. There is no factual basis for such a position. Rather, the undisputed facts show that the Town intended and wanted to offer Berry the PIO position as late as August 15, 2019; Berry engaged in protected activity; she was not offered the PIO position that day or any subsequent day; she was not offered any training in connection with the assumption of the PIO duties; she never refused to take training related to the PIO position or otherwise; and she never rejected assuming the PIO duties or the possibility of becoming the PIO. It is impossible to reject or even consider a position not offered. Similarly, Berry could not turn down training that was not offered to her or did not exist. She searched for the training Sealock mentioned, and it did not exist. Bush confirmed that she also searched and could find no such training. Sealock did not provide any further information. And he confirmed that he said nothing to Berry about the PIO position and enhanced duties. Thus, the materially adverse action was immediate. It occurred again in November 2019 when, eleven days after the purported "investigation report" was given to Berry,

the Town gave Jones the PIO position. The Town simply cannot meet the burden imposed on it to rebut Berry's prima facie case on these facts.

Berry does not need to move to the pretext stage, on which she also would prevail, because the Town can offer no evidence admissible at trial to show that it offered Berry training, the PIO position, or that she rejected either or both. Accordingly, Berry is entitled to partial summary judgment on the portion of her retaliation claim involving the denial of the PIO position. *See Okoli*, 648 F.3d at 225.

## IV.   Conclusion and Relief Sought

For the foregoing reasons, Jennifer Berry requests entry of partial summary judgment in her favor on the issue of the liability against the Town for violation of the anti-retaliation provisions of Title VII involving failure to offer her the PIO position. She makes no request at this time with respect to the remedies, including damages, back and front pay, equitable relief, costs and attorneys' fees, or other relief, as these and other liability and damage issues remain for trial.

**JENNIFER BERRY**

By: */s/ Timothy E. Cupp*
Timothy E. Cupp (VSB #23017)
Shelley Cupp Schulte, P.C.
1951 Evelyn Byrd Avenue, Suite D
Harrisonburg, VA  22803
(540) 432-9988
(804) 278-9634 [fax]
cupp@scs-work.com

Tim Schulte (VSB #41881)
Shelley Cupp Schulte, P.C.
3 W Cary Street
Richmond VA 23220
(804) 644-9700
(804) 278-9634 [fax]
schulte@scs-work.com
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of March, 2022, the foregoing was delivered through

the CM/ECF system to be forwarded electronically to:

> Heather K. Bardot, Esquire
> McGavin, Boyce, Bardot, Thorsen & Katz, P.C.
> 9900 Fairfax Blvd, Suite 400
> Fairfax, Virginia 22030
> hbardot@mbbtklaw.com
> Counsel for Defendant
> _/s/ Timothy E. Cupp_