**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

JENNIFER BERRY,                                )
                                                              )
      Plaintiff,                          )
                                                              )       Case No.: 5:21cv00001
v.                                                            )
                                                              )
TOWN OF FRONT ROYAL, VIRGINIA,   )
                                                              )
      Defendant.                       )

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW Defendant, Town of Front Royal, Virginia ("the Town"), by counsel, and

files its Opposition to Plaintiff's Motion for Partial Summary Judgment, stating as follows:

**I.        SUMMARY OF DEFENDANT'S OPPOSITION**

Plaintiff, Jennifer Berry ("Berry"), has filed what can only be referred to as a frivolous

Motion for Partial Summary Judgment, asserting that the uncontradicted facts in this case establish

that the Town failed to offer her a position as Public Information Officer ("PIO") "in retaliation

for her having engaged in protected activity under Title VII, namely, in complaining of sexual

harassment and sexist, demeaning, and humiliating behavior by William Sealock ("Sealock"), a

Town Councilmember,…." ECF No. 80, p.1. Relying upon this baseless assertion, Berry claims

that she is entitled to Partial Summary Judgment on the issue of liability against the Town on this

portion of Count II of her Complaint.

At the outset, as the Town has argued extensively in its Motion for Summary Judgment,

the Town had no control over Berry's job duties. She was appointed by Council and answered

solely to Council. Council set her job responsibilities and pay. Had the Town determined that it

would have liked to have Berry handle the PIO duties, which never occurred as will be shown

1

below, it would have had to seek Council's approval. This also never occurred.

The record demonstrates, without question, the reason that Berry was not selected to assume the PIO duties had nothing to do with her complaint against Sealock. Rather, on August 15, 2019, Matthew Tederick ("Tederick"), then Interim Mayor, had a regular, weekly meeting with the Town Manager, Joe Waltz ("Waltz"), and Councilmember Sealock. At that meeting, Tederick expressed an interest in enhancing the Town's public information image and role. A conversation ensued in which Berry was mentioned as a possible fit for what would later become the PIO role. It was believed that she might have the ability to assume these duties given that she was handling the Town's Facebook page and did not seem overtasked with work. It was Tederick's intent to approach Berry to discuss the matter with her and determine if she had any interest in the PIO role and/or whether she was qualified to handle the work. Immediately after the meeting, Sealock, who had mentioned his intent to do so during the meeting, approached Berry and suggested that there was a free internet class at the library which she might want to take. Although Berry never located the class, somehow she determined it was elementary and well below her skill level. The suggestion that she might want to take the class reportedly offended Berry. She made this apparent in the initial complaint regarding Sealock which she made on August 15, 2019. Thereafter, on September 9, 2019, Berry sent an email to Council stating:

> As I have been asked to stay close to a Monday-Friday schedule, I will not be posting Staff updates, checking or responding to comments from citizens on the Town's social media page, where we have close to 9,000 followers and many posts receive over 20,000-30,000 interactions.
>
> **I know in order to address the needs of our citizens the Town will want to make other arrangements for coverage.**
>
> **The Town receives many questions and comments specifically during holidays, hurricanes, snow storms, electrical outages, and flood events, so an employee checking during those times would be very important for our citizens. Staff also has posts that need coverage on days/times that are not typical work days.**

Previously I was always happy to do this on the weekend, evenings, holidays, and my vacation, as it allowed the Town to stay current and interactive with citizens every day of the week/365 days a year. With the recent request from Council to stay within specific days/hours I am attempting to comply with that request the best that ***I can and will no[t] answer during "off" hours.***

(emphasis added).

The PIO position, as it was being contemplated and as it operated once established, required the person(s) assigned to the role to be available at times other than "regular work hours." It required nighttime availability, weekend availability and holiday availability. Inasmuch as Berry made clear on September 9, 2019 that she would not be available during "off hours," which she later clarified meant she was only going to handle social media during "regular hours," Tederick no longer considered approaching Berry to discuss: 1) whether she had an interest in the PIO position (she had made clear that she did not); or 2) whether she had the qualifications to handle the work. There was no reason to do so. It was clear to Tederick that Berry refused to work other than during "regular hours," and the PIO role required the individual assigned the duties to be available outside the "regular hours" Berry expressly indicated she would be available.

Tederick was subsequently informed that Todd Jones ("Jones"), the IT manager, had extensive marketing and video production experience. As the IT manager, with that background, it made sense to approach him to handle the PIO duties. Tederick did so. Before Jones was selected to handle the PIO duties, there was a lot of discussion regarding what to do with the position, how it was going to come into form and what the goals were for the position. Jones also made a presentation to Council regarding how he envisioned the position before he was selected by Tederick to handle the PIO duties. Tederick did not need Council's position to assign Jones the PIO duties as Jones was an employee of the Town and was not appointed by or under the direction of Council. After being selected to handle the PIO duties, Jones pulled together a group of women

3

to assist him with the PIO duties.

There is absolutely no evidence that Berry was excluded from consideration for the PIO position because of any complaint she made relating to Sealock. There is also no evidence that Berry was qualified for the PIO position. There is also no evidence that the Town or Council intended to offer Berry the PIO position *at any time*. Berry's claims to the contrary are not supported by the record, but are instead completely refuted by the record. The Town submits that there is absolutely no basis upon which the court could possibly grant Berry partial summary judgment as it relates to the issue of liability against the Town on the PIO position portion of Count II of her Complaint.

## II. BERRY'S <u>PURPORTED</u> STATEMENT OF MATERIAL FACTS ABOUT WHICH THERE IS NO GENUINE DISPUTE IS UNRELIABLE, CITES TO "EVIDENCE" WHICH IS INADMISSIBLE, MISCHARACTERIZES THE RECORD AND IS COMPLETELY INSUFFICIENT TO SUPPORT PARTIAL SUMMARY JUDGMENT IN HER FAVOR

Berry's representations regarding what material facts are purportedly not in dispute are quite outrageous. In large part, Berry ignores the voluminous record which is contrary to the "undisputed facts" she cites and she misrepresents the record, or pulls from and relies upon testimony in the record which is not admissible and may not be considered on summary judgment. The Town addresses each of the disputed paragraphs in Berry's Memorandum in Support of Summary Judgment [ECF No. 80], pp. 3-17 below.

1.      Berry was not always "Clerk of Town Council," as alleged. She was hired as part-time Clerk of Town Council on August 24, 2005. Ex. 1, Berry Dep. 64:15-65:5. Berry became full-time Clerk of Town Council on July 1, 2017. *Id.* 88:14-89:9.

2.      Berry's conclusion that she was "good at her job," is not a fact, but a self-serving conclusion which is not admissible for purposes of summary judgment. To suggest that there were

no issues with Berry's job performance in the 2018-2020 time period is false. Ex. 2, Matthew Tederick Designee ("Tederick Dep.) 77:1-84:8; 93:12-94:2; Ex. 3, Thompson Dep. 31:21-34:11; Ex. 4, Gillispie Dep. 28:18-30:12, 31:4-11; Ex. 5, Tharpe Dep. 16:14-19:7. While Berry's Overall Performance Review Comments from 2019 are as quoted, the Review also identified issues such as failure to post hours, inconsistent work hours, and that her phone was not always appropriate. Ex. 6, Berry's 2019 Employee Performance Evaluation.

3.      The Town did not give Berry a merit increase, as asserted. Berry was Clerk of Town Council, appointed by Town Council in accordance with The Town Charter, Chapter I, § 4. Ex. 7, Town Charter. Pursuant to Town Charter, Chapter VI, § 43, Council set her salary. *Id.* Ex. 13, Napier Dep. 34:3-14.

4.      Berry has quoted only sections of how Thompson, Gillispie and Tharpe described Berry's performance. Each of them identified performance issues, as set forth in paragraph 2, above. Further, it matters not what any individual Council member thought of Berry's performance, as they speak only as a whole.

6.      Sealock denies instructing Berry to contact Tharpe in April 2019 to tell him not to come to the council meeting that night because he would take it better from a woman. Ex. 8, Sealock Dep. (7/13/21) 152:16-156:21. With regard to Berry's assertion that she needed to attend closed sessions, that is disputed. Ex. 9, Tewalt Dep. 119:5-120:2, 132:3-133:2. It is also disputed that Berry asked to be recognized at the closed session in April of 2019. Ex. 9, Sealock Dep. (7/13/21) 152:16-153:4. Further, Tharpe, Sealock, Thompson and Holloway did not see the referenced meme in closed session, as asserted by Berry. Ex. 5, Tharpe Dep. 31:20-32:12; Ex. 8, Sealock Dep. (7/13/21) 152:16-153:4; Ex. 3, Thompson Dep. 26:3-27:8; Ex. 10, Holloway Dep. 81:23-82:13; Ex. 1, Berry Dep. 221:7-222:2. Tewalt recalls Berry showing him the meme in closed

session, but he did not have on his reading glasses and could not see it. Ex. 9, Tewalt Dep. 56:3-59:16

8.      Sealock never saw the meme. Ex. 8, Sealock Dep. (7/13/21) 152:16-153:4. The testimony by Sealock about what he was told the meme depicted and the testimony by Bush as to what Sealock told her Tewalt told Sealock about the meme is hearsay and may not be considered on summary judgment. "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Maryland Highways Contractors Ass'n v. State of Md.*, 933 F.2d 1246, 1251 (4th Cir. 1991); *Washington v. Kroger Ltd. P'ship I*, No. 3:11-cr-00074, 2012 U.S. Dist. LEXIS 171993 (W.D. Va. Dec. 4, 2012). Further, Berry does not recall what the meme depicted. Ex. 1, Berry Dep. 215:8-223:12. She also failed to capture or maintain a copy of the meme. *Id.*

9.      Sealock never saw the meme. Ex. 8, Sealock Dep. (7/13/21) 152:16-153:4. Any characterization or description by him is based on inadmissible hearsay. Further, Berry mischaracterizes Sealock's testimony. The quoted sections make clear that he is trying to describe that which he hasn't seen and identify it as Berry had: "this so-called cartoon or joke or memes or whatever she calls it about a blow job." Ex. 8, Sealock Dep. (7/13/21) 179:18-20.

10.      Sealock and the Town deny that Sealock asked Berry the "going rate for a blow job." Ex. 8, Sealock Dep. (7/13/21) 159:8-12; 254:2-16. To the extent that Berry relies on hearsay from Holloway, Bush and Berry, the court may not consider that on summary judgment. *Maryland Highways Contractors Ass'n,;* supra*; Washington,* supra. Further, Holloway admits that he has no knowledge whether Sealock ever discussed a blow job in Berry's presence. Ex. 10, Holloway Dep. 71:4-14.

11.      The Town of Front Royal maintains an Employee Handbook ("the Handbook"),

last updated and adopted on March 11, 2013. Ex. 11. The Handbook expressly states:

> All employees of the Town of Front Royal, those persons who work for the Town in return for financial compensation, ***except elected officials*** and independent contractors, are governed by this common set of employment policies.

*Id*. at p. 1, paragraph I(C) (emphasis added). The handbook dated March 11, 2013 is still in effect. Ex. 4, Gillispie Dep. 78:1-79:22. The Town's elected officials are therefore not subject to the Town's employment handbook and the policies contained therein. Ex. 11. Further, Bush's beliefs as to what constitutes sexual harassment is irrelevant and inadmissible. She is a layperson, not designated as an expert. The term "sexual harassment" is a term of art. Whether or not certain behavior rises to the level of sexual harassment is a legal question. *Moses v. Correct Care of S.C., LLC*, No. 3:18-cv-2358-JFA-SVH, 2020 U.S. Dist. LEXIS 96944 (D.S.C. June 3, 2020); *EEOC v. Fed. Express Corp*., 188 F. Supp. 2d 600 (E.D.N.C. 2000). The Town has exhaustively outlined in it Memorandum in Support of Motion for Summary Judgment [ECF No. 75] why the Town is not responsible for any alleged behavior by Sealock and how Berry has failed to establish sexual harassment, regardless, and relies on those argument to contest what Berry has stated herein.

13.    While the Town does not dispute that Sealock testified generally to what is cited, his opinion as to whether an unspecified subordinate may find a comment offensive is speculative and lacks a factual basis. Also, to the extent that Berry suggests that this testimony by Sealock supports a claim of sexual harassment against the Town, the Town relies on the statements made in response to paragraph 11.

14.    Berry has cited to no facts as to why Sealock came to her office on May 13, 2019. Tharpe never ran for re-election or served on Council after resigning. Ex. 5, Tharpe Dep. 33:17-34:5. The Town disputes Berry's claim that Sealock threatened her job on May 13, 2019. Ex. 1, Berry Dep. 183:3-186:1; Ex. 8, Sealock Dep. (7/13/21) 157:12-158:10, 161:24-162:15; Ex. 12.

15.     The recited email communication between Napier and Berry is incomplete. *See* Ex. 17 to Town's Motion for Summary Judgment. ECF No. 76-5. The email exchange speaks for itself. *Id.* As for Berry's contention that the Town considered Douglas Napier, the Town Attorney appointed by Town Council, as one of Berry's HR representatives based on Ex. 3 to Napier's deposition, that document does not so state or support that contention. Napier, like Berry, serves at the behest of Town Council and was nothing more than Berry's co-worker. Ex. 13, Napier Dep. 14:18-22, 20:21-21:8. Napier had no reason to be involved in the investigation into the complaints made by Berry regarding Sealock and wanted no part in the investigation. Ex. 13, Napier Dep. 20:21-21:19, 76:19-77:6.

16.     It is completely false that Council discussed giving Berry enhanced duties associated with a "PIO position" sometime prior to August 15, 2019 in connection with a discussion regarding her evaluation. What ***actually*** occurred is that, shortly before August 15, 2019, Tederick had been appointed Interim Mayor. ECF No. 75-5. Tederick was:

> on a big push to enhance the Town's public information image and role. And [that] morning, [August 15, 2019], we [Waltz, Tederick and Sealock] had a discussion about the PIO and Joe Waltz had an open discussion about – Joe Waltz being the Town Manager at the time. We had an open discussion about the role of PIO, who would be a good person for the PIO, how to enhance the job duties – I say "job duties," the job of disseminating information to the public.
>
> And it was the consensus at the time that it made sense because, you know, we felt that Jennifer was a full-time employee and that she didn't seem overburdened with work, that she could assume this role of an enhanced PIO position.
>
> Bill [Sealock] mentioned that he had come across a training class … so I thought it would be a good idea to get Jennifer to take some enhanced specific in-depth, perhaps marketing training. It was just a good discussion. It was just a healthy, good discussion. Joe Waltz -- my recollection is Joe Waltz agreed.

Ex. 2, Tederick Dep. 66:10-67:9.

However, the Town had not discussed the "PIO position" with Berry or explored whether,

in fact, she had the skill set to take on the PIO duties. *Id.* 71:9-16; 89:9.

The "PIO position" did not carry with it increased pay for additional duties. Ex. 14, Jones Dep. 36:24-37:18. Jones, who took on the PIO duties was paid a one-time bonus of $6,000 for taking on those duties. *Id.* 35:21-36:23.

18.     Berry mischaracterizes Holloway's deposition testimony. Ex. 10, Holloway Dep. 41:21-48:16. If one reviews the entire conversation with Holloway during his deposition as it relates to the PIO duties, it is clear that he has no direct knowledge about anything related to the PIO position and/or consideration of Berry for the role. *Id.*

Berry also mischaracterizes Tederick's testimony by suggesting that there was a "consensus that Berry could assume this role." *See*, paragraph 16, above. As Tederick clearly testified that, on August 15, 2019, he raised the idea that the Town needed to enhance its public information image and role during a regular, weekly meeting with Waltz and Sealock. *Id.* ***At that time***, there was a consensus that Berry may be able to fill the role. *Id.* However, after Sealock approached Berry about taking an internet class, Berry blew up and refused to do social media tasks which would be necessary for someone assuming the PIO duties. Ex. 2, Tederick Dep. 66:6-70:15, 70:20-71:19, 72:5-19, 73:4-16, 84:9-86:3, 86:17-88:9, Ex. 14, Jones Dep. 120:2-123:6, ECF No. 76-12. As a result, in November 2019, Tederick offered Jones the role of PIO. ECF No. 77-5.

19.     The statement set forth herein is incomplete and a mischaracterization of the facts. *See*, paragraphs 16 and 18 above.

20.     Berry again mischaracterizes the evidence. The quoted language from Tewalt's deposition regarding whether Berry was qualified for the PIO position, which was given over an objection, was:

> Q.     In your estimation, would Ms. Berry have been an appropriate person to take on [the PIO] position?

9

> A.    Well, in the work she had done previously and was doing, as far as I was concerned, she would have been qualified, yes.

Ex. 9, Tewalt Dep. 95:13-20.

Putting aside that Tewalt's personal opinion regarding Berry's qualifications to take on the PIO duties if of no relevance, since it was Tederick's role of making a determination who he would like to see in the role, Berry fails to advise the court of the follow up testimony by Tewalt which makes it clear that there is no basis for his opinion regarding Berry's qualifications in the first instance:

> Q.    Okay.· You had talked about this PIO position for a minute.
>
> A.    Uh-huh.
>
> Q.    Do you know what the qualifications were for that job?
>
> A.    I have not. This was something, like I told you, the manager takes care of that hired any employees, other than the three.
>
> ***
>
> Q.    Do you know what the job duties would have been for the PIO position?
>
> A.    No, ma'am.

Ex. 9, Tewalt Dep. 126:15-127:3.

The above testimony also refutes any basis for Tewalt to assert that Berry was doing the duties of PIO as part of her job.

The cited comments by individual Council members regarding Berry being "well spoken," "front facing" (whatever that means), and believing that Berry could be "doing more things that would be helpful with the way [the Town] interact[ed] with the public," say nothing about Berry's qualifications to handle the PIO duties. It is also irrelevant what individual Council members thought about Berry's qualifications to handle the PIO duties, as it was Tederick who was

10

spearheading the effort to determine who would best be able to handle the PIO duties.

Additionally, as set forth above in paragraphs 16 and 18, the Town never determined whether Berry was qualified to handle the duties of PIO because, based on her September 9, 2019 email refusing to handle social media outside "regular hours" and advising the Town "I know in order to address the needs of our citizens [on social media] the Town will want to make other arrangements [other than through Berry] for coverage," it was clear that the PIO duties, which require work outside "regular hours," could not be assigned to Berry. Jones Dep. 120:2-123:6, ECF No. 76-12.

21.     Berry again mischaracterizes Thompson's testimony. As Thompson makes clear during her deposition, Tederick was taking the lead on the PIO position. Ex. 3, Thompson Dep. 67:1-70:23. After some discussion between Tederick and Council regarding the potential that Berry might be suitable to take on the PIO duties, it was Tederick who was going to follow through to determine if that was the case. *Id.* For reasons set forth in paragraphs, 16, 18 and 20, that did not occur.

22.     The meeting on August 15, 2019 was not to discuss Berry's evaluation. Ex. 2, Tederick Dep. 64:25-65:6. As set forth above in paragraphs 16, 18, 20 and 21, Council had not approved offering the PIO position to Berry on August 15, 2019 or at any time, and there was never an "agreement" that Berry could assume that role.

23.     The first part of this paragraph is accurate. The second part, is partially accurate, but also misleading. The cited testimony from Tederick's deposition does not support the claim that the Town offered no training to Berry. In fact, when Sealock suggested training to Berry, she blew up and refused to perform duties which would have been required of someone handling the PIO duties. *See* paragraph 18, above. It is because of Berry's response to Sealock's suggestion of

training that Tederick did not pursue determining whether Berry would have been qualified for the PIO position. Ex. 2, Tederick Dep. 84:9-88:9.

24.     The assertion in this paragraph is untrue. Sealock told Tederick during the August 15, 2019 meeting that he was going to approach Berry about a training class, or an internet class. Ex. 2, Tederick Dep. 66:24-69:15. He did so, which is what led Berry to react by sending an email refusing to handle any social media outside "regular hours." *See* paragraph 20, above.

25.     It is true that Sealock did not mention the PIO position to Berry when he spoke with her on August 15, 2019. It remains untrue that, prior to Sealock speaking with Berry, he, Tederick and Waltz "agreed Berry could assume the PIO role." *See* paragraphs 16, 18, 20-22, above.

26.     Sealock did not instruct Berry to take a class on "how to use the internet." Ex. 8, Sealock Dep. (7/13/21) 94:23-95: 19. Rather, he came across a free course at the library on Internet Facebook activities, and he brought it to Berry's attention because he thought she might like to take it. As for the reason that Berry was not ultimately considered for the PIO position, see paragraphs 16, 18, 20-22, above.

27.     To state that the class Sealock advised Berry of was "well beneath Berry's skill level" is not a fact or admissible since it is unclear what the class was in the first instance. Further, Thompson's opinion as to Berry's skill level is irrelevant and lacks any foundation. As Thompson also explained:

> Bill doesn't have technical skills. So he might have handed Ms. Berry something that was more elementary. And I believe she took offense to that because it was the rest of us would have been like – it was not, I guess, the proper course or something. I *think* it was a computer basics course. ***I don't remember the exact details*** but I remember he said something to Jennifer about taking this course and it was about something that was pretty much basics that she would have already known….And I'm pretty sure he said he gave her something for education that he thought would be pertinent to a new position.

Ex. 3, Thompson, Dep. 69:6-24 (emphasis added).

28.     Sealock did not offer Berry any specifics about the course because he didn't have any specifics. Ex. 8, Sealock Dep. (7/13/21) 96:18-97:3. It is true that Sealock did not advise Berry that the course he mentioned to her had anything to do with her potentially taking on PIO duties. No such decision had been made by the Town or Council, despite Berry's continued representations to this court to the contrary. *See* paragraphs 16, 18, 20-23 and 25, above.

29.     The Town disputes Berry's characterization of Sealock's demeanor during his discussion with her regarding taking a free class at the library. First, Berry's characterization of the encounter during her deposition is not in accord with Sealock's characterization of the encounter. Ex. 8, Sealock Dep. (7/13/21) 95:20-97:3. It is also not consistent with what Berry documented on August 15, 2019. ECF No. 76-7. Finally, Berry's opinion of Sealock's demeanor and/or her feelings are not facts, but opinions which the Town does not accept as true, and which the court may not consider as true either.

30.     Sealock's recollection as to why he suggested the internet class to Berry on August 15, 2019 is less than clear. He testified that he "thought it was the David Silek" matter that prompted the discussion. Ex. 8, Sealock Dep. (7/13/21) 98:16-24. Then, the following exchange occurred:

> Q.     Did you specifically tell Ms. Berry, when you approached her that day, that this was – that your suggestion for her to take this internet class was because of the David Silek situation, or did you say because of recent events or something like that?
>
> A.     I thought it was the David Silek event.
>
> Q.     Yeah. What I am asking you is, did you tell her that>
>
> A.     I'm not sure.

*Id.*, 16:98-24.

Sealock does recall, however, consistent with what Tederick testified to, that before

speaking with Berry on August 15, 2019, Sealock had been in a meeting with Tederick and Waltz where there was a discussion of the need to have someone responsible for handling the Town's social media. Ex. 8, Sealock Dep. (7/13/21) 97:23-98:4. It was at that meeting that Sealock advised he was going to tell Berry about an internet class she might be interested in taking. Ex. 2, Tederick Dep. 66:10-67:9. Later that same day is when the exchange between Berry and Sealock related to the internet class occurred.

31.     These assertions are untrue. *See* paragraph 29, above.

32.     Berry's characterization of herself as "overqualified" for a course which she never saw or located is a conclusory opinion, not based in fact and lacking in foundation. The court may not consider this assertion for purposes of a motion for summary judgment. As for Bush's testimony, it is inadmissible hearsay which is also not properly considered by the court on summary judgment.

33.     Sealock doesn't recall why Berry did not take the course he suggested. Ex. 8, Sealock Dep. (7/13/21)103:5-14. Additionally, the cited section of Sealock's deposition does not state, as asserted, that Sealock did not follow up to find *any* training for Berry. He simply stated that after he spoke with Berry about the free class at the library he did not send her information about that class. *Id.*, 103:15-18.

34.     The allegations in this paragraph – based on self-serving testimony by Berry – are disputed. *See* paragraphs 16, 18, 20-23 and 25, above.

35.     The allegations in this paragraph are disputed. *See* paragraphs 16, 18, 20-23 and 25, above. *See also* Ex. 10, Holloway Dep. 43:23-44:2.

36.     The allegations in this paragraph are disputed. *See* paragraphs 16, 18, 20-23 and 25, above. Berry was never selected to assume the duties of PIO and was not considered for the

14

position once it was formally formulated for the reasons outlined above. *Id.*

37.     The Town disputes that Sealock ever engaged in any behavior toward Berry which was sexist or harassing, as the Town has exhaustively briefed in its Motion for Summary Judgment. That briefing is relied upon herein.

38.     Berry's email is paraphrased inaccurately. ECF No. 76-7.

39.     As for Berry's contention that the Town considered Bush and Waltz to be Berry's HR representatives based on Ex. 3 to Napier's deposition, that document does not so state or support that contention. Waltz, like Berry, serves at the behest of Town Council and was nothing more than Berry's co-worker. Ex. 13, Napier Dep. 14:18-22, 20:21-21:8.

40.     To be clear, as the Town has outlined in its Motion for Summary Judgment, the elected officials of the Town are not "the Town." Thus, to the extent that Berry tries to suggest that telling an elected official something is akin to telling the Town, that is a legally unsupported and disputed proposition. After Berry's August 15, 2019 complaint related to Sealock, the Town learned that Berry claims that Sealock asked her the "going rate for a blow job." Sealock steadfastly denies this. Ex. 8, Sealock Dep. (7/13/21) 159:8-12, 161:4-12; Ex. 17, Sealock Dep. (8/31/21) 320:22-25; Ex. 15, Bush Dep. (7/6/21) 143:10-24; Ex. 16, Bush Dep. (12/13/21) 28:7-29:5. It wasn't until Sealock was deposed in this litigation that the Town learned that he had ever used the word "blow job" in Berry's presence. Ex. 2, Tederick Dep. 138:4-139:9.

41.     Sealock did not demand that there be a "penalty for Berry's complaints." Ex. 8, Sealock Dep. (7/13/21) 212:24-213:5. Rather, he thought that HR should take action for the manner in which Berry made her complaint; i.e. in a blow-up in Brandi Cameron's office rather than through a complaint to HR. *Id.* Ex. 15, Bush Dep. (7/6/21) 194:22-195:17. Bush/HR/the Town took no action in response to Sealock's statement. Ex. 15, Bush Dep. (7/6/21) 194:22-195:17.

Sealock had no power to take any action against Berry for failure to follow the Town's policies as it relates to reporting complaints. Ex. 8, Sealock Dep. (7/13/21) 212:24-213:5.

42.     Berry overstates and mischaracterizes Sealock's testimony, which speaks for itself.

43.     Despite avoiding Berry, Sealock was able to conduct his Council business. Ex. 17, Sealock Dep. (8/31/21) 320:2-21.

44.     Exhibit 1 speaks for itself. That being said, the Town policies regarding retaliation and harassment do not apply to elected officials. *See* arguments raised in the Town's Motion for Summary Judgment and ECF No. 75-8. Additionally, the Town's policies do not define or set the standard for what is retaliation or sexual harassment. *See, e.g., Moses v. Correct Care of S.C., LLC*, No. 3:18-cv-2358-JFA-SVH, 2020 U.S. Dist. LEXIS 96944 (D.S.C. June 3, 2020); *EEOC v. Fed. Express Corp.*, 188 F. Supp. 2d 600 (E.D.N.C. 2000).

47.     The email speaks for itself and is not fully recited herein.

48.     The letter speaks for itself and is not fully recited herein.

49.     The letter speaks for itself and is not fully recited herein.

50.     The email speaks for itself and is not fully recited herein. To the extent that Berry intends to convey anything she said in the email is true, the Town disputes Berry's claims of being demeaned and bullied for the reasons cited in its Motion for Summary Judgment and above. Berry has presented no admissible evidence of ever being bullied or demeaned.

51.     The email speaks for itself and is not fully recited herein. To the extent that Berry intends to convey anything she said in the email is true, the Town disputes Berry's claims for the reasons cited in its Motion for Summary Judgment and above. Further, Berry's opinion that it's disastrous how things have been handled is not a fact, nor may the court treat it as such.

52.     The email speaks for itself and is not fully recited herein. The last sentence is also

inadmissible hearsay from a layperson who lacks a foundation to make the statement in any event.

53.     The letter speaks for itself and is not fully recited herein. And, although Berry was asked not to discuss her complaints related to Sealock with Council during the Town's investigation, she blatantly disregarded the request. ECF Nos. 76-3, 76-8.

55.     The statement in this paragraph is false. *See* paragraphs 16, 18, 20-23 and 25, above. *See also*, Ex. 3, Thompson Dep. 67:22-70:23; 128:24-135:4; 229:20-25. Thompson had no involvement in the decision as to who would handle PIO duties. Ex. 3, Thompson Dep. 229:20-25. The decision was Matt Tederick's. *Id.*

56.     Berry performed *some* social media duties for the Town after August 15, 2019, but expressly refused to handle others and told the Town to "make other arrangements [other than through Berry] for coverage." Ex. 2, Tederick Dep. 84:9-86:3; Ex. 3, Thompson Dep. 28:24-29:11; ECF No. 76-12.

57.     The referenced documents speak for themselves and have not been fully set forth by Berry. To the extent that Berry says that the "purported" report was "finally" sent to her on November 15, 2019, the court should ignore Berry's characterizations as they are not facts and are baseless. The investigation into Berry's complaint of sexual harassment was delayed when Berry made an accusation that a Council member "took her out back" and threatened her, triggering the need for additional investigation. Ex. 2, Tederick Dep. 169:23-170:22 There was additional delay in finalizing the investigation due to outside counsel's trial schedule. *Id.*

58.     Council never approved Berry for the PIO position. *See* paragraphs 16, 18, 20-23 and 25, above. Jones was not considered for the PIO duties until after it became evident that it would be futile to investigate whether Berry would be suitable because she refused to do tasks which the position required. *Id.* After Berry's email telling Council she would not handle social

media except during regular hours and the Town should make other arrangements for coverage, Tederick learned from Waltz that Jones had extensive marketing and video production experience. Ex. 2, Tederick, 86:17-87:1. As the IT manager, with that background, it made sense to approach him to handle the PIO duties. *Id.* Tederick approached Jones to discuss the PIO position. Ex. 14, Jones Dep. 110:3-112:5. Before Jones was selected to handle the PIO duties, there were a lot of discussion regarding what to do with the position, how it was going to come into form and what the goals were for the position. *Id.* Jones also made a presentation to Council regarding how he envisioned the position before he was selected by Tederick to handle the PIO duties. *Id.* Additionally, Berry, consistent with her September 8, 2019 email to Council, had told Jones that she had no interest in handling social media for the Town. *Id.*, 112:6-20. After being selected to handle the PIO duties, Jones pulled together a group of women to assist him with the PIO duties. Ex. 14, Jones Dep. 115:20-121:5. The cited record does not support the contention that "Tederick told Council that he had decided to give the PIO position to a male employee,"….

60.    The Town takes issue with Berry's characterization of its "position" based on small excerpts from various documents. The Town's position, as amply supported by the record and uncontradicted by fact, is set forth above, most notably in paragraphs 16, 18, 20-23, 25 and 58.

61.    The statements in this paragraph are false. *See* paragraphs 16, 18, 20-23, 25 and 58, above.

62.    The statements in this paragraph are false. *See* paragraphs 16, 18, 20-23, 25 and 58, above. Further, the last statement is plaintiff's opinion or conclusion and is not a fact which the court may consider on summary judgment.

63.    While Tederick acknowledged that Berry was not "required" to work overtime, he also testified that Berry was a salaried employee, and salaried employees work to fulfill their job

responsibilities. Ex. 2, Tederick Dep. 75:1-24. Further, Berry was an "exempt" employee which by definition means she had no set or regular work hours. ECF No. 75-10.

64.     The assertions in this paragraph are disputed. *See* paragraphs 16, 18, 20-23, 25 and 58, above. Berry was not "perfectly willing" to continue the social media work she had been doing before August 15, 2019. She told the Town to find someone else to handle the social media work she had up until September 2019 been doing outside what she deemed to be her "regular hours." Berry's refusal to do that which would have been required if she had been qualified to perform the PIO duties foreclosed any further thought of investigating her suitability for the position. *Id.*

65.     Jones taking on of PIO duties was not a promotion. ECF No. 77-1. It did not come with a pay raise, as asserted by Berry. Ex. 14, Jones Dep. 36:24-37:18. Jones, who took on the PIO duties was paid a one-time bonus of $6,000 for taking on those duties. *Id.* 35:21-36:23. In fact, one of the reasons he resigned from employment with the Town is because after receiving the one-time bonus, he was not further compensated for handling the PIO duties. *Id.*

### III.     LAW AND ARGUMENT

### A.  Standard of Review

A party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.  Berry Cannot Establish Entitlement to Partial Summary Judgment on Her Retaliation Claim as it Pertains to the Alleged Failure to Promote Her to PIO[1]

---

1 The Town again reiterates and relies upon the fact that Berry was appointed by Council and was exclusively under its control. There is no evidence that Council ever approved the Town offering Berry PIO duties or raising her pay and, without that having occurred, the Town had no authority to offer Berry any change in job duties or pay. This, alone, should not only defeat the request by Berry for partial summary judgment, but should defeat the entire case against the Town. This has

To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove (1) that she engaged in a protected activity, (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (quoting *EEOC v. Navy Fed.*, 424 F.3d 397, 405-06 (4th Cir. 2005)). While Berry's complaint to the Town on August 15, 2019 regarding Sealock satisfies the first prong, there is no evidence that satisfies the other prongs (or at least the evidence is in such conflict as to create a genuine issue of material fact precluding entry of partial summary judgment in Berry's favor).

As to the second prong, Berry contends that denial of the PIO position was materially adverse action. In support, she contends that the alleged denial resulted in loss of a promotion and a raise which Jones instead received. As set forth above, however, Jones did not receive a raise for taking on the duties of PIO. It was also not a promotion. Instead, he retained the same title he had always had (IT Manager), and was burdened with the additional duties of PIO without an increase in pay. Jones received a one-time, discretionary bonus of $6,000 when he accepted the PIO role, and never again received any compensation for handling the PIO duties. It is among the reasons that he left employment with the Town. To the extent that Berry contends that she would have received the one-time bonus had she been appointed the PIO duties, the Fourth Circuit has made clear that the denial of a discretionary bonus does not constitute adverse employment actions under Title VII. *Harris v. Vanguard Grp., Inc.*, No. 3:15cv382, 2015 U.S. Dist. LEXIS 174235, 2015 WL 9685565, at *3 (W.D.N.C. Nov. 6, 2015) (citing cases), report & recommendation adopted at 2016 U.S. Dist. LEXIS 2417, 2016 WL 110600; of 'd 667 F. App'x 815 (4th Cir. 2016).

---

been argued extensively in the Town's Motion for Summary Judgment and is relied upon herein by the Town.

As to the "causal link" prong, Berry begins her argument by suggesting that Thompson's testimony somehow shows that there was a direct causal connection between Berry's August 25, 2019 complaint and Tederick's decision not to approach Berry regarding the PIO position. Thompson's testimony simply does not support Berry's contention in this regard. It is clear from Thompson's testimony (and other evidence) that she knew that Tederick had initially considered discussing with Berry the possibility of handling the PIO duties. However, Tederick was handling that, and Thompson has no knowledge regarding why Tederick made the decision not to approach Berry regarding the PIO position and to later extend an offer to Jones. Tederick has made it very clear why this occurred, and there is no evidence to contradict what he has offered.

Berry goes on to argue that there is "immediate temporal proximity of the adverse action to Berry's oppositional behavior [which] alone provides a causal connection." ECF No. 80, p. 23. In support, Berry cites to "*Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)(noting that causal connection in the prima facie case has been found where four months lapsed between plaintiff's protected activity and firing)." *Id.* Berry's reliance on *Carter* ignores the fact that it is no longer good law. *Shields v. Fed. Express Corp.*, 120 F. App'x 956 (4th Cir. 2005) (noting that subsequent to *Carter*, the United States Supreme Court, in *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 149 L. Ed. 2d 509, 121 S. Ct. 1508 (2001) (per curiam), cast doubt on the extent to which a four-month gap is sufficient proof of causation). In *Clark*, the Supreme Court noted that, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." (citing *Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (CA10 2001); *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (CA10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (CA7

1992) (4-month period insufficient)). *Id.* The Fourth Circuit has not adopted a bright temporal line, but it has also held that a three-to-four month lapse is "too long to establish a causal connection by temporal proximity alone." *Pascual v. Lowe's Home Ctrs., Inc.,* 193 F. App'x 229, 233 (4th Cir. 2006) (unpublished). Additionally, courts in this circuit have held a two-month gap between a protected activity and adverse action is also insufficient to establish a *prima facie* case based on temporal proximity. *Bullock v. Kraft Foods, Inc.*, Civil Action No. 3:11CV36-HEH, 2011 U.S. Dist. LEXIS 134481 *24 (E.D. Va. Nov. 22, 2011).

The evidence in this case shows that as of August 15, 2019, there had been no decision made to offer the PIO position to Berry, nor had it been determined that she was even qualified to handle the duties which the position would require. Instead, the morning of August 15, 2019, Tederick mentioned that he was interested in enhancing the Town's public information image and role and raised the possibility that perhaps Berry might be able to handle the PIO duties. Later that same day, Berry filed her complaint against Sealock. Tederick immediately opened an investigation. During the early stages of the investigation, and before Tederick had an opportunity to discuss the PIO position with Berry, she sent her September 8, 2019 email clearly advising Tederick and Council that she would not work beyond her "regular hours" and that the Town needed to find someone else to handle the very social media issues which a PIO would need to handle. This made it very apparent that Berry would not be in a position to fill the PIO position, if she was even qualified. Thus, 3 ½ months later, the position was offered to Jones. All of this shows that: (1) the decision to not offer the PIO position to Berry has nothing to do with her complaint regarding Sealock; and (2) there is not sufficient temporal proximity between the August 15, 2019 complaint and the November 26, 2019 offer of PIO duties to Jones.

There is absolutely no factual basis to support Berry's Motion for Partial Summary

Judgment. The evidence does not support her claim that the Town retaliated against her by not promoting her to PIO because she complained of sexual harassment by Sealock. In fact, the evidence clearly establishes to the contrary.

## IV.     CONCLUSION

WHEREFORE, the foregoing considered, and for any reasons to be stated orally at the hearing on this matter, Defendant, Town of Front Royal, Virginia, by counsel, respectfully requests that the court deny plaintiff's Motion for Partial Summary Judgment on the issue of liability as it pertains to the PIO position referenced in Count II of her Complaint.

Respectfully submitted,

**TOWN OF FRONT ROYAL, VIRGINIA**
By Counsel

McGAVIN, BOYCE, BARDOT,
  THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
(703) 385-1000 Phone
(703) 385-1555 Facsimile
hbardot@mbbtklaw.com


_____/s/_____
Heather K. Bardot, Esquire
Virginia State Bar No. 37269
Counsel for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of March, 2022, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Timothy E. Cupp, Esquire
Shelley Cupp Schulte, PC
1951 Evelyn Byrd Avenue, Suite D
PO Box 589
Harrisonburg, Virginia 22803
Telephone:     (540) 432-9988
Facsimile:     (804) 278-9634
cupp@scs-work.com
Counsel for Plaintiff

Tim Schulte, Esquire
Shelley Cupp Schulte, PC
2020 Monument Avenue
Richmond, Virginia 23220
Telephone:     (804) 644-9700
Facsimile:     (804) 278-9634
Shelley@scs-work.com
Co-Counsel for Plaintiff

McGAVIN, BOYCE, BARDOT,
  THORSEN & KATZ, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
(703) 385-1000 Phone
(703) 385-1555 Facsimile
hbardot@mbbtklaw.com


                      /s/
_____
Heather K. Bardot, Esquire
Virginia State Bar No. 37269
Counsel for Defendant