**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

| | | |
|---|---|---|
| **JENNIFER BERRY BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 5:21CV00001** |
| | ) | |
| **TOWN OF FRONT ROYAL, VIRGINIA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Jennifer Berry Brown ("Berry" or "Plaintiff"), by counsel, pursuant to of Fed.

R. Civ. P. 56, submits this Memorandum in Opposition to the Defendant Town of Front Royal's

Motion for Summary Judgment.

I.     **Introduction**

Defendant, Town of Front Royal (the "Town" or "Defendant"), acted through its

councilmembers and officials to deny Berry her rights under Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq.*, because of her sex and because she engaged in protected activity,

including a complaint on August 15, 2019 (the "August 15 Complaint"). The Town also created

and maintained a sexually hostile work environment and a retaliatory hostile work environment.

Berry wanted only to do her job. Instead of protecting Berry, the Town denied Berry a promotion

to a new position it had wanted and intended to give her, engaged in further harassment and

retaliation, and then summarily fired Berry in January 2020 in a sham reduction in force ("RIF")

concocted by the then Town Manager, Matthew Tederick, after receiving and relying on advice of

counsel.[1]  See, generally, Berry's Response to IR No. 1, pp. 1-30, ECF 76-6. Berry relies upon and incorporates her Memorandum in Support of Partial Summary Judgment and the materials relied upon there, ECF No. 80 and ECF 80-1 through 80-34 ("Pl's Memo ISO PSJ").

## II.   Plaintiff's Statements of Additional Material Facts

Many of the significant facts in this record are intertwined and support one, more or all of Berry's claims. Some of the evidence supporting these facts is in Berry's responses to the Town's Interrogatories (ECF No. 76-6) and in Pl's Memo ISO PSJ. The facts set forth below are referred to herein as "Berry SOF."

**A.    Berry was a full-time Town employee:** Berry was an employee of the Town. Exh. 1, Berry Dep. 119:4-7; Exh. 2, Bush 7-6-21 Dep. Exh. 7. Exh. 3, Bush 12-13-21 Dep. Exh. 5, p.1. She moved to a full-time position as Clerk of Council by unanimous vote of Council in 2017. Exh. 2, 178:9-179:23, Bush Dep. Exh. 7. Councilmembers, including Sealock and Tewalt, voted unanimously to approve the budget with a clearly delineated line item of $21,780 for "Increase due to Clerk of Council PT to FT." *Id*. A proper vote was taken to move Berry to full-time. This evidences that a formal vote of Council is required to change the status of an employee under its supervision, even if effectuated through a budget decision. Tewalt made no efforts to have Berry taken back to part-time at that time. Exh. 11, Tewalt Dep. 31:1-11.

Berry was misclassified as an exempt employee and was not paid overtime for hours worked in excess of forty, although, she was not required to work overtime. Exh. 10, Tederick Dep. 75:1-12, 19-24; Exh. 13, Thompson Dep. 35:12-14. On August 20, 2019 the Town received an opinion from Tina Stevens, its VRSA HR consultant, that Berry was non-exempt and should be paid

---

[1] Plaintiff's Motion to Compel Testimony and Documents Concerning Advice and Involvement of Counsel (ECF No. 43) remains undecided by the Court.

overtime.  Exh. 3, Bush 12-13-21 Dep. 34:17-37:12, Bush Dep. Exh. 5, p. 4.  The Town told Berry erroneously that she was exempt. While the Town relied on and communicated VRSA's August 20, 2019 opinion about Bush being one of Berry's HR representatives (Exh. 3, Dep. Bush Dep. Exh. 5, p.1; Exh. 7, Napier Dep. Exh. 3), which was contrary to what Berry had been told just days before by Napier (Exh. 14, BERRY922-923; Exh. 15, TOWN2512-2514), the Town withheld from Berry VRSA's opinion on her non-exempt status.

**B. Supervisors**: Sealock and Holloway both served as Berry's supervisors. All councilmembers and the mayor were Berry's supervisors. ECF No. 75-11; Exh. 11, 116:2-3. Berry reported to Council, following instructions from individual councilmembers unless she had different direction from Council as a whole.  Exh. 1, 66:21-67:17.

**C. Unwanted physical contact:** The record is replete with incidents of Sealock's unwanted touching, physical assaults, and physically threatening and intimidating conduct, including rubbing up and down Berry's back, arms, and shoulders, pushing her down in her chair and holding her there by her shoulders when she tried to get up to avoid his touching, leaning in and leering over her head, shoving up against her desk chair and blocking her in and causing her to feel trapped, repeatedly presenting himself outside the restroom to "escort" her back to his office (a few steps away) with his arm around her waist, attempting to hug her, knocking her to the ground after she rebuffed his hug when she was kneeling in front of the refrigerator. ECF No. 76-6, pp. 3-30; Exh. 1,137:14-19, 150:1-161:14, 259:21-260:1. She repeatedly complained of his unwelcome conduct to him directly. *Id.* See Berry SOF L.

**D. Comments and gestures relating to Berry's body:** Sealock made comments about Berry's legs, dress and shoes, making a gesture of an hourglass figure, and frequently stared and leered at her.  Berry objected and told him he was out of line. Exh.1, 169:22-170:16, 171:6-15,

173:6-174:3. The behavior started when he came on Council in January 2017 and got "worse and more frequent," he was "more vocal with his abrasiveness," his inappropriate comments, leering and staring happened "quite often."  Exh. 1, 328:3-329:1. Between the May 2019 job threat (see Berry SOF G.1) and August 15, 2019, Sealock's anger worsened and his behavior became more bizarre and threatening. ECF No. 76-7.

E.  **"Blow job" comments:**  Sealock asked Berry on three occasions whether she knew the going rate for a "blow job" and on another occasion, if she had found out the going rate for a "blow job." Exh. 5, Holloway Dep. 70:1-71:7, 75:24-77:12, 91:5-24, 118:20-24, 119-120, 126:5-7, 9-10; Exh. 2, 143:17-21, 152:8-9, 189:16; Exh. 1, 251- 255, 279:21-280:1, 288:15-289:5, Berry Dep. Exh. 20; ECF No. 76-6, pp. 10-12. Berry spoke to Council during a closed session in April 2019, conveyed her offense and upset over the meme posted on Facebook with an offensive depiction of Mayor Tharpe and Berry laden with sexual innuendo, and requested that Tharpe be censured for his public joking reaction to it . Exh. 1, 221:7-22; Exh.10, 52:18-20; Exh. 11, 59:17-23.  Sealock repeatedly stated that Tewalt told him exactly what the meme showed and that it depicted Tharpe, Berry and a "blow job." Exh. 8, Sealock 7-13-21 Dep. 153:5-17, 153:21-154:17, Sealock Dep. Exh. 17, p. 4; Exh.16, TOWN648; Exh. 2, 204:11-20.

Berry showed the meme to Tewalt, turned it to the council table, and Sealock laughed. Exh. 1, 221:18-22; Exh. 11, 59:22-60:4. Tewalt told Sealock exactly what was on the meme. Sealock referred to it as a "joke" and "cartoon."  ECF No. 76-6, p. 11. A reasonable inference is that Tewalt saw the meme, despite his dissembling that he did not have his glasses on. Exh. 11, 58:1-59:24. Thompson saw the meme on Facebook and described it as sexually offensive. Exh. 13, 26:11-27:8. Sealock knew the meme's content and knew Berry was upset and offended by it. He knew it was directly linked to "blow job" comments he later made to Berry. He wielded his power as Berry's

supervisor to sexually harass her with words and insinuations he knew she would find offensive and humiliating over her objections. Exh. 1, 253:9-12. Sealock later denied making the "blow job" statements (Exh. 8, Sealock Dep. Exhs. 15 and Exh. 17; Exh. 2, 143:11-23), suggesting falsely that Berry was "forgetful" and using Tharpe's words against him because she felt threatened (Exh. 8, Sealock Dep. Exh. 17, p. 4.), that it was the meme situation that resulted in the "blow job" remarks (Exh. 2, 204:21-205:5). At his deposition, Sealock admitted to the following:

> My statement to her was—when I left the golf course that day and I came to the town hall, the statement I made was, "A golfer at the golf course shouted from the top of the hill, 'Hey, Mayor, I think I'm going down to town hall and get a free blow job.'"  That's what I said.

Exh. 8, 159:12-17. Sealock admits the statement was offensive to him and would be very offensive to a female subordinate.  Exh. 8, 178:4-22). Even the statement to which Sealock admits was "awful and it should violate something." Exh. 13, 227:6-23.

   **F.     Other comments and incidents evidencing gender hostility:** Beginning in 2017, in front of Berry and others, Sealock often referred to Berry as a receptionist, which was demeaning to her as a sexist statement.  Exh. 1,  258:3-260:3).  Despite his role in evaluating her performance, Sealock never bothered to ask to see Berry's personnel file (Exh. 8, 64:22-65:2) and had nothing to do with providing her with a job description (Exh. 8*., *67:7-10). At Berry's evaluation in 2018, Sealock referred to her as a receptionist and stated that she had to be at her desk at all times, when that was not her job. Exh. 1, 259:8-12.  He also said she should post times she would be out of the office on her door, to which Berry objected since the male employees who answered to Council were not treated similarly. ECF No. 76-6, pp. 8-9; Exh.1, 354:2-16; Exh. 8, Sealock Dep. Exh. 20. Tharpe was also at Berry's evaluation.  He knew Berry was not a receptionist. Exh. 12, Tharpe Dep. 18:16-17. Tharpe agreed with Berry that she should not have to post times when she would be out of the office. Exh.12, 19:10-20; Exh. 1, 354:2-355:10. Sealock's demeaning references to Berry as

a receptionist evidence gender hostility, as do his depiction of her objection to his sexually discriminatory conduct as an "explosion" (Exh. 8, 115:4, 116:1-9) when she "was just telling us direct" that she should not be treated differently from the male employees (Exh.8, 116:23-25). Tharpe said  Berry as "very polite" in her response to Sealock. Exh. 12, 19: 10-13. Thompson testified that Sealock said "(d)on't make the mistake of calling her a receptionist, she found it very offensive." Tharpe then said "Yes, that's true." "Bill said he had made the mistake of calling her a receptionist and she didn't like it."  Exh. 13, 61:17-62:15. Being referred to as a receptionist for Berry's position would be humiliating.  Exh. 13, 76:20-77:18. Tharpe also said Sealock referred to Berry as a high paid secretary. Exh. 12, 20:9-25.

Thompson had also personally experienced Sealock's gender hostility. Around the time of the August 15 Complaint, Thompson and Sealock were judging a car show together. Thompson had previously expressed her concern about allegations of Sealock's obstruction in a State Police investigation. Sealock "grabbed [Thompson] by [her] elbow and pulled [her] across several parking spaces and said, Young lady, I need to talk to you. This information you've got is wrong."  Exh. 13, 93-95. Thompson viewed Sealock's behavior as hostile and aggressive.  Exh. 13, 234:6-14.

**G.  Threats of job loss and penalty.**

1.  Sealock threatened Berry's job on May 13, 2019 when, as her supervisor, he was supposed to be discussing her goal setting. He stated falsely that Tharpe had said Berry would have a target on her back when he returned to council because she had requested that Council censure Tharpe over his public, joking reaction to a sexually offensive meme that implied Berry gave Tharpe "blow jobs." Sealock told Berry there was no need to discuss her goals because she was on her way out. ECF No.76-6, pp. 12-13; Exh. 7, Napier Dep. Exh.1. Sealock said "with Tharpe coming back and him there, him being Sealock, and the other support of Council, I would be on my

way out."  Berry felt the statement was a threat to her job from Sealock as well as from Tharpe.
Exh. 1, 179:5-181:11. Berry complained about this to Napier (Exh. 7, Napier Dep. Exh.1), and also
reported this incident of harassment to Holloway (Exh. 5, 77:21-78:6).  Tharpe denies that he made
a threat to Berry's job or that he communicated any such threat to Sealock. Exh. 12, 30:5-31:1.
From Tharpe's denial, there is a reasonable inference that Sealock was communicating a false
threat, and he was doing so when he was supposed to be talking about Berry's job goals. The
conversation between Sealock and Tharpe was taped by Tharpe on his phone. Exh. 12, 31:2-14;
44:14-45:5. The Town has or had this recording in its possession (Exh. 6, Jones Dep. 52:4-24), but
has not produced it despite its relevance.

    2.  Sealock communicated to the Town in August 2019 after the August 15 Complaint that
there needed to be a penalty for Berry's accusations. Exh. 8, 212:24-213:15, Sealock Dep. Exh. 17.

    3.    Holloway also threatened Berry's job. On August 16, 2019, Holloway, being aware
of Sealock's conduct towards Berry because of her complaints, told Berry the following:

> How do we make this all go away?  We have to make this go away.  You gotta take
> back what you said.  This is going to affect everything.  This will affect the
> ordinances.  This will affect the election coming up.  This will mess up everything.
> Bill (Sealock) is gonna have to resign.  Matt (Tederick) took this to Julie (human
> resources).  All Council knows about it now.  This will affect your job, you kids,
> everything, Jennifer.

Holloway continued as follows:

> Holloway said that this situation with Sealock would come out in the papers and her
> children would know about it.  Holloway told Berry that Council would not stand
> for this, referring to her complaints, that it would affect her livelihood, and that the
> other supervisors would want to let her go if she continued with the accusations.
> Berry said that her statements were true, Holloway knew it, and that she could not
> take it back because it was the truth.  Holloway said he knew that my complaints
> about Sealock were accurate, but that Sealock was old, and that Berry needed to
> realize that's just how things were.

ECF No. 76-6, pp. 15-16. Berry objected to Thompson on September 6, 2019 about a threat from a councilmember without revealing the identity of the councilmember. Thompson forwarded Berry's email to Tederick and Bush.  Exh. 13, Thompson Dep. Exh. 15.  Berry was reluctant to disclose Holloway as the councilmember because she feared termination. Exh. 1, 294:1-21, 345:3-346:1, Berry Dep. Exh. 44; Exh. 13, Thompson Dep. Exh. 22. Berry did identify the threat was from Holloway when she informed HR that he was engaging in "ongoing retaliation … since HR was informed that he threatened my job behind Town Hall…."  Exh. 1, Berry Dep. Exh. 69. Holloway told Council it was him,  and provided a false statement to HR. Exh. 5, 123:123:22-124:2, 124:17-125:7. Holloway's statement disputing Berry's complaint of retaliation by him did not undermine Berry's credibility. Exh. 2, 157:12-21. Tederick improperly inserted his "personal feelings" and his position on Berry's credibility into the investigation by providing a written statement to Bush and Council recounting his conversation with Holloway with his own spin. Exh. 10, 198:3-200:22, 206:20-24. Though Holloway admitted Berry told him about Sealock threatening her job and three specific instances when Sealock asked her for the going rate of a blow job (Exh. 5, 77:2-78:12) and stated that he specifically told Tederick that Berry complained about Sealock's "blow job" comments because he thought Tederick needed to know (Exh. 5, 118:19-24, 119:4-120:6), Tederick omitted that critical information from his "summation of the conversation," stating instead, for the benefit of Council and as part of the investigation file, that Holloway said that Berry had "bad-mouthed Sealock." Exh. 10, 201:7-202:1-5, 202:17-24. The Town characterized Berry's conversation with Holloway during which she complained about Sealock's ongoing sexual harassment "was not a notable event."  Answer to Complaint, ECF No. 7, Pageid#: 45, ¶ 43.

4.  Berry knew on August 19, 2019 that Tederick, Sealock and Napier were discussing getting rid of her.  Exh. 1, 294:1-21, 345:3-346:1, Dep. Exh. 44; Exh. 13, Thompson Dep. Exh. 22.

Tederick went to Napier to question who had revealed to Berry that she was on the "chopping block." Exh. 3, Bush Dep. Exh. 7. These emails make it clear Berry had been advised about a threat to her job and was extremely upset about it. *Id.* Holloway was the one who communicated the job threat to Berry, and Tederick knew it. This email string between Tederick, Napier and Cameron was not produced by the Town during discovery despite its relevance.

5.    When Berry complained of harassment and retaliation in September and October, 2019, Tederick sent Berry a letter referring to a determination of Berry's "employment status." Exh. 17, BERRY1073. Berry viewed this as another job threat. Exh. 13, Thompson Dep. Exh. 24.

**H.  Denial of raise, enhanced duties of PIO position, and training**

**1.   2019 Evaluation:** The Composite Sheet that Sealock prepared prior to the preparation of Berry's evaluation reflected Council's decision to give Berry a 2.5% merit increase. Exh. 4, Gillispie Dep. 81:3-25; Exh. 13, Thompson Dep. Exh. 2. Instead, she was given only 2% in the evaluation provided to her on August 22, 2019. *Id.,* Thompson Dep. Exh. 3. Sealock had taken on the responsibility for Berry's evaluation despite knowing she had objected to his harassing behavior. Exh. 13, 46:11-15, Thompson Exh. 24; Exh. 1, Berry Dep. Exhs. 24 and 44; Exh. 8, 123:13-19; Exh. 11, 78:5-17. "During the whole 'evaluation process' the harassment got worse." Exh. 1, Berry Dep. Exh. 44.

**2.   PIO Position:** The Town and Council had wanted and intended to offer the PIO position to Berry up until she filed the August 15 Complaint. Exh. 13, 68:13-17, 69:25-70:3, 11-15; Exh. 10, Tederick Dep. Exh. 22, p. 11. Berry was a good fit for and was fully qualified for the PIO position. Exh. 11, 84:7-15, 95:13-20; Exh. 5, 44:3-7; Exh. 13, 70:15-20. Sealock was tasked with offering to Berry the position and training to prepare her for the duties. He came to her office on August 15, 2019 after a discussion with Tederick and Waltz about offering her the PIO duties. He

pounded on Berry's counter, shouted at her, became angry (Exh. 1, 247-248), and instructed her to take a class on "how to use the internet" that was well beneath her skill level (Exh. 13, 69:6-21). ECF No. 76-6, pp. 14-16. He referred to recent issues, but refused to say what they were and became very frustrated and agitated. Exh. 1, 247:5-22, 248:1-21. Berry did not refuse to take the class; there was no such class; and when Berry explained she could not find the class listed, Sealock did not follow up with her. Exh. 8, 103:7-12. Instead he became angry; his behavior was becoming more bizarre. Exh. 1, 257:7-258:2. Bush confirmed there was no such class. Exh. 2, 171:23-172:17. See Pl's Memo ISO PSJ (ECF No. 80) at SOF ¶¶ 25-33, incorporated here. Sealock's communication about the internet class was supposed to have included an offer of the PIO position to Berry and training to effectuate that position. The Town claims he did so. Defendant's Answer to Plaintiff's First Interrogatories No. 4 (Exh. 18), states in part, with respect to the PIO position:

> The first candidate who came to mind was plaintiff as she was the Clerk of Council and was largely responsible for managing the Town's Facebook page. This idea was discussed with Mr. Sealock, then Vice Mayor, and Joe Waltz, then Town Manager. Following their discussion, Mr. Sealock took it upon himself to approach plaintiff about the position. During the discussion, Mr. Sealock suggested that plaintiff would need to take an internet class to gain additional skills necessary to perform the duties of PIO – specifically, digital and social media marketing. Plaintiff clearly expressed she had no interest in taking the class or assuming the duties of PIO. It was only after plaintiff rejected the possibility of becoming PIO, that another candidate was considered. . . .

Thompson testified to the reason for the Town not offering the PIO position to Berry: "I think the Bill Sealock, this whole thing by itself, right? And then we have, you know, Jennifer [Berry] and what's going on there…Like I said, it completely fell off…[E]verything kind of went everywhere and it was never brought up again…You've got the case ongoing…Jennifer's case." Exh. 13, 129:16-134:9. Sealock testified repeatedly that he never offered Berry the PIO position. Exh. 8, 97:9-14, 99-100; Exh. 9, Sealock 8-31-21 Dep. 336:19-22; 338:24-339:5. Berry confirmed that Sealock never offered her the position. ECF No. 76-6, p. 16. Holloway's mention of the PIO

10

position to Berry on August 15, 2019 was the first and last Berry heard of it.  Exh. 1, 249:18-250:18. See response to SOF ¶ 26. After the August 15 Complaint, Jones, a male employee, was given the PIO position as a promotion. *Id*. The "committee who performed the functions of the PIO position (ECF No. 7, ¶ 36) included a female independent contractor who was paid $35 per hour and Town employee Mary Ellen Lynn. Exh. 6, 117-125. Handling the social media portion of the PIO position after Berry's termination took 15 to 30 hours a week. Exh. 63, 117:14-17, 128:8-11.

**I.   Alteration of Berry's job duties:** Berry was removed from her regular seat at the Council table on October 21, 2019, which made it difficult for her to perform one of her primary duties, which included recording accurate minutes of official proceedings. Tederick directed her where to sit, directly behind Sealock, her harasser.  Exh. 1,  365:5-11. Berry viewed being moved from the table and behind her harasser as further retaliation and humiliation.  Exh. 1, 366:7-8, Berry Dep. Exh. 73. Berry's replacement, Tina Presley, has been sitting at Council table since Berry was terminated.  Exh.11, 99:21:23, 100-101, Tewalt Dep. Exh. 5.

Berry was also excluded from closed sessions. She was required to attend closed sessions under her job description (ECF No.75-11) and by the Town Charter (ECF No. 75-1). The request to exclude her was made by **Sealock** after the August 15 Complaint and was made **because of** her claim of harassment. Exh. 11, 120:3-9, 132:17-20; Exh. 8, 169:24-170:7. Sealock told Bush "It will be further hard for me to conduct my council business with this staff member being in future closed sessions discussions on sensitive matters." *Id*., 169:24-170:7. He insisted that there be a penalty for Berry's accusations. *Id.*, 212:24-213:15, Sealock Dep. Exh. 17. Berry's exclusion from closed sessions had a materially adverse effect on her employment by eliminating one of her clearly delineated job duties. Both Tewalt and Sealock made clear the reason for her exclusion was because she had filed a harassment claim and she supposedly could not be trusted with sensitive information.

Exh. 8, 169:24-170:7; Exh. 11, 134:20-24. Berry's job duty to communicate with members of Council was also altered by Sealock's refusal to speak with her. Exh. 1, 304-305.

    **J.  Efforts to manufacture performance issues with false statements.**  After the August 15 Complaint, Berry received her performance evaluation. With significant negative and false input from Sealock during the evaluation process, Council decided to change Berry's flexible schedule that had accommodated for evening meetings she was required to attend (Exh. 1, 95-99, Exh. 13, 35:4-14), and instead require that she work in the office 40 hours a week. At the evaluation meeting, a schedule was agreed upon and Berry abided by it. Exh.1, 387. Tederick then falsely stated to Council that Berry was refusing to follow a set schedule, to which Berry objected. *Id.* Tederick also falsely stated to Council that Berry was refusing its direction to post a note on her door stating when she would be out. Jones's office was near Berry's and he confirmed what Berry contended. She was posting her away hours on her door. No one bothered to ask him. Exh. 6, 93:14-22. Bush knew Berry was posting her hours and even stated so in the Timeline document she provided to Council on September 9. Exh. 3, 59:19-60:11, 66.  Bush Dep. Exh. 9, p. 4. Tederick's false statements, made after retaining Judkins to assist with the "investigation," that Berry was not complying with Council's directions was part of a pattern of comments aimed at portraying Berry as antagonistic and defiant. Exh. 13, Thompson Dep. Exh. 18; Exh. 10, 225:13-21; Exh. 3, Bush Dep. Exh. 9, p. 4; Exh. 6, 93:14-22; Exh. 13, 31:21-32:32 (Thompson's opinion of Berry's performance as "excellent" continued despite believing the representation that she was not posting her hours). Tederick denied telling Berry she was in danger of being fired prior to the termination of her employment. Exh. 10, 93.

    Holloway also attempted to manufacture a performance issue and coupled it with a job threat in connection with an issue about reading a citizen's letter at a council meeting in October 2019.

Berry had been instructed not to read citizens' letters in accordance with Council's policy. Exh. 1, 356:19-357:3. Holloway treated Berry in an abusive manner, slamming his iPad and phone in a public meeting and becoming angry. Exh. 1, Berry Dep. Exh. 69.  In response to Berry's polite and professional explanation of why she had not read the citizen's letter, Holloway responded curtly and in a threatening manner "I think maybe there should be some clarification on you (sic) duties as Clerk." Exh. 1, Berry Dep. Exhs. 69-70. Berry perceived Holloway's behavior and statements in this situation as retaliation and a job threat and so informed Bush (*id.*) and Tederick (Exh. 19, TOWN2511).

**K. Ostracism.** Sealock was instructed not to speak to or deal with Berry on any matters, even though this impacted his ability to perform his job duties (Exh. 8, Dep. 169:24-170:7), and impacted Berry's ability to perform her job as well (Exh. 1, 304-305, 366:7-8, 328; Berry Dep. Exh. 73). Sealock didn't speak to and avoided Berry at all costs after the August 15 Complaint through the end of her employment. Exh. 8, 113:8-13, 129:17-21, 130:25-131:25. Holloway also shunned her after August 16, 2019. Exh. 5, 128:8-20. Other councilmembers also ostracized her, making it difficult to perform her job. Exh. 11, 96:1-25; Exh. 1, 78:16-79:20. Such behavior violated the Town's policies. Exh. 2, Bush Dep. Exh. 1, p. 5.

**L.   Reports and Complaints:** Berry reported the incidents outlined above to the appropriate Town officials in accordance with the Town's Employee Handbook (ECF No. 75-8). She complained directly to Sealock, her supervisor and the "offending person," from January 2017 through August 2019. As her supervisor, Sealock had a duty to address her complaints. Instead, he became more annoyed, angry, indignant and bore down with more sexually harassing, retaliatory and intimidating behavior. ECF No.76-6, p. 5. Berry also reported his behavior to Bush after Sealock had physically accosted and assaulted her at the refrigerator before a meeting in February

2017; Bush told Berry that her hands were tied and there was nothing she could do. Exh. 1, 159:4-161:22. Berry knew that Bush previously had taken no action when Bush herself had been sexually harassed by her supervisor because Bush knew that a complaint would result in her termination because "that's how it rolled." Exh. 1, 83-84; Exh. 2,  125-126. What the Town's supposed "zero tolerance" for sexual harassment meant depended on who the Town Manager was at the time. Exh. 2, 31:2-12. Berry also complained to Bush, Napier, Holloway, Thompson, Tederick and all of Council on multiple occasions. See Exh. 1, 72:3-75:7, 84:7-18, 130:10-12, 130:18-131:7, 171:6-15, 179:5-181:11, 191:7-10, Berry Dep. Exhs. 69, 70; Exh. 7, Napier Dep. Exh. 3; Exh. 13, 171:6-15, Thompson Dep. Exh. 18;  Exh. 5, 77:21-78:6; Exh. 10, 225:13-21. When she complained to Holloway about Sealock's behavior, he advised her maybe Sealock would behave once she told him a few times to back off. ECF No.76-6, p. 5. She did; Sealock didn't. Despite her reluctance to report ongoing harassment and retaliation for fear she would lose her job, especially in light of job threats already made (Exh. 1, 294:1-21, 345-346, Berry Dep. Exh. 44; Exh. 13, Thompson Dep. Exh. 22), Berry did continue to complain.

Berry complained about Sealock's May 2019 threat to her job to Napier. Exh. 1, 191:7-10. As Town Attorney and one of Berry's HR representatives, Napier was an appropriate person for Berry to contact. ECF No. 75-8, p. 85, ¶ B.2; Exh. 7, Napier Dep. Exh. 3. Napier did nothing other than advise Berry that "HR cannot do anything directly" and he would hold onto it as it might "prove to be a (sic) evidentiary backup."  Exh. 7, Napier Dep. Exh. 1. The Town then excluded Napier from further involvement with Berry's complaints (Exh. 7, 20:21-23, 21:9-19, 76:19-77:6, Napier Dep. Exh. 9) and chastised Berry when she included Napier on an email detailing some of her additional allegations (Exh. 13, Thompson Dep. Exh. 17).

**M.      Berry's termination and pretext.**   The Town used a RIF scheme to terminate Berry' employment.   The rush to implement the scheme and Berry's termination in the guise of a budget proposal did not follow the Town's past practice and procedure. Council typically had four meetings on the budget so they could digest the information (Exh 8, 248:22-249:3), but Tederick briefed Council on the RIF on just one occasion (Exh. 8, 251:11-15). After Thompson raised concerns about including Berry in the terminations, she and others asked Tederick if they could have some time to think about his proposal. He responded, "No, no, no, we have to move now.  A decision has to be made tonight."  Exh. 13, 197:12-15. Tederick admitted there could have been more meetings to discuss his proposal and there was no financial reason to push it through in one week.  Exh. 10, 262:14-263:2; Exh. 13, 197:12-15. The Town obviously had no problem with funds because the proposal also included a real estate tax reduction and gave the remaining employees a 2% merit increase. ECF No. 75-7, p. 6. The Town had also just given Jones the PIO position with a $17,000 pay increase. See response to SOF ¶ 26. It also included $124,000 for an assistant town manager position. Exh. 22 FY20-21 Adopted Annual Budget (BERRY1883-1904), see p. 22. Further, Tederick had no plan or explanation for ensuring how the necessary duties of the eliminated positions would be provided or what the cost of doing so would be. Exh. 13, 221:18-223:15, 223:24-224:1, 226:3-5. Almost immediately after Berry was fired, the Town had to rehire a former male employee who had retired (at a rate equal to $197,000 per year) because its inclusion of the male planning and zoning director in the RIF left the Town without an official to certify plans. Exh. 20, BERRY1017. Tederick simply rushed the RIF through, characterizing it, with advice of counsel, as a cost savings without regard to what the offsets to the savings would be in the aftermath.

Judkins was retained in connection with the reduction in force to tell Tederick how to avoid liability with regard to Berry, but when he was asked whether she had recommended Berry be

included in the "rightsizing" as a means of getting rid of her, Ms. Bardot instructed him not to answer. Exh. 10, 247:1-6, 14-18. Individual councilmembers were scheduled to speak with Judkins about any concerns with the process, outside the presence of other councilmembers.[2] Exh. 10, 249:3-11. It was not the Town's practice to have individual councilmembers discuss issues with outside legal counsel outside the presence of other councilmembers. Thompson had never previously had such a discussion, and it has not happened since her call with Tederick and Judkins to discuss her concerns about terminating Berry. Exh. 13, 214:10-215:3.

Thompson was concerned about the "optics" of including Berry in the RIF because she had filed a sexual harassment complaint, and Thompson wasn't comfortable with including Berry in the terminations. Exh. 13, 197:3-11. When she expressed her concerns to Tederick, he arranged a call between himself, Thompson, and Judkins to allow Thompson to address her HR-related questions about his proposal to terminate Berry. Exh. 13, 204:9-24, 214:22-215:16. She also expressed her concerns at the closed session. Exh. 13, 197:4-11, 198:13-18, 200:4-17. Thompson's suggestion that Berry stay on in a proposed part-time Clerk position was rejected by Tederick and Council. Exh. 13, 196:1-20, 198:22-24, 201:9-14, 202:4-11, 203:3-15 ("Nope. Cut it. It's got to go."), 221:18-224:1, 226:3-5. Tewalt, who was serving as Mayor at the time of Berry's termination, also recommended Berry be made part-time, but he was left out of the conversation after that. Exh. 11, 103:2-104:1, 104:12-15, 105:2-6; 112:10-16.

Tederick could not say whether Berry had the option to stay on part-time (Exh. 10, 250:19-25), but admitted the Town had not said Berry could remain on as part-time clerk (Exh. 10, 253:6-10). All Council had to vote when evaluating Berry or making decisions about her pay. Exh. 4,

---

[2] Ms. Bardot has refused to let any witnesses testify to what Judkins told them in their private conversations with her regarding the RIF or concerns about including Berry in the RIF. See Plaintiff's Motion to Compel Discovery On Advice of Counsel (ECF No. 43).

81:11-25, 82:24-83:6; Berry's SOF A.  Yet, Council did not vote or even reach a consensus on firing Berry. Exh. 13, 207:16-208:4 (an "official decision hadn't been made."), 198:25-199:8; Exh. 8, 252:8-24, 266:10-23. The minutes of the meeting when the Town says the RIF was discussed reflects no vote to terminate Berry.  Exh. 21 (BERRY553-557), p.5.

Not only did Council not vote on Berry's termination as required, but the discussions on terminating Berry included Sealock and Holloway, both of whom had been involved in harassing and/or retaliating against Berry.  Exh. 4, 68:21-25; Exh. 8, 246:2-10, 248:4-10, 251:18-25, 266:2-23; Exh. 5, 164:18-165:19; Exh. 13, 197:20-22.  They should have been excluded from this closed session. Exh. 10, 144:7-15, 239:11-240:1.

III.   **Plaintiff's Responses to the Town's Statements of Material Undisputed Facts**

Berry responds to the Defendant's "Material Undisputed Facts" ("SOF"), as follows[3]:

**SOF ¶¶ 1, 2, 4, 5, and 6**: These facts are not disputed, but are not material.

**SOF ¶ 3:**  The second sentence is disputed to the extent it suggests the Mayor was not one of  Berry's supervisors along with the councilmembers. Berry SOF B. The balance is not material.

**SOF ¶¶ 7, 8, and 9:**  These facts are not disputed, but the brief statement in paragraph 9 omits material facts relating to the circumstances of Tharpe's resignation and the context for some of Sealock's most outrageous acts of sexual harassment, discussed more fully in Berry SOF E.

**SOF ¶ 10:**  These facts are not disputed.

**SOF ¶ 11:**  These facts are undisputed to the extent the words quoted were in the Town's Employee Handbook absent the emphasis. Individual councilmembers are employees of the Town as the Handbook defines "employee" as "persons who work for the Town in return for financial

---

[3] Berry further relies on and incorporates the undisputed facts set forth in and attached to Pl's Memo ISO PSJ and refers the Court to her Answers to Interrogatory No. 1 in ECF No. 76-6 which contains facts referred to throughout this Memorandum that further dispute Defendant's "facts."

compensation." ECF No. 75-9, p. 1. Otherwise the provision explaining which employees are subject to the Handbook would not include "except elected officials" after stating what is considered an "employee." See also Exh. 11, 46:24-47:24, 125:15-126:9.  In any event, the Town has admitted that elected officials are subject to prohibitions against sexual harassment and retaliation. *Id.;* Exh. 10, 45:22-46:22.

**SOF ¶ 12:**  The first sentence must be clarified to note that Berry was an employee of the Town. Berry SOF A. The second sentence of SOF ¶ 12 is misleading.  Berry's duties were not limited to the tasks cited, as her employment continued and she obtained required training and certifications. See ECF No. 75-11; Exh. 1, 20:8-20, 22:22-23:15, 67:17-68:8, 69:5-21, 92:7-93:13. The increased hours when she went full-time allowed her to fine-tune her work and catch up with duties.  *Id.* 93:7-94:21. Tharpe and Thompson testified to the breadth of Berry's job duties. Exh. 13, 29:9-30:1; Exh, 12, 38:15-24. Berry followed instructions from individual councilmembers unless she had different direction from Council as a whole. Berry SOF B. That councilmembers did not notice the budget line item that resulted in Berry becoming full-time is disputed. Berry SOF A. Berry continued to have excellent performance evaluations, and no changes to her employment status were sought until after she complained formally in writing of Sealock's harassing, sexually offensive and demeaning conduct. Exh. 11, 31:12-32:16. The statement that the mayor was Berry's supervisor is inaccurate to the extent that it limits who supervised Berry. Berry disputes that she was an exempt employee. Berry SOF A.

**SOF ¶ 13:**  The statement that Berry made no complaint about Sealock's sexually harassing behavior between January 1, 2017 and February 6, 2017 (fn1) is false. Berry SOF L.  That Sealock rubbed Berry's shoulders and back two to three times at meetings from January 1, 2017 to February 6, 2017 is undisputed, but misleading to the extent it omits Berry's reference to multiple offensive

actions by Sealock at these meetings. Berry SOF C. As to the incident in which Sealock pushed Berry down in front of the refrigerator, Berry did not just "rebuff" him as the Town asserts; she told him that he did not hug the guys that way or something to that effect. *Id.* The assertion that Berry filed no "formal complaint" is disputed because it implies that a "formal complaint" was required. The Handbook does not require a "formal complaint" and provides alternatives for reporting sexual harassment, which Berry followed. Berry SOF L. Berry did not file criminal charges against Sealock because she did not want to lose her job.  Exh. 1, 162:10-16.  Nothing in the Handbook suggests an employee has to file a criminal charge to substantiate her allegations of harassment.

**SOF ¶ 14:**  It is undisputed Sealock looked Berry up and down, leered at her, and made remarks about her dress, legs, and shoes. Berry objected and told him he was out of line.  He knew she was annoyed. Exh. 1, 169:22-170:16.  He knew what he had done and knew the shoe comment wasn't the problem. He was apologizing, not for the shoe comment, but "because he knew (Berry) was aggravated that he had said several comments about … the dress, the shoes, and he made the hourglass figure with his hands. And [Berry] had told him … you can make a comment about my shoes, sure, but he knew it was more than just about shoes."  *Id.* "It's the comment on  my body I have an issue with."  *Id*. 173:6-174:3. Berry SOF L.

**SOF ¶ 15:**  Berry disputes that Sealock was conveying to Berry what Tharpe had advised him about Berry's job being in jeopardy. Berry also disputes that the report and note Berry provided to Napier do not document any alleged threat by Sealock toward Berry. Sealock's statement of what Tharpe said is disputed. Berry SOF G.1 and L.

**SOF ¶ 16:**  That Sealock referred to Berry as a receptionist is not disputed, but see Berry SOF F.

**SOF ¶ 17:** Disputed. See Berry SOF E. The Town mischaracterizes the evidence of Sealock's harassment and Berry's complaints. Berry did not say in the cited testimony that Sealock told her "golfers were joking about going to town hall to get a free blow job" or that he repeated that comment, though that would have been bad enough as it implied that Berry would be the one to give the "blow job" given the meme in social media, which Sealock stated to Bush resulted in the "blow job" remarks (Exh. 2, Bush Dep. 204:21-205:5). SOF ¶ 17's treatment of Sealock's "blow job" comments fails to provide the context needed to establish the outrageous nature of his behavior. It relegates the triggering events to a footnote. Berry SOF E. Berry saw the meme on a public Facebook page over which she had no control. Exh. 1, 219:21-221:6, 223:2-5. She had no reason to capture a copy of it. The fact that she did not make a copy of the meme is immaterial. The Town's statement that it has never seen the meme is disputed and absolutely false. Berry SOF E.

**SOF ¶ 18:** These assertions are disputed.  See Berry SOF C, D, E. F, G and L.

**SOF ¶ 19:**  The date Berry's 2019 employee performance evaluation was completed, in the form produced to Berry on August 22, 2019, is disputed. The cited testimony does not establish this as an undisputed fact. Tederick purported to know when the evaluation had been completed, but he had not seen the actual performance evaluation as of the August 15 Complaint.  Exh. 10, 61:12-21. Berry's SOF H.  Further, there was another evaluation Sealock had done, different from the one produced by the Town and provided to Berry. Exh. 8, 111:20-112:18, 122:8-11, 119:9-22.

**SOF ¶ 20**: Berry disputes the manner in which the incident on August 15, 2019 is depicted. Berry SOF H.2. Berry disputes that the Town "almost immediately" retained outside counsel to assist it with Berry's complaint. Two significant issues raised by this alleged statement are Berry's Motion to Compel Discovery On Advice of Counsel (ECF No. 43) and the Town's withholding of a document entitled Timeline Clerk of Council ("Timeline"), which the Town refused to allow

Berry's counsel to inquire into in the Rule 30(b)(6) deposition. Exh. 10, 214:21-218:4, Tederick Dep. Exh. 20. The Timeline revealed for the first time to Berry that on September 6, 2019, Bush indicated that "Final Report will find a 'she said/he said' statement on both allegations. A recommendation of harassment training to council and possibly sensitivity training for councilman Sealock." It went on the say that "H.R. Director has concerns of charges of not only Harassment/Bullying Claim, but Retaliation as well." Following the entries in the Timeline on September 11, 2019, Bush did no more investigation despite Berry raising additional issues of retaliation and harassment (Exh. 3, 71:12-17). See Berry SOF L. Bush provided the Timeline, as created up to the September 9, 2019 entry, to Council on September 9, 2019 and told them she had completed her investigation. Exh. 3, 65:10-66:19, 72:6-24. Council did not ask her any questions and gave her direction to "pursue with the attorney." *Id.* The first contact with outside counsel Judkins was on September 10, 2019. Exh. 3, 69:23-70:11. As to advice given to Berry about filing a "formal complaint" against Sealock, Tederick did not mention that an EEOC claim would be against the Town, rather than Sealock personally. Moreover, Berry had already made a "formal complaint" through her communications with Holloway and Napier. Berry L. Berry advised Napier on August 19, 2019 when he provided the same EEOC information that "I just want to come to work and not feel demeaned and bullied." Exh. 7, Napier Dep. Exh. 5.

**SOF ¶ 21:**  As to Holloway's threat to Berry's job if she did not withdraw her complaint, Berry disputes the Town's depiction and its omission of significant, material facts. Berry SOF G.3.

**SOF ¶ 22:**  Berry disputes that she delayed the "investigation." Bush told Council on September 9, 2019 that she had completed her "investigation," and she did nothing further. Exh. 3,

72:6-73:3, 71:12-25. Bush was not awaiting any input prior to finalizing her "investigation." Exh.2, 162:12-17. Berry also disputes that there was delay due to outside counsel's trial schedule.[4]

**SOF ¶ 23:** Berry disputes the characterization that she was not cooperative with Bush during the "investigation." Berry SOF L; response to SOF ¶¶ 12, 20 ; Exh. 1, Berry Dep. Exhs. 69 and 70. Before Judkins's involvement, Bush had determined there "concerns of charges of not only Harassment/Bullying, but Retaliation as well."  Exh. 3, Bush Dep. Exh. 9, p. 6. Bush also documented that "Members of Council find it difficult to trust the Clerk of Council," though she could not say which Councilmembers stated that. Exh.3, 67:9-68:21, Bush Dep. Exh. 9.  The "Timeline" also states, "She continues to create an antagonistic atmosphere between herself and the council," but Bush could not recall what her factual basis was for making that statement.  Exh.3, 68:22-69:3. Bush felt Council did not want to be involved because they did not want to be called as witnesses in the event it went to court.  Exh.3, 72:6-16.

**SOF ¶ 24:**  Berry disputes the implication that she had an obligation to advise Tederick of concerns she had with Holloway's or Sealock's behavior. When he was serving as interim mayor, he was just one of Berry's supervisors. As Town Manager, he was not her supervisor. She reported her complaints to Holloway, who was her supervisor. Berry's SOF L. Holloway told her to put them in an email and he would forward to Tederick. Exh. 5, 95:25-96:4. Berry thought by Holloway asking her to document it that he would ask Sealock to get back in his lane and behave, not make demeaning comments, not touch her anymore, not be abrasive. Exh. 1, 249:11-17. Berry disputes

---

[4] Plaintiff's Motion to Compel Advice of Counsel, ECF No. 43, seeks information relating to advice of counsel and Judkins's input into the termination of Berry's employment.  At this point, Judkins has not been listed as a witness for the Town, and there is no way to admit her reason for delaying in working on Berry's complaint without her testimony.  Accordingly, such information is not appropriate for consideration at summary judgment because it is hearsay. Fed. R. Evid. 801(c).

SOF ¶ 24's second sentence as it neglects to mention Berry's May 2019 emails with Napier. Further, no "written complaint" is required. See response to SOF ¶ 13. Berry objects to the characterization of her August 15, 2019 complaint as her "initial complaint." Prior to then, she had complained to Bush, Napier, Holloway, and directly to Sealock on many occasions. Berry SOF L.

**SOF ¶ 25:** Berry disputes this characterization because the citation does not support the assertion. While Sealock and Holloway may not have made any sexually inappropriate **comments** after the August 15 Complaint, that was because they stopped speaking with her altogether. Berry SOF K. This **behavior** in itself was part of the shunning and alteration of her job duties that created a sexually and retaliatory hostile work environment. *Id.* Further, Sealock and Holloway both engaged in ongoing harassment of Berry after the August 15 Complaint by retaliating against her and contributing to a hostile work environment. Berry SOF G, H, I, J, K, and M.

**SOF ¶ 26:** Berry disputes these assertions.[5] She did not refuse to perform social media functions. Berry SOF H.2. The Town ignores the exchange in the cited email between Thompson and Berry in which Thompson asked Berry to clarify whether she was stating she would "no longer manage social media at all OR just outside of office hours," to which Berry responded "I'm happy to continue during regular hours." Tederick conceded Berry was willing to continue with social media duties during the regular hours being required of her by the Town. Exh. 10, 72:16-19, 84:9-24. This email specifically referred to Berry's **continuing** her duties as Clerk related to social media, which Tederick referred to as "very elementary," involving "occasionally post[ing] informally on Facebook," not the "enhanced role" of the PIO position. Exh. 10, 87:2-10. Berry's social media functions as they existed at the time of her September 8, 2019 email in no way reflected

---

[5] The disputes over the statements in SOF ¶ 26 do not undermine Pl's Memo ISO PSJ on which she is entitled to partial summary judgment.

her assumption of additional duties related to the PIO position. Neither those duties, nor the PIO position itself, were ever offered to Berry. Berry SOF H.2. Berry's agreement to continue managing her social media duties during the strict schedule demanded of her from Council was acceptable to Council and did not affect the decision not to give her the PIO position. Exh. 13, 49:6-25, 136:24-137:2. See also Berry SOF A regarding the Town's misclassification of Berry's status as exempt. Requiring a non-exempt employee to work more than 40 hours without overtime would be illegal.

It is undisputed that after August 15, 2019 Berry continued to perform social media duties. She continued after the September 8, 2019 email and even after the Town selected a male for the PIO position, despite the fact that the PIO position should have been handling those duties. Exh. 10, 86:16-87:4. Berry was a good fit for and was fully qualified for the PIO position. Berry SOF H.2. Tederick's testimony at Exh. 10, 87:11-16 does not dispute that Berry was qualified. Berry disputes the characterization of the promotion of Jones to the PIO position. Discussions with Jones about the PIO position came after Berry was further retaliated against and the Town had hired Judkins to effect her termination. Judkins had drafted the letter Tederick sent Berry on October 2, 2019 (Exh. 23, TOWN2040-2041; Exh. 10, 93:17-94:12; Exh. 13, Thompson Dep. Exh. 18) that resulted in some of Berry's additional complaints of harassment and retaliation. Exh. 13, Thompson Dep. Exh. 18; Exh. 10, 225:13-21. Jones's increase in pay of $10,792 annually was due to the promotion, not to bring his salary to market level. He received a raise from $74,484.80 to $85,280.00 "based upon the Performance Pay Plan and added responsibilities of his Job Title in communications for the Town." Exh. 6, Jones Dep. Exh. 11. Jones already had been brought to more than market level based on the terms of the pay study which had found that his market rate should have been $35.23 per hour, or $73,278.40 annually. Exh. 8, 309:10-310:3, Sealock Dep. Exh. 30, p. 79.  Jones's pay exceeded that amount in 2018, and was raised again effective July 1,

2019 to $35.81 per hour to implement Year 2 of the Compensation Study, or $74,484.80 annually. Exh. 24, TOWN685 (Personnel Action Form). With regard to the statement that the bonuses did not continue after payment of the first $6,000, Jones certainly thought they would. Exh. 6, 36:7-37:18. See also Exh. 11, 85:18-86:2 (promotion carried $10,000 pay increase); Exh. 13, 131:6-13.

SOF ¶ 27: Berry disputes any insinuation here that she acted inappropriately. Berry SOF J.

SOF ¶ 28: Berry disputes the characterizations of her removal from Council table. Berry SOF I. The fact that Napier had been moved from Council table is immaterial. Berry had never been moved before and needed to sit at the table to perform her job. *Id.* Napier did not.

SOF ¶ 29: This mischaracterizes Berry's exclusion from closed sessions. Berry SOF I.

SOF ¶ 30: Berry disputes the first two sentences. She went on approved FMLA leave on December 10, 2019, was on intermittent leave working part-time from home, and returned to work on January 13, 2020. ECF No. 77-5, pp. 5 & 6. On January 30, 2020, she was told her Clerk position was to be abolished, the Clerk position was to be part-time, and her employment with the Town would be terminated effective February 4, 2020. Exh. 3, Bush Dep. Exh. 9. Berry disputes the characterization of the circumstances of her termination. Berry SOF M. The statement that in discussions regarding elimination of positions, Council did not discuss the fact that Berry had filed a claim of discrimination is not supported by the record. Berry SOF M. The cited Gillispie testimony cited states that Gillispie didn't **recall** any discussion about the fact that Berry had just filed a charge of discrimination. Gillispie Dep. 69:1-6. In fact, he didn't recall many things and testified he was unaware of Berry's allegations against Sealock until he received a copy of the Complaint filed in court. Exh. 4, 24-26. The Town also cites to Tederick's Declaration, Def's Ex. 7, which says nothing that supports this false assertion. Tederick, on behalf of the Town, testified evasively about discussions he had had with councilmembers and discussions among councilmembers relating to

concerns that Berry was being included for termination after having complained about sexual harassment.  Exh. 10, 247:20-248:12.  But he did admit that "there may have been discussions" of how to handle the situation with Berry because of her having recently filed charges against Sealock.  "It would not at all surprise me if Council deliberated about that.  Again, I don't have a very direct recollection of exactly that being discussed in that way … I may have had conversations with some Council members prior to that and gotten general feedback from them about the budget."  *Id.* 242:7-243:2. When asked to provide specific information relating to statements councilmembers made about his recommendation on "rightsizing" after he left the room or reasons why he pushed his recommendation through on a short timetable, Tederick again dissembled. *Id.* 258:12-263:8. Thompson's recollection was much clearer.  Berry's SOF M.

**SOF ¶ 31:**  Berry disputes the statement that she did not assert anyone other than Sealock ever sexually harassed her.  She did so in her Complaint, her charge of discrimination, and her interrogatory responses, and specifically referenced Tharpe's conduct involving the meme and the Town's failed reaction to that situation.  Complaint, ECF No. 1; EEOC Charge, ECF No. 1-2;, paragraph 30-32; ECF No. 76-6 (Answers to IR Nos. 1 & 8).  Berry disputes that the first act of retaliation and creation of a retaliatory hostile work environment occurred after the August 15 Complaint.  Sealock's ongoing conduct was both discriminatory and retaliatory, and his retaliatory action included his conduct in May 2019 and continuing through August 15, 2019, as well as conduct after the August 15 Complaint.  See Berry SOF A-M; ECF 76-6, pp. 3-30; and responses to various SOF paragraphs above.

## IV.   Legal Argument

### 1.  Summary Judgment Standard

The Court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to Berry to determine whether there are genuine issues of material fact in dispute. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (citing *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014)); *Vaughn v. Virginia*, 2019 U.S. Dist. LEXIS 206106 **13-14 (W.D. Va. Nov. 27, 2019). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000) (citation omitted); *see also Tolan v. Cotton*, 572 U.S. 650 (2014). *Id*. at 1866-77.

### 2. Under the Supremacy Clause of the U.S. Constitution, the Town Is Responsible For Violations of Title VII By Its Elected Officials And Employees

The Town first argues without valid authority that it is not responsible under Title VII for the acts of its Mayor and Town Councilmembers because they are elected. This argument fails. First, towns in Virginia are run by their town councils. See Va. Code Ann. § 15.2-1404 (powers granted localities vested in their governing bodies). Under its Town Charter, Council has general power over all officials and employees of the Town, as well as control and management of the Town's fiscal and municipal affairs. ECF No. 75-1, Charter V. §§ 17, 18, pp. 6-7. The Town is not separate from its Council. Rather, Council acts for and on behalf of the Town.

The Fourth Circuit dealt with a related issue in *King v. McMillan*, 594 F.3d 301, 308-309 (4th Cir. 2010). Its ruling controls here. There, a past and current sheriff appealed an adverse Title VII jury verdict, arguing that due to Virginia law (including a law to the effect that sheriffs are elected and appoint their own deputies), a successor sheriff could not be substituted as a party defendant in her official capacity rendering her liable in a sexual harassment case involving conduct by her predecessor in office because each sheriff in Virginia is an independent entity. Rejecting this argument, the Fourth Circuit said "[u]nder the Supremacy Clause of the Federal Constitution," the

27

"relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Id.* at 309 (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)). The *King* court went on to say that "[r]egardless of whether [appellant] reads Virginia law correctly with respect to the circumscribed authority of an individual sheriff, Virginia law cannot override Title VII employer liability." *King,* 594 F.3d at 309.  In *Fitzpatrick v. Bitzer*, 427 U.S. 445, 448-49, 457 (1976), the Supreme Court held that the 1972 amendments to Title VII expanding coverage to states and political subdivisions expressly abrogated state sovereign immunity. "In sum, state law demarcations of particular offices cannot be used to cut off the (federal) Title VII rights of state and local employees." *King*, 594 F.3d at 309. *See*, *Rutan v. Republican Party of Ill.*, 497 U.S. 75, n. 8 (1990) (federal courts have long been available for protesting unlawful state employment decisions under Title VII).

The opinion in *King* confirms that the Title VII claim is against the employer (here, the Town) and that state law cannot be used to cut off Berry's Title VII claims against her employer. Thus, a Handbook provision that excludes employees (referred to as "those persons who work for the Town in return for financial compensation") who are elected officials from being governed by the Handbook's employment policies (ECF No. 75-8, Pageid#: 421, I.C.) has no legal effect on the Town's Title VII liability for the conduct of its individual elected officials.  The language of Title VII controls here. Title VII defines "person" to include governments, governmental agencies and political subdivisions and "employer" to include any person employing 15 or more employees "and any agent of such a person." 42 U.S.C. § 2000e(a) and (b).  Governmental employers are liable for discrimination or harassment engaged in by their elected officials as agents of the employer. *See, e.g., McCall v. Oregon*, 2013 U.S. Dist. LEXIS * (D. Ore. Nov. 27, 2013) and *Bruno v. Monroe*

*County,* 200 U.S. Dist. LEXIS 84364 *6 (S.D. Fl. 2009). Here, it is undisputed that the Town employed Berry. Berry SOF A. The Town is liable under Title VII for discrimination or retaliation against its employees. Moreover, even if the Town's council members are not employees of the Town (a disputed issue of fact), the Town remains liable under Title VII for acts of third parties and agents. *See, e.g., Freeman v. Dal-Tile*, 750 F.3d 413, 423 (4th Cir. 2014)).

### 3. The Sex Discrimination Claim (Count One)

Berry's Title VII sex discrimination claim is not limited to the Town's creation and maintenance of a hostile work environment. Berry identifies several adverse actions under her substantive Title VII claim that  the Town ignores in its summary judgment motion. Berry SOF H and M. Title VII makes it unlawful for an employer to discriminate against any individual with respect to the terms, conditions, and/or privileges of employment because of the individual's sex. 42 U.S.C. § 2000e-2(a)(2). Berry need only prove that the sex was a motivating factor in any of those adverse actions through direct or circumstantial evidence on her disparate treatment claims. *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 312 (4th Cir. 2005). The Town does not assert the affirmative defense under 42 U.S.C. § 2000e-5(g)(2)(B). This affirmative defense applies only to limit available remedies, not liability.

When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 753-54 (1998). Berry has established that she was a member of a class protected by Title VII, she was qualified for the PIO position and was the right fit, the Town changed course from its intention and desire to offer her the position and training for it immediately after the August 15 Complaint, and the Town kept the position open until it filled it

with a male. *See Dennis v. Columbia Colleton Med. Ctr, Inc.,* 290 F.3d 639, 645 (4th Cir. 2002). As set forth in detail in Pl's Memo ISO PSJ, the Town cannot offer a valid reason for denying her the PIO position. In its response to Berry's Interrogatory No. 4, the Town states that  Sealock offered the PIO position and training to Berry and she rejected both. Berry SOF H.2. And yet, Sealock testified repeatedly that he never offered Berry the PIO position and did not tell her that he thought a "internet class" had anything to do with such a position. *Id.* If Berry is not entitled to partial summary judgment on her PIO retaliation claim, there clearly are issues of fact precluding summary judgment on the Town's behalf on that claim and on her sex discrimination claim involving the same position. The Town's conduct described in Berry SOF A-M ultimately led to Berry's termination. There is no motion for summary judgment on the sex discrimination claims (other than the hostile work environment claims), so these issues and claims are for the jury to decide.

### 4. Sexually Hostile Work Environment (Count One)

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). Where harassment does not directly result in tangible changes in employment, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a change in benefits (*Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)), the harassment must be severe or pervasive enough to fall within Title VII's requirement that workplace sex discrimination affects a term, condition, or privilege of employment.  *See Meritor*, 477 U.S. at 69.

For hostile work environment claims, "a woman's work environment can be hostile even if she is not subjected to sexual advances or propositions. . . . A work environment consumed by remarks that intimidate, ridicule, and maliciously demean the status of women can create an environment that is as hostile as an environment that contains unwanted sexual advances." *Smith v.*

*First Union National Bank*, 20 F.3d 234, 242 (4ᵗʰ Cir. 2000). To prevail on a Title VII claim that a workplace is hostile, a plaintiff must show that there is (1) unwelcome conduct (2) that is based on the plaintiff's sex, (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment, and (4) which is imputable to the employer. *Okoli v. City of Balt.,* 648 F.3d 216, 220 (4th Cir. 2011). Although the Town purports to rely on prongs three and four in its Motion (Def. Memo., p. 14), it addresses only its contention that the harassing behavior was not sufficiently severe or pervasive.[6] The Town's description of Berry's evidence and its application of the law to that evidence are flawed.

The determination of severity is made by looking at all the circumstances, including frequency, severity, whether physically threatening or humiliating, the relationship between the harasser and the victim, and whether the conduct unreasonably interferes with the employee's work performance. *Boyer-Liberto v. Fontainebleu Corp.*, 786 F.3d 264, 277 (4ᵗʰ Cir. 2015) (*en banc*).

> Whether this environment is sufficient to satisfy the objectively unreasonable "severe or pervasive" prong is not answered by a "mathematically precise test," but rests on a variety of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 22-23; see also *Jennings v. Univ. of N.C.*, 482 F.3d 686, 696 (4th Cir. 2007) ("Whether gender-oriented harassment amounts to actionable (severe or pervasive) discrimination 'depends on a constellation of surrounding circumstances, expectations, and relationships.' All the circumstances are examined, including the positions and ages of the harasser and victim, whether the harassment was frequent, severe, humiliating, or physically threatening[.]" (citation omitted)).

*Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 209 (4ᵗʰ Cir. 2014).[7]

---

[6] Presumably, the Town is again arguing that it is not liable for the acts of its elected officials, which Berry disposed of as meritless above.

[7] The district court opinion in *Walker v. Mod-U-Kraf Homes, Inc.,* 988 F. Supp. 2d 589 (W.D. Va. 2013) was vacated and remanded on the very issue (what constitutes "severe or pervasive") on which the Town relies in its brief (Def. Memo., p.16).

Thus, one verbal or visual incident can be sufficiently severe to justify a finding of a hostile work environment. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanagh, J., concurring); *see also Boyer-Liberto*, 786 F.3d at 280 (two uses of racial epithet severe enough to create a hostile work environment). A single act of physical assault motivated by anti-female animus can alter conditions of employment even if only perpetrated by a co-worker. Larson, Employment Discrimination § 46.05[3][b] (2d ed. 2012).[8] "[A] few severe incidents can create a hostile work environment, while lesser acts can also create such an environment if greater in number." *Etefia v. East Baltimore Community Corp.*, 2 F. Supp. 2d 751, 758 (D. Md. 1998) (ten comments over three years, coupled with a threat to "memo [him] out of work" by supervisor sufficient to support hostile work environment claim). There is no "magic number" of incidents required. *Etefia*, 2 F. Supp. 2d at 758-59 (pervasiveness met as plaintiff testified "albeit somewhat vaguely, that comments about his heritage 'kept going on and on'"). Discriminatory harassment is sufficiently severe or pervasive where the victim subjectively perceives it to be abusive, and where a reasonable person would find it hostile or abusive. *Vaughn v. Virginia*, 2019 U.S. Dist. LEXIS 206106 *18-19 (W.D. Va. Nov. 27, 2019); *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019).

Berry endured physical assaults and physically threatening and humiliating conduct from Sealock directly related to his sexually offensive behavior. Berry SOF C-M. The disparity in power between Berry and Sealock increases the objective severity. *Okoli*, 648 F.3d at 221. Berry initially addressed the issue with Bush to no avail. Berry SOF L. Sealock's "blow job" comments to Berry

---

[8] *See Mercado v. Lynnhaven Lincoln-Mercury, Inc.*, 2011 U.S. Dist. LEXIS 122145 *17 (E.D. Va. Oct. 21, 2011) (the alleged grabbing, touching, hugging, and other inappropriate remarks could be construed reasonably as physically threatening or humiliating); *Okoli v. City of Baltimore*, 648 F.3d 216, 221 (4th Cir. 20  ) (massaging shoulders has been included in the types of conduct deemed to constitute hostile work environments).

were extremely offensive, degrading, humiliating, and disgusting, particularly in light of the context with the meme on Facebook that included insinuations that Berry had given a "blow job" to Tharpe. Berry SOF E. Sealock knew he had made "blow job" comments to Berry and vehemently denied it during the "investigation" of Berry's claim that he had. Berry SOF E.  His physical intimidation, the leering, looking Berry up and down, happened frequently. Sealock's ongoing, increasingly disturbing behavior toward Berry after the August 15 Complaint was part of the hostile work environment. Berry SOF G-K. The facts establish that her job duties were altered. Berry SOF I. Her responsibilities that required dealings with Sealock and Holloway were rendered extremely difficult because they refused to communicate with her or did so in an abusive and threatening manner. *Id.*

The hostile work environment began in January 2017 and continued through the termination of Berry's employment. All of the harassing conduct was part of the actionable hostile work environment even as to any acts outside of the 300 days from filing her Charge. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (continuing violation doctrine applies to hostile work environment claim, and evidence outside of applicable limitations period can be used to support such a claim); *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 223, n. 5 (4th Cir. 2016) (same).

The harassment Berry experienced was also pervasive. The jury must view the harassment for its cumulative effect. *EEOC v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 318 (4th Cir. 2008). This includes where the environment was pervaded with discriminatory conduct "aimed to humiliate, ridicule, or intimidate, thereby creating the abusive atmosphere." *Id.* at 316 (quoting *Jennings v. Univ. North. Car.*, 482 F.3d 686, 695 (4th Cir. 2007). Sealock's conduct was aimed at humiliating and degrading Berry. He knew it was offensive and that Berry objected to it. Berry SOF E, F, and G. Discriminatory harassment is sufficiently severe or pervasive where the victim subjectively

perceives it to be abusive, and where a reasonable person would find it hostile or abusive. *Vaughn v. Virginia*, 2019 U.S. Dist. LEXIS 206106 *18-19 (W.D. Va. Nov. 27, 2019); see also *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019). Berry's evidence and the reasonable inferences that flow from it clearly establish that she experienced severe **and** pervasive harassment.

The hostile work environment of which Berry complains is imputable to the Town. It includes harassment, gender hostility, and a course of discriminatory behavior that resulted in denial of the PIO position and the termination of Berry's employment. Sealock, the mayor and the other councilmembers individually were Berry's supervisors. Berry SOF B. Each could direct her work and affect her work environment. "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.*, 570 U.S. 421, 450 (2013). Sealock, Holloway, the mayor, and all Council did so (as did Tederick when he was town manager). Berry SOF G, H, I, K, and M. Because the Town did not raise the affirmative defense that it had exercised reasonable care to prevent and promptly correct any harassing behavior, and that Berry had failed to take advantage of preventive or corrective opportunities that were provided, the imputation of liability prong is satisfied by the acts of Sealock, Holloway, and the Town. If the jury finds that the behavior occurred, the Town is strictly liable. Additionally, the Town contends it had no control over its elected officials. Accordingly, it cannot refute its responsibility for their acts, even if they were merely agents. Berry has presented substantial evidence of pretext. Berry SOF M.

### 4. Retaliation (Count Two)

Berry suffered through numerous incidents of retaliation. Berry SOF F, G, H, I, J, K[9], and

M. The Supreme Court in *Burlington Northern & Santa Fe Ry. v. White,* 548 U.S. 53, 69 (2006)

emphasized that

> [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. (citation omitted) A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children.

The Town acknowledges that Berry engaged in protected activity, but it asserts it began with the

August 15 Complaint. Protected activity is not limited to filing formal charges or complaints of

discrimination, but includes informal protests and voicing one's own opinions in order to bring

attention to the discriminatory activities as well as complaints about suspected violations.  *Bryant*

*v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 526, 543-44 (4th Cir. 2003). Berry engaged in protected

activity when she complained to Sealock of his sexist behavior. Berry SOF F-L. When her

complaints were ignored and Sealock's conduct intensified after May 2019, she made the August

15 Complaint. This, too, was protected activity. The result was a tortured period of job threats, loss

of promotion, isolation, exclusion, hyperscrutiny, alteration of work duties that affected Berry's

job, attempted false discipline, and termination. Berry SOF G-M.

### 5.  The Threats to Berry's Job Were Materially Adverse Actions (Count Two)

The cumulative effect of several allegedly retaliatory acts must be considered to determine

whether a reasonable worker could be dissuaded from engaging in protected activity. *Smith v.*

*Vilsack*, 832 F. Supp. 2d 573, 585-86 (D. Md. 2011); *Mezu v. Morgan State Univ.*, 2014 U.S. Dist.

---

[9] *See Halliburton v. Administrative Review Board*, 771 F.3d 254 (5th Cir. 2014) (environment of ostracism well might dissuade a reasonable employee from whistleblowing where job involves collaboration).

LEXIS 52391 **10-11 (D. Md. Apr. 16, 2014); *Dyer v. Oracle Corp.*, 2016 U.S. Dist. LEXIS 167195 (D. Md. Dec. 5, 2016). "[R]etaliation may come in the form of a pattern of behavior, rather than a single discrete act." *Smith v. Vilsack*, 832 F. Supp. 2d at 586. Berry suffered discrete acts as well as an orchestrated pattern of retaliatory behavior.

Statements that can be construed as threats of termination of employment, such as telling an employee that he would "end up gone", are sufficient to constitute materially adverse actions for purposes of a retaliation claim. *Howerton v. Bd. Of Educ.*, 2015 U.S. Dist. LEXIS 109787 *54, fn. 4 (D. Md. Aug. 18, 2015); *see, e.g.*, *Maron v. Va. Polytechnic Inst. & State Univ.*, 508 Fed. App'x 226, 230-31 (4th Cir. 2013) (threats to terminate employment, including threat that plaintiff needed to "become invisible" to keep her job, were sufficient to constitute a materially adverse action). Berry endured exactly these types of materially adverse threats to her job from Sealock and Holloway. Berry SOF G. Individually, each act was materially adverse. Holloway warned her that not withdrawing the August 15 Complaint would affect her job, that Council would not put up with it, and her supervisors would want her gone. Council had just gone through an embarrassing sex scandal with Tharpe. It did not want another. Sealock demanded that Berry be penalized for her "accusations." Thompson admitted that the PIO position was not given to Berry because of the Sealock situation and "Jennifer's case." Berry SOF E, G, H.  She was excluded from closed sessions because of her harassment claims. Berry SOF I. Within days of Holloway's August 16, 2019 job threat, Sealock demanded that a penalty should be exacted on Berry for her "accusations." When Berry continued  to complain of harassment and retaliation in September and October, 2019, Tederick sent Berry a letter written by Judkins referring to a determination of Berry's "employment status." Berry viewed this as another job threat. Berry SOF G. Berry wrote to Bush twice on October 16, 2019 about ongoing retaliation to which she had been subjected since the August 15 Complaint

and the threat from Holloway the next day. The Town did not document those continuing complaints or open any type of investigation of them.  It did nothing.  Everything from the date of her complaint led inexorably to the termination of her employment.

Berry went from being the "Exceptional employee…Glue in organization" (Exh. 13, Thompson Dep. Exh. 3) to being totally expendable. This occurred almost immediately after the August 15 Complaint. The PIO position that had been slated for her was never offered to her. Berry SOF H. Temporal proximity of the adverse action to Berry's protected activity alone provides a causal connection. *Strothers v. City of Laurel*, 895 F.3d 317, 337 (4th Cir. 2018). Thompson's statement that the reason was due to the Sealock situation and Berry's "case" is direct evidence of motive and causation, but direct evidence is not needed here. The circumstances are clear. Berry complained, she was told Council would not stand for it, and to withdraw it. Berry's refusal to withdraw the complaint resulted in the termination of her employment. Berry SOF M. The purported RIF was hastily assembled by Tederick with advice of counsel the Town will not reveal but on which it relies, and shoved down Council's throat despite their request for more time to consider its ramifications and their suggestion Berry be allowed to continue as Clerk part-time. Berry SOF M. Further, Council had no idea of the costs of substituting or replacing the individuals terminated in the RIF to ensure that necessary duties and services would continue to be provided. The RIF should not have been rushed, and Berry's harassers should not have been included in the discussions that led to Berry's termination. Had Berry not been denied the PIO position after the August 15 Complaint, she would not have been subject to any RIF.  After the RIF, the social media portion of the position required between 15 and 30 hours per week. Berry SOF H.2. Had Berry been given the PIO position, she easily could have assumed the Clerk position as modified in the RIF to part-time and assimilated the duties of the PIO position, thereby continuing as a full-time employee.

37

The circumstances leading to inclusion of Berry in the RIF establish pretext. The Town never acted in an official manner to terminate Berry. There was no vote of Council. Berry SOF M. Irregularities in following established procedures is indicative of pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1299 (11th Cir. 2006); *see Barnett v. Roanoke Cnty. Sch. Bd.,* 221 U.S. Dist. LEXIS 228823 **24-25 (W.D. Va. Nov. 30, 2021) (noting that pretext may be shown through, among other things, irregularities, implausibilities, contradictions, and incoherencies). Pretext is not just an element in an artificial proof construct.  It is circumstantial evidence of discriminatory animus in and of itself.  The Fourth Circuit recently addressed the issue of pretext in *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) as follows:

> In order to show pretext, a plaintiff may show that an employer's proffered reasons for the termination are inconsistent over time, false, or based on mistakes of fact. *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001).  **Once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment.**

*Id.* (Emphasis added).  Flimsy and implausible reasons for an adverse employment action, such as that offered by the Town, also may constitute pretext. Thus, the Fourth Circuit stated in *Westmoreland v. TWC Admin.*, LLC, 924 F.3d 718, 728 fn. 4 (4th Cir. 2019):

> But nothing bars a jury from considering an employee's tenure and performance in evaluating whether her employer's justification for her termination is so flimsy as to  be *untrue* or *implausible*, and thus asserted in an attempt to mask a discriminatory motive.

Here, it is implausible that the Town had to terminate Berry when it did, days after her return from intermittent FMLA leave and directly following a continuing and unbroken course of retaliatory conduct going back to May 2019 when Sealock threatened Berry's employment. Berry was threatened with job loss on August 16, 2019 if she did not withdraw her complaint. She did not withdraw her complaint. She was fired. The fact that it was wrapped up in the guise of an RIF is of

no consequence. It was a termination directly related to the protected activity, and both Sealock and Holloway participated in the decision.

### 6.   The Retaliatory Hostile Work Environment Claim (Count Three)

The Town acknowledges the existence of Berry's claim of retaliatory hostile work environment.  It claims, though, that the numerous instances of harassment were not severe or pervasive. First, as to the denial of the PIO position and training, the reduction in her raise, altering her job duties, and the termination of her employment, there is no requirement of "severe or pervasive." Additionally, Berry was subjected to numerous instances of retaliation from May 13, 2019 until her termination at the end of January 2020 just days after her return from FMLA leave. Several of these resulted in tangible adverse employment actions that support discrimination claims as well. Berry SOF G-M. Together with all of the materially adverse actions described above, they constitute a retaliatory hostile work environment even if "severe or pervasive" is a requirement of the claim. However, a close review of the cases and statute reveals that is not required.  See *Moore v. City of Philadelphia,* 461 F.3d 331 (3d Cir. 2006) (ruling that after *Burlington Northern*, the proper standard for evaluating a retaliatory hostile environment claim was material adversity); *Smith v. RB Distrib., Inc.*, 498 F. Supp. 3d 645, 664 (E.D. Pa. 2020) (reasonable worker would be dissuaded from making or supporting a charge of discrimination in response to conduct that included "interference with his position, being told that other officers were 'out to get him,' false discipline, and another officer's involvement with plaintiff's custody battle").

The Town cites to *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 840 (E.D. Va. 2016), which relies on *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 n.5 (6th Cir. 2014), reh'g denied (Apr. 2, 2016). The footnote to which the *Hinton* court referred in *Laster* reveals the basis for the element "severe or pervasive retaliatory harassment" originates with *Morris v. Oldham County*

*Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000), a pre-*Burlington Northern* opinion. Thus, *Hinton's* reliance on this standard is misplaced and results in requiring more than material adversity sufficient to dissuade a reasonable employee from filing a charge of discrimination. Under either standard, the retaliatory hostile work environment Berry was forced to endure until the Town completed its slow but inexorable march to termination easily supports her claims under Count Three.

### 6. The FMLA Claim (Count Four)

Berry intends on dismissing this claim unless the Court grants her Rule 56(d) motion for additional time for the Court to rule on ECF No. 43.

### V.    <u>Conclusion</u>

WHEREFORE, for the foregoing reasons and any additional reasons to be argued at any hearing, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment and grant such other and further relief as the Court deems just.

JENNIFER BERRY BROWN
By:    /s/Timothy E. Cupp
         Counsel

| | |
|---|---|
| Timothy E. Cupp (VSB No. 23017) | Tim Schulte (VSB No. 41881) |
| Shelley Cupp Schulte, P.C. | Shelley Cupp Schulte, P.C. |
| 1951-D Evelyn Byrd Avenue | 3 West Cary Street |
| Post Office Box 589 | Richmond, Virginia 23220 |
| Harrisonburg, Virginia 22803 | (804) 644-9700 |
| (540) 432-9988 | (804) 278-9634 (facsimile) |
| (804) 278-9634 (facsimile) | Email: schulte@scs-work.com |
| Email: cupp@scs-work.com | *Counsel for Plaintiff* |

CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2022, the foregoing was delivered through the CM/ECF system to be forwarded electronically to: Heather K. Bardot, Esquire, McGavin, Boyce, Bardot, Thorsen & Katz, P.C., 9990 Fairfax Boulevard, Suite 400, Fairfax, Virginia 22030, HBardot@mbbtklaw.com.

/s/Timothy E. Cupp
